**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GROUPON, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SUNG SHIN, | ) |
| | ) |
| Defendant. | ) |

## VERIFIED COMPLAINT

Plaintiff Groupon, Inc. ("Groupon") for its Complaint against Defendant Sung Shin ("Shin"), states as follows:

## INTRODUCTION

1.      In direct violation of a valid and reasonable contract, Groupon's Vice President – Global Head of Advertising and Ancillary Revenue, Shin, has resigned from Groupon to join a direct competitor, Yelp, Inc. ("Yelp").  By working for Yelp, Shin will breach his valid and enforceable Confidentiality, Intellectual Property and Restrictive Covenants Agreement (the "Agreement") with Groupon.  A true and correct copy of the Agreement is attached hereto as Exhibit A.  Yelp uses a near-identical advertising and marketing platform to compete in connecting consumers to businesses.  Groupon and Yelp compete for the same merchants and clients and limited merchant and client spend.  Groupon only seeks to prohibit Shin from working for a competitor in a role that is violative of the Agreement and which will require him to inevitably use and disclose Groupon's trade secrets and proprietary and confidential information.  Groupon offered Shin the opportunity to stay employed at Groupon, and it even offered Shin the opportunity to stay on at Groupon until he found a non-competitive role (so he would be gainfully employed at a salary of $275,000 with potential for a bonus, a $100,000 sign-on bonus, and $700,000 in

Restricted Share Units, and full benefits while he searched for another role). Shin rejected all overtures, and notably, still refused to repay his $100,000 sign-on bonus despite his resignation per the terms of his offer letter.

2.      In his high-level strategic advertising role with Yelp, Shin will use and/or disclose Groupon's highly technical and hard-earned confidential and proprietary information and trade secrets for Yelp's benefit. Shin's presence will allow Yelp to unfairly compete with Groupon without having to do the trial and error work, develop and nurture merchant and client relationships and their advertising objectives, or make the substantial product and service development and enhancement investment itself. This is precisely what Shin agreed not to do when he accepted his employment and executed his Agreement with Groupon.

3.      Shin's efforts to contravene his contractual obligations to Groupon will irreparably harm Groupon, diminish the value of Groupon's confidential and proprietary information and trade secrets, harm Groupon's relationships with its merchants and clients, and undermine Groupon's competitive edge in the specialized marketing and advertising offerings arena. Shin's unlawful activities must be enjoined.

## PARTIES

4.      Groupon, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

5.      Upon information and belief, Sung Shin was a citizen and a resident of Washington at all times relevant to this Complaint.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this District pursuant to 28 U.S.C. § 1331 because Groupon asserts a cause of action under federal law. Specifically, Groupon asserts a cause of action under

the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq*.

7.      Jurisdiction is also proper in this district pursuant to 28 U.S.C. §1332(a) because Groupon and Shin are citizens of different states, and the amount in controversy exceeds $75,000.

8.      Venue is proper in this district under 28 U.S.C. § 1391, *et seq.*, because Shin entered into a contract directly connected to Illinois and breached his contractual duties, the effects of which Groupon felt in Illinois.

## GENERAL ALLEGATIONS

**Groupon's Business**

9.      Groupon is a global scaled two-sided marketplace that connects consumers to merchants through targeted advertisements, deals, and marketing techniques.  Groupon provides consumers access to its "marketplace" through Groupon's mobile applications and its website. More fundamentally, Groupon is an online platform designed to attract multi-location and enterprise merchants and small businesses to advertise on Groupon's online platform.

10.      Consumers use Groupon's platforms to search for and discover services and deals offered by multi-location, enterprise, and small businesses.

11.      Groupon operates in three primary categories: Local, Goods, and Travel.  In these market segments, Groupon targets potential merchants and clients to spend their advertising dollars directly with Groupon to drive their specialized advertising efforts.

12.      Groupon's Local category is its largest and most profitable.  This category includes offerings from local and national merchants, and comprises multiple verticals of local experiences, including events and activities; health, beauty, and wellness; food and drink; home and garden; and automotive.

13. Groupon's Goods category offers a marketplace for third-party merchants to sell products to customers.

14. Groupon's Travel category features travel offers at both discounted and market rates, including hotels, and package deals covering both domestic and international travel.

15. Groupon leverages its Local, Goods, and Travel categories by providing its merchants and clients targeted and specialized advertising. Such advertising focuses on curated and Groupon-perfected forms of cost per click, cost per impression, and cost per action advertising.

16. Groupon utilizes Programmatic Advertising. Programmatic Advertising uses software specially coded to follow trends and patterns within a consumer's search history in order to display targeted advertisements within Groupon's website to drive impressions at scale. For instance, if a consumer visits a website for a credit card, a credit card advertisement from that website then will appear on Groupon's website the next time the consumer visits the site.

17. Groupon also utilizes Pay for Performance Advertising. Through these advertisements, Groupon earns a percentage of the amount the consumer spends on the merchant's website after clicking on the merchant's advertisement featured on Groupon's website.

18. Groupon uses innovative marketing and advertising strategies to promote its merchants' and clients' offerings to potential customers and to reach consumers throughout the purchase cycle.

19. Groupon depends greatly on its relationships with its merchants and clients and its intimate knowledge of its merchants' and clients' needs, which it has compiled over the course of many years at great time and expense to develop and offer competitive advertising services and products.

20.     Groupon is continually perfecting and adapting its marketing and advertising strategies based on its particular and potential merchants and clients.

**Shin's Employment with Groupon**

21.     Shin served as Groupon's Vice President – Global Head of Advertising and Ancillary Revenue from March 2021 to November 2021.  In this capacity, he led Groupon's advertising business.

22.     On February 25, 2021, Groupon tendered an offer of employment to Shin through an Offer Letter (the "Letter").  The Letter expressly provided Groupon's offer of employment was contingent upon Shin's acknowledgement, and execution, of the Agreement. *See* Offer Letter, attached hereto as Exhibit B.

23.     Due to the exigencies of the COVID-19 pandemic, Shin remotely interviewed for the position.  The Groupon employees who interviewed him were based in Illinois, except for one who was based in France.  Shin commenced his employment remotely.

24.     The Letter detailed that Shin's annualized base salary would be $275,000.  *See* Exhibit B.

25.     The Letter further detailed Shin's eligibility to participate in Groupon's Annual Bonus Plan with an annual Target Bonus equal to 40% of his base salary. *See* Exhibit B.  Groupon paid Shin $45,205 of his annual bonus in approximately August 2021.

26.     The Letter further detailed Groupon's grant to Shin of Restricted Share Units valued at $700,000, which was contingent upon his acknowledgement and execution of the Agreement. *See* Exhibit B.

27.     The Letter also detailed Groupon's grant to Shin of a sign-on bonus of $100,000, identified as additional consideration for the Agreement, which was also contingent upon his

execution of the Agreement.  *See* Exhibit B.

28.     On February 25, 2021, at the time Groupon tendered Shin the Letter, and prior to his acceptance of Groupon's offer of employment, Groupon also tendered to him the Agreement.

29.     Shin signed the Letter on February 25, 2021.  *See* Exhibit B.

30.     Shin commenced employment with Groupon on March 23, 2021.

31.     On March 30, 2021, Groupon paid Shin the $100,000 sign-on bonus as additional consideration for the Agreement.

32.     On May 3, 2021, Shin signed the Groupon, Inc. 2011 Incentive Plan Notice of Restricted Share Unit Award and the Groupon, Inc. 2011 Incentive Plan Restricted Share Unit Award Agreement.  *See* RSU Notice and Agreement, attached hereto as Exhibit C.  In further consideration of his execution of the Agreement, Groupon granted Shin 12,613 restricted share units on April 21, 2021.  *See* Exhibit A; Exhibit B; Exhibit C.

33.     On November 10, 2021, after Shin refused Groupon's offer to remain employed and not go to Yelp (and even after offering him the ability to stay employed while he searched for a non-competitive role, if he did not want to work at Groupon), Groupon requested Shin repay the sign-on bonus per the terms of the Letter.  Shin refused to repay the sign-on bonus and reiterated his intent to commence employment with Yelp.

34.     Groupon spent a considerable sum to recruit Shin based on his expertise in advertising.  Specifically, Groupon paid a third-party recruiter, Talentfoot, 25% of Shin's base salary, totaling $68,750, which is no longer recoupable.  Groupon hired Shin to develop, lead, and guide Groupon's advertising strategies and plans on a granular level and with a global viewpoint. Shin worked as Groupon's advertising subject matter expert.  Groupon provided Shin with specialized training and gave him access to its most intimate marketing data and information,

including Groupon's revenue, present and historical advertising methods and strategies, and long-term plans, so he could develop Groupon's multi-year advertising plan and day-to-day advertising strategies.

35.     This is not the "creative" advertising that one may associate with a creative campaign or otherwise.  This is the critical, business-side of advertising, which by its nature requires intimate knowledge of confidential customer and merchant information to drive engagement, overcome objections, and increase merchants to commit their limited marketing budgets to Groupon vis-a-vis other competitors vying for those marketing dollars.

36.     The information to which Shin had access focused on Groupon's specialized methods for advertising, including cost per click, cost per impression, cost per action, and redemption, including consumer online appointment setup and redeeming Groupon in-store, as well as each method's effectiveness with respect to Groupon's individual merchants and clients.

37.     Shin was Groupon's advertising architect.  Shin's primary role at Groupon was to build and implement the Company's advertising strategy by carefully consulting with Groupon's sales and production teams as well as its business operations.  As a part of his role, he solicited proprietary feedback from these teams to tailor the Company's advertising pitches and overall strategy to Groupon's former, current, and prospective advertising clients.  Armed with this confidential information, Shin fused his advertising expertise with the knowledge he acquired from Groupon's sales, products, and business operations teams to ensure a successful and strategic advertising campaign for Groupon's platform for years to come.

38.     Through Shin's work at Groupon, he learned the identities of Groupon's former, current, and prospective advertising clients and merchants, their advertising needs, the strategies that worked and did not work to achieve those advertising needs, their specific sales objections to

Groupon's online platform and advertising offerings. He also had intimate knowledge of Groupon's strategy in overcoming sales objections. Groupon provided Shin with its advertising strategy history and rates of success based on individual merchants and clients. Shin had access to Groupon's core advertising processes and formulae, and he used that information to work to actively define them and to create Groupon's roadmap for their implementation.

39. Groupon also provided Shin with confidential information on its global financials as well as specific advertising financial data, including merchant-by-merchant revenue generated, money spent, ad fulfillment, and return on spend. Shin had access to data including market analyses on the effectiveness of a variety of advertising strategies within different locations, geographically-based consumer survey results, repeat-consumer business experience data, average consumer spend, and merchant and client survey data on sponsored ads. This information is highly confidential, and only select individuals within the finance, sales, and advertising teams had access to it. Shin used this confidential information to create a specific and competitive advertising plan to give Groupon a competitive advantage in the advertising space over its competitors, including Yelp.

40. Although he worked for Groupon for just over seven months, Shin developed a multi-year advertising model that provided audience extension features allowing Groupon's merchants and clients to reach potential customers beyond just Groupon's website. Shin was intimately involved in this specialized plan through his deep knowledge of Groupon's merchants and clients, including their identities, the strategies that worked best for them, their advertising goals, their particular needs in terms of advertising, and how Groupon has, thus far, met their needs through customized advertising techniques, plans, and budgets.

41.     Throughout his tenure at Groupon, Shin participated in multiple high-level meetings where specific performance, sales, advertising, and strategy details were discussed with key team leads and top executives at Groupon.  These confidential meetings included Groupon's Global Weekly Business Reviews and Monthly Business Reviews.  Through these meetings with Groupon's top executives and leaders, Shin learned the precise account margins, metrics, and growth of Groupon's entire business, and not just in its advertising space.  With this holistic performance information and the individual metrics driving that performance, Shin formulated Groupon's advertising plans.

42.     Shin directly led many executive and strategy meetings regarding Groupon's advertising plan.  In particular, he led a presentation to Groupon's senior executive team on his specially-tailored multi-year advertising model.

43.     Shin regularly consulted with executives on Groupon's sales, product, engineering, marketing, research, and business operations teams to build and implement Groupon's advertising platform.  He oversaw multiple teams at Groupon including Content Marketing, Digital Advertising, Affiliates (Groupon's "Coupons" business), Content Operations, and Advertising Revenue with over thirty employees on his team.  Shin also led a group of five direct reports.  He reported to Groupon's Chief Revenue Officer, who reports directly to Groupon's Interim Chief Executive Officer.

44.     Groupon took reasonable measures to keep the advertising methods and strategies developed by and information known by Shin confidential.  Access to such information is tightly controlled by Groupon.

45.     Each individual laptop issued to a Groupon employee contains security software programs, is password-protected, and requires multiple log-ins in order to access the applications.

46.     Similarly, all mobile devices, including iPhones, Androids, and iPads, used to access Groupon's information are also required to be password protected.

47.     Moreover, Groupon requires its employees, including Shin, to sign confidentiality agreements in which they promise not to disclose Groupon's trade secret, proprietary, and confidential information.

**Shin's Agreement with Groupon**

48.     In consideration for Shin's employment with Groupon, his base salary of $275,000, his eligibility for an annual bonus, a $100,000 sign-on bonus, Restricted Share Units valued at $700,000, and access to Groupon's trade secrets and proprietary and confidential information, Shin executed the Agreement.

49.     The Agreement contains, among other things, Shin's agreement not to compete against Groupon following his separation from Groupon.  It also contains provisions to protect Groupon's Proprietary Information (as defined therein).

50.     Shin agreed to be bound by an eighteen (18) month post-employment non-competition provision, in pertinent part, as follows:

> 13.     Non-Compete, Non-Solicit of Business, Non-Solicit of Employees/Contractors and No-Hire ("Restricted Covenants").     I acknowledge and agree that during my employment and during the Restricted Period, regardless of the reason for my termination, I will not, without Groupon's consent, other than on behalf of Groupon:
>
> (a)     Directly or indirectly, and whether or not for compensation, . . . be employed by, consult with or contract with any entity which is in competition with Groupon in the Geographic Area. The restriction in the preceding sentence only applies to positions with responsibilities similar to any position I held with Groupon during the twelve (12) months preceding the termination of my employment or relationship with Groupon or in which I would have responsibility for and access to confidential information similar or relevant to that which I had access to during the twelve (12) months preceding the termination of my employment or relationship with Groupon. The Geographic Area shall mean any geographic territory where

I was assigned to work and/or over which I had responsibilities during the twelve (12) months preceding the termination of my employment or relationship with Groupon and any area within a 50-mile radius of such geographic territory;

*See* Exhibit A, ¶ 13(a).

51.     The Agreement defines the Restricted Period:

12.     Restricted Period. I agree that the Restrictive Covenants in this Section II shall apply during my employment and during the "Restricted Period." The "Restricted Period" begins as of the date I cease to be employed by Groupon and is defined as eighteen (18) months from the Date of Termination. Date of Termination is the date recorded in Groupon's internal Human Resources Information Systems that my employment was terminated with Groupon.

*See* Exhibit A, ¶ 12.

52.     As it relates to Groupon's Proprietary Information, the Agreement provides:

2.     Ownership and Confidentiality of Proprietary Information.

. . .

(b)     At all times, both during my employment by Groupon and after termination of such employment, I will keep in confidence and trust all Proprietary Information, and, except as necessary to meet Groupon's business needs, I will not: (i) use any Proprietary Information; (ii) directly or indirectly permit a third party to obtain access to any Proprietary Information; or (iii) transmit or disclose any Proprietary Information to any person, concern or entity. Further, I shall not make use of any Proprietary Information, directly or indirectly, for myself or for others, including, without limitation, in connection with any other employment or consulting capacity, or in connection with soliciting Groupon's customers, prospective customers, vendors, independent contractors, consultants, or business partners or Groupon's employees.

*See* Exhibit A, ¶ 2(b).

53.     The Agreement details Proprietary Information to include:

[A]ny and all technical and non-technical information including patent, copyright, trademark, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, business methods, processes, apparatus, equipment, algorithms, software programs, domain names, social media handles, code, software source documents, flowcharts,

tools, architectures, databases, menu layouts, routines, formats, data compilers and assemblers, and formulae related to the current, future and proposed products and services of Groupon or its subsidiaries, and including, without limitation, respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, job histories, job performance and salary information of employees, business forecasts, sales and merchandising and marketing plans and information. "Proprietary Information" also includes proprietary or confidential information of any third party who may disclose such information to Groupon or to me under any obligation of confidentiality in the course of Groupon's business.

*See* Exhibit A, ¶ 1.

54.     Shin acknowledged the covenants within the Agreement were reasonable based on the nature of Groupon's business, the valuable relationships Groupon has with its merchants and clients, and his knowledge of Groupon's business, including Groupon's trade secrets. *See* Exhibit A, ¶ 14.

55.     Shin also agreed that violations or attempted violations of his contractual obligations would cause irreparable and continuing damage to Groupon for which there would be insufficient adequate remedy at law. He further agreed Groupon would be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper if he violated his contractual obligations to Groupon. *See* Exhibit A, ¶ 20.

56.     Shin further agreed that if Groupon was successful in enforcing any portion of the Agreement, Groupon shall be entitled to all of its reasonable attorney's fees and costs incurred as a result of enforcing the Agreement. *See* Exhibit A, ¶ 20.

57.     Shin further acknowledged and represented that he has substantial material connections to Illinois by way of his employment with Groupon. He acknowledged the Agreement would be governed by Illinois law, and he irrevocably consented to the exclusive personal and subject matter jurisdiction of the federal and state courts located in Illinois. He further agreed that

the forum for any disputes arising out of the Agreement would be in the federal and state courts in Illinois. *See* <u>Exhibit A</u>, ¶ 23.

58.     Prior to his resignation from Groupon, Groupon reminded Shin of his post-employment contractual obligations.  Groupon had a meeting with Shin to discuss his post-employment commitments to Groupon.

59.     On November 3, 2021, Groupon's counsel sent Shin a letter reminding him of his post-employment obligations to Groupon and informing him that his planned employment with Yelp would undoubtedly constitute a direct violation of his contractual obligations to Groupon. Groupon's counsel also sent the letter to Yelp's Chief Administrative Officer, and Yelp's in-house counsel acknowledged receipt of the letter.  A true and correct copy of the November 3, 2021 letter is attached hereto as <u>Exhibit D</u>.  In the letter to Shin and Yelp, Groupon outlined its position that going to work for Yelp would violate the non-compete.  Groupon did not want to leave Shin without options and offered Shin the ability to stay employed at Groupon with his full salary, bonus, equity, and benefits intact.  Groupon also offered, in the event Shin still wanted to leave, the opportunity to work at Groupon while he searched for a non-competitive role (of which there are many available) with the same pay and benefits.  Shin refused all of these options.

60.     Shin announced his resignation on October 29, 2021.  He effectively resigned his employment from Groupon on November 12, 2021, while at the same time refusing to repay his sign-on bonus of $100,000.

**Yelp's Business**

61.     Shin told Groupon he was leaving to work for Yelp in a high-level role to Lead Product Management for Yelp's Enterprise and Multi-Location - Yelp Audiences and In-store Measurement Group.  In this role, Shin will be required to provide expertise concerning marketing

and advertising strategies to make Yelp's products and services competitive with similar platforms, namely Groupon.

62. Shin's role at Yelp will require him to develop advertising solutions for Yelp's enterprise merchants, the same merchants Groupon targets and for which it competes, and about which Shin acquired intimate knowledge during his employment at Groupon.

63. At its core, Yelp is a "marketplace," like Groupon, that provides marketing and advertising products to help its merchants and clients reach large audiences, advertise their products, and drive conversion of their services.

64. Like Groupon, Yelp helps businesses connect and engage with consumers. More specifically, it provides targeted and specialized advertising services intended to draw in consumers for its merchants and clients based on collected, processed, and analyzed information concerning the consumer and his or her likelihood to be attracted to such advertisement.

65. As stated in Yelp's 10-Q filed on November 5, 2021, "We generate substantially all of our revenue from the sale of performance-based advertising products, which our advertising platform matches to individual consumers through auctions priced on a cost-per-click ("CPC") basis." *See* Yelp's 10-Q, attached hereto as <u>Exhibit E</u>. Groupon similarly generates revenue through such performance-based advertising products.

66. Similar to Groupon, Yelp provides marketing and advertising services and products in a wide array of enterprise and small business verticals.

67. More specifically, Yelp provides a "marketplace" for local consumers to connect with enterprises and small businesses in a data-driven advertising scheme intended to drive visibility, sales, and revenue based on verticals such as food and drink, health, beauty, home, and auto.

68. Consumers specifically utilize Yelp's platforms to search for, discover, and engage with enterprise and small businesses in order to ultimately purchase their services and deals, primarily in the food and drink, home services, beauty, health, and wellness verticals.

69. Yelp, like Groupon, has a built-in consumer base that specifically utilizes Yelp's platforms to connect, discover, and engage with enterprise and local verticals. This feature is particularly attractive to the merchants and clients for whom Yelp and Groupon compete, as both companies provide strategic advertising solutions to drive merchant impressions, revenue, and sales far beyond the already unique, built-in exposure to consumers the companies offer their merchants and clients.

70. Yelp also now competes with Groupon in the same enterprise and local verticals.

71. Groupon and Yelp compete for the same merchants and clients, and the same merchants and clients spend their limited advertising dollars in the same targeted marketing and advertising space Groupon and Yelp lead.

72. Groupon historically has considered Yelp to be one of its primary competitors. *See* Brand Team Hot Sheet, Slide 13, attached hereto as <u>Exhibit F</u>.

73. Yelp offers "deals" on its online marketing platform, which Yelp describes as "discounted vouchers that customers can purchase for [merchant] business[es]." This is exactly the core product in which Groupon specializes and offers its merchants and clients. *See* https://www.yelp-support.com/article/How-do-I-post-a-Yelp-Deal-or-Gift-Certificate?l=en_US (last visited November 12, 2021).

74. As based on mobile reach, Yelp and Groupon compete directly to be the "leading local guide," connecting consumers to merchants directly. *See* December 2017 ComScore, attached hereto as <u>Exhibit G</u>. Groupon and Yelp both have consumer-driven blogs, showcasing

the gamut of merchant products and services, from wellness products to food and beverage locales. *See* https://www.groupon.com/thegist/ (showcasing food and beverage guides, such as "Phoenix Phoodies: These Are the 10 Best Restaurants in the Valley of the Sun") (last visited November 12, 2021); https://blog.yelp.com/category/community/ (highlighting locale-driven food and beverage spots, such as "A vegan road trip through the Midwest") (last visited November 12, 2021).

75.     Multiple analyst reports characterize Groupon and Yelp as competitors within the same uniquely-defined business space.  For example, in Aegis Capital Corp.'s October 2019 report, it stated, "These [Groupon and Yelp] are two of the best-known brands addressing the online local services market - both with high brand awareness and a shared vision of connecting consumers with local businesses."  *See* Aegis Capital Report, attached hereto as <u>Exhibit H</u>.  In D.A. Davidson & Co.'s April 2020 report, it stated, "As we have noted in our weekly reports on the impact of the coronavirus outbreak on the Consumer Technology sector, we see [Groupon] and [Yelp] having the greatest risk because local businesses are their lifeblood."  *See* D.A. Davidson's Report, attached hereto as <u>Exhibit I</u>.

76.     Even a simple Google search for "Groupon" and "Yelp" results in several websites describing Groupon and Yelp as competitors.  *See, e.g.*, https://www.uschamber.com/co/good-company/the-leap/yelp-small-business-features (last visited November 12, 2021); https://venturebeat.com/2010/08/26/yelps-groupon-like-deals-go-live-in-san-diego/ (last visited November 12, 2021).

77.     Through years of experience, trial and error, and research and development, Groupon has developed advertising strategies and techniques that allow it to provide superior targeted advertising services to its merchants and clients.  Groupon has invested years of time and substantial resources cultivating and studying its merchant and client relationships and maintaining

existing relationships based on the quality and innovativeness of its offerings, as well as enterprise merchants' and small businesses' responses and/or objections to Groupon's advertising pitches. Groupon's wealth of information and data included merchant and client spend metrics within different markets, revenue based on different demographics of consumers, and strategies tailored on each merchant's and client's specific needs.

78.     Shin will necessarily use his knowledge of Groupon's historical advertising strategies, including what merchants and clients were targeted, how they were targeted, and the effectiveness of Groupon's advertising strategies for such merchants and clients, detailed financial data, and client and merchant preferences, and his development and implementation of a multi-year strategic advertising model for Groupon to help Yelp develop more attractive advertising offerings for those same merchants and clients, and ultimately diminish Groupon's market share.

79.     In his role as Groupon's head of advertising, Shin was the lead architect for the very Groupon advertising products and services that are directly competitive with Yelp.

80.     Shin himself identified and referenced Yelp as a Groupon competitor multiple times.  *See* August 2021 Email, attached hereto as Exhibit J; May 2021 Email, attached hereto as Exhibit K.  In one email, Shin discussed Yelp's "Yelp Audiences" platform.  This is the very group Shin will lead at Yelp as its Lead Product Management for Yelp's Enterprise and Multi-Location - *Yelp Audiences* and In-store Measurement Group. (emphasis added).  Shin compared it to Groupon, stating that it "aligns with the data roadmap we [Groupon] built out."  *See* Exhibit J.

81.     Shin's multi-year advertising model and day-to-day advertising strategies are the exact initiatives Yelp can implement to unfairly compete with Groupon for the same advertising spend.

82.     Shin's role at Yelp will necessarily use and reference his knowledge of Groupon's trade secrets and proprietary and confidential information.  Yelp will undoubtedly advance its efforts by using Shin to implement the advertising strategy that works for Groupon and to avoid the advertising strategy that has not worked for Groupon.

**COUNT I**
**Breach of Contract – Non-Compete**
**(Injunctive Relief and Damages)**
**Against Shin**

83.     Groupon realleges and incorporates by reference Paragraphs 1 through 82 as though fully set forth herein.

84.     The Agreement is a valid and enforceable contract.

85.     In consideration for entering into the Agreement, Groupon provided Shin a base salary of $275,000, eligibility for an annual bonus, a $100,000 sign-on bonus, Restricted Share Units valued at $700,000, and access to Groupon's trade secrets and proprietary and confidential information.

86.     Among other obligations under the Agreement, Shin agreed and was obligated, for a period of eighteen (18) months following the separation of his employment, not to directly or indirectly be employed by an entity in competition with Groupon in the Geographic Area.

87.     The restriction is narrowly tailored and only applies to positions with responsibilities similar to any position Shin held with Groupon during the twelve (12) months preceding the termination of his employment with Groupon or in which he would have responsibility for and access to confidential information similar or relevant to that which he had access to during the twelve (12) months preceding the termination of his employment with Groupon.

88.    The Geographic Area is narrowly defined as any geographic territory where Shin was assigned to work and/or over which Shin had responsibilities during the twelve (12) months preceding the termination of his employment or relationship with Groupon and any area within a 50-mile radius of such geographic territory.

89.    The temporal scope of eighteen (18) months is reasonable and limited to the extent necessary to protect Groupon.

90.    The terms of the Agreement are not greater than required for the protection of Groupon's legitimate business interests, including its trade secrets and proprietary and confidential information, and the valuable relationships it has cultured with its merchants and clients, which were developed at considerable expense, time, and difficulty.

91.    Shin breached the Agreement by leaving Groupon to join Yelp, a direct competitor of Groupon, in a position with responsibilities similar to his position at Groupon.  Shin's position at Yelp will involve the use or disclosure, or the likelihood of the use or disclosure, of Groupon's proprietary information.

92.    Yelp competes against Groupon for the same merchants and clients in the specialized marketing and advertising space.

93.    Shin knew he had a duty not to compete against Groupon, and Groupon reminded Shin of his post-employment obligations prior to his resignation.

94.    Groupon has fully performed its contractual obligations to Shin under the Agreement.

95.    Groupon will continue to suffer damages as a result of Shin's breach of contract, including without limitation, diminishing value of Groupon's trade secrets and confidential and proprietary information, harm to Groupon's relationships with its merchants and clients by unfairly

competing for the same merchant and client spend, and undermining Groupon's competitive edge in the specialized marketing and advertising space.

96.     Groupon's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

97.     Shin's actions will continue to cause harm to Groupon if not restrained.

98.     Groupon has demonstrated that Shin, unless restrained, has already and will continue to engage in conduct that breaches the Agreement.

99.     The terms of the Agreement do not pose an undue hardship on Shin.

100.     The Agreement is not injurious to the public.

101.     Should this Court grant injunctive relief to Groupon, the burden on Shin would be slight compared to the injury to Groupon if it is not granted.  No injury to Shin would result from an order requiring him to comport his actions under the Agreement.

102.     The grant of an injunction will not disserve the public interest.

**WHEREFORE**, Groupon prays for judgment against Shin and requests the Court grant the following relief:

A. Entry of a Temporary Restraining Order against Shin, consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

B. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Defendant, enjoining Defendant from breaching his non-competition obligations contained in the Agreement, and any other applicable relief as set forth in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

C. Entry of a declaratory judgment in favor of Plaintiff, and against Shin, finding that the

conduct complained of is illegal and unfair and violates the Agreement between the parties;

D. For actual, compensatory and exemplary damages to be determined at trial;

E. For reasonable attorneys' fees, costs and expenses incurred in enforcing the Agreement; and

F. Such other and further relief the Court deems as just.

## COUNT II
### Breach of Contract – Failure to Repay Sign-on Bonus
### (Damages)
### Against Shin

103.    Groupon realleges and incorporates by reference Paragraphs 1 through 102 as though fully set forth herein.

104.    The Letter is a valid and enforceable contract.

105.    In consideration for entering into the Agreement, Groupon provided Shin, *inter alia*, a $100,000 sign-on bonus.

106.    Shin acknowledged as much by executing the Letter and accepting employment with Groupon.

107.    By signing the Letter, Shin agreed and was obligated to repay the gross amount of the sign-on bonus by his last day of employment if his employment with Groupon terminated for any reason within two years.

108.    Shin's employment with Groupon terminated within one year.

109.    Shin was required to repay 100% of the gross sign-on bonus because his employment terminated within one year.

110.    Groupon requested Shin repay the sign-on bonus per the terms of the Letter, and Shin refused to do so.

111.     Shin breached the Letter by failing to repay the gross amount of the sign-on bonus.

112.     Groupon has fully performed its contractual obligations to Shin under the Letter.

113.     Groupon has suffered damages as a result of Shin's breach of contract.

**WHEREFORE**, Groupon prays for judgment against Shin and requests the Court grant the following relief:

A.  For actual, compensatory and exemplary damages to be determined at trial; and

B.  Such other and further relief the Court deems as just.

**COUNT III**
**Violation of the Illinois Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against Shin**

114.     Groupon realleges and incorporates by reference Paragraphs 1 through 113 as though fully set forth herein.

115.     The Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*, prohibits the misappropriation of trade secrets.  Under the Act, a trade secret means "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by others who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  *Id.*

116.     Under the Act, misappropriation means any of the following: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) Disclosure or use of a trade secret of another without the express or implied consent by a person who: (a) Used improper means to acquire knowledge of the trade secret; (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the

trade secret was: (1) Derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake." *Id.*

117.     Shin had access to Groupon's marketing and advertising strategies, methods, and techniques.  Shin also had knowledge and access to intimate merchant and client data, including their identities, the strategies that worked best for them, their advertising goals, their particular needs in terms of advertising, and how Groupon has, thus far, met their needs through customized advertising techniques, plans, and budgets.  Groupon further provided Shin with detailed and confidential financial data concerning Groupon's account margins, metrics, and growth.  Shin had access to data including market analyses on the effectiveness of a variety of advertising strategies within different locations, geographically-based consumer survey results, repeat-consumer business experience data, average consumer spend, and merchant and client survey data on sponsored ads.  Shin developed and had access to and knowledge of Groupon's multi-year advertising model and day-to-day advertising strategies, access to which is limited to Groupon's high-level executive and management team only.

118.     This information constitutes trade secrets under Illinois law because it provides independent economic value from not being generally known to others, such as Yelp, who can obtain economic value from its use.  If a competitor, such as Yelp, obtained this information, it could target Groupon's current and prospective merchants and clients and, among other things, unfairly diminish Groupon's market share in the limited and tightly competitive market for advertising revenue from merchants and clients.

119.    This information also gives Groupon a competitive edge over its competitors, including Yelp.

120.    Groupon takes reasonable measures to protect the secrecy of its trade secrets.

121.    Groupon's employees, including Shin, are required to enter into comprehensive confidentiality agreements to protect Groupon's trade secret, confidential, and proprietary information.

122.    Access to the information is tightly controlled by Groupon.  In fact, Shin was the lead architect developing the specific, granular details of the advertising plan he developed specifically for Groupon.

123.    Each individual laptop issued to a Groupon employee contains security software programs, is password-protected, and requires multiple log-ins in order to access the applications.

124.    Similarly, all mobile devices, including iPhones, Androids, and iPads, used to access Groupon's information are also required to be password protected.

125.    Shin knew he had a duty to maintain the secrecy and confidentiality of Groupon's trade secrets due, in part, to his obligations under the Agreement.  Groupon reminded Shin of his post-employment obligations by letter prior to his resignation.

126.    Shin also knew he had a duty to maintain the secrecy and confidentiality of Groupon's trade secrets due to his position as Groupon's advertising architect.

127.    Shin's high-level strategic advertising role with Yelp features the same or similar duties and responsibilities as his role with Groupon.

128.    In his role at Yelp, Shin will not be able to separate himself from the knowledge he learned about Groupon's trade secrets and proprietary and confidential information, including Groupon's specialized marketing and advertising strategies, methods, and techniques, intimate

merchant and client data, including their identities, the strategies that worked best for them, their advertising goals, their particular needs in terms of advertising, and how Groupon has, thus far, met their needs through customized advertising techniques, plans, and budgets, detailed financial data concerning Groupon's account margins, metrics, and growth, and Groupon's multi-year advertising model and day-to-day advertising strategies, which he developed.

129.     Shin will inevitably and immediately use and continue to use Groupon's trade secret information relating to Groupon's granular financial data and marketing and advertising strategies, methods, and techniques that he himself developed and enhanced during his employment with Groupon, for the benefit of Yelp, Groupon's direct competitor. Shin will inevitably and immediately use Groupon's trade secrets without consent of any kind for Yelp's financial gain.

130.     Shin's extensive knowledge of Groupon's confidential and proprietary information relating to its granular financial data and marketing and advertising strategies, methods, and techniques will allow a competitor, including Yelp, to irreparably harm Groupon's business because Groupon and Yelp compete for the same merchants and clients in the specialized marketing and advertising space.

131.     Shin is armed with the technical and insider knowledge to help a competitor, particularly Yelp, develop and enhance its advertising service and product offerings to unfairly compete against Groupon.

132.     Defendant's actions constitute threatened misappropriation in violation of the ITSA.

133.     Defendant's actions constitute a willful and malicious violation of the ITSA.

134. Groupon has suffered and will continue to suffer damages and irreparable harm as a result of Defendant's actions, including without limitation, diminishing value of Groupon's trade secret, confidential, and proprietary information, harm to Groupon's relationships with its merchants and clients by unfairly competing for the same merchants and clients and limited merchant and client spend, and undermining Groupon's competitive edge in the specialized marketing and advertising space.

135. Groupon is entitled to actual damages and punitive damages from Defendant, and for attorneys' fees.

136. Groupon's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

137. Defendant's actions will continue to cause irreparable harm and damages to Groupon and its trade secret information if not restrained.

**WHEREFORE**, Groupon prays for judgment against Shin and requests the Court grant the following relief:

A. Entry of a Temporary Restraining Order against Defendant, consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

B. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Defendant, enjoining Defendant from using, referencing or disclosing Plaintiff's trade secrets under the Illinois Trade Secrets Act, and any other applicable relief as set forth in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

C. For actual, compensatory and exemplary damages to be determined at trial;

D.  For reasonable attorneys' fees, costs and expenses; and

E.  Such other and further relief the Court deems as just.

<u>COUNT IV</u>
**Violation of the Defend Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against Shin**

138.     Groupon realleges and incorporates by reference Paragraphs 1 through 137 as though fully set forth herein.

139.     The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

140.     Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3) (as amended).

141.     Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by

improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5) (as amended).

142. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6) (as amended).

143. Shin had access to Groupon's marketing and advertising strategies, methods, and techniques. Shin also had knowledge and access to intimate merchant and client data, including their identities, what strategy did or did not work with which merchant, each merchant's and client's particularities, pricing information, objections raised by merchants and clients, and Groupon's solutions to specific merchant and client objections. Groupon further provided Shin with detailed and confidential financial data concerning Groupon's account margins, metrics, and growth. Shin had access to data including market analyses on the effectiveness of a variety of advertising strategies within different locations, geographically-based consumer survey results, repeat-consumer business experience data, average consumer spend, and merchant and client

survey data on sponsored ads. Shin developed and had access to and knowledge of Groupon's multi-year advertising model and day-to-day advertising strategies, access to which is limited to Groupon's high-level executive and management team only.

144. This information gives Groupon a competitive edge over its competitors, particularly Yelp.

145. This information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. If a competitor, particularly Yelp, obtained this information, it could target Groupon's current and prospective merchants and clients and, among other things, unfairly diminish Groupon's market share.

146. Groupon took reasonable steps to keep this information secret.

147. Shin knew he had a duty to maintain the secrecy of Groupon's trade secrets and proprietary information, and Groupon reminded Shin, by letter, of his obligations to maintain the secrecy of this information prior to his resignation.

148. Groupon employees, including Shin, are required to enter into comprehensive confidentiality agreements to protect Groupon's trade secret, confidential, and proprietary information.

149. Access to the information is tightly controlled by Groupon. Shin was the lead architect developing the specific, granular details of the advertising plan he developed specifically for Groupon.

150. Each individual laptop issued to a Groupon employee contains security software programs, is password-protected, and requires multiple log-ins in order to access the applications.

151. Similarly, all mobile devices, including iPhones, Androids, and iPads, used to access Groupon's information are also required to be password protected.

152. Shin's high-level strategic advertising role with Yelp features the same or similar duties and responsibilities as his role with Groupon.

153. In his role at Yelp, Shin will not be able to separate himself from the knowledge he learned about Groupon's trade secrets, proprietary, and confidential information, including Groupon's specialized marketing and advertising strategies, methods, and techniques, intimate merchant and client data, including their identities, the strategies that worked best for them, their advertising goals, their particular needs in terms of advertising, and how Groupon has, thus far, met their needs through customized advertising techniques, plans, and budgets, detailed financial data concerning Groupon's account margins, metrics, and growth, and Groupon's multi-year advertising model and day-to-day advertising strategies, which he developed.

154. In violation of the Agreement, Shin will improperly use and/or Groupon's trade secret information in his capacity as an employee of Yelp, a direct competitor to Groupon, with parallel responsibilities and duties to his role at Groupon. By working at Yelp to develop the very same strategies to drive merchants to spend their limited advertising dollars at Yelp, he will be using the data and information he learned and deployed at Groupon to overcome similar challenges or objections and to develop pricing, business, and advertising strategies.

155. Shin will improperly use and disclose Groupon's trade secret information for the purpose of unlawfully using this information to benefit himself and Yelp to Groupon's detriment. Yelp competes against Groupon for the same merchants and clients in the specialized marketing and advertising space.

156. Defendant's actions constitute threatened misappropriation in violation of the DTSA.

157. Defendant's actions constitute a willful and malicious violation of the DTSA.

158. As a result of Defendant's conduct, Groupon has suffered and will continue to suffer damages and irreparable harm, including without limitation, diminishing value of Groupon's trade secret, confidential, and proprietary information, harm to Groupon's relationships with its merchants and clients by unfairly competing for the same merchants and clients and limited merchant and client spend, and undermining Groupon's competitive edge in the specialized marketing and advertising space.

159. Groupon's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

160. Defendant will continue to cause irreparable harm and damages to Groupon and its trade secrets and proprietary information if not restrained.

**WHEREFORE**, Groupon prays for judgment against Shin and requests the Court grant the following relief:

A. Entry of a Temporary Restraining Order against Defendant, consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

B. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Defendant, enjoining Defendant from using, referencing or disclosing Plaintiff's trade secrets under the Defend Trade Secrets Act, and any other applicable relief as set forth in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

C.  For actual, compensatory and exemplary damages to be determined at trial;

D.  For reasonable attorneys' fees; and

E.  Such other and further relief the Court deems as just.

## JURY DEMAND

Groupon hereby asserts its right to a trial by jury.

Dated:  November 12, 2021

Respectfully submitted,

GROUPON, INC.


By:  /s/ Kevin M. Cloutier
               One of Its Attorneys

Kevin M. Cloutier (6273805)
Shawn D. Fabian (6310637)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
Tel: (312) 499-6300
Fax: (312) 499-6301
kcloutier@sheppardmullin.com
sfabian@sheppardmullin.com