# Exhibit A

## CONFIDENTIALITY, INTELLECTUAL PROPERTY
## AND RESTRICTIVE COVENANTS AGREEMENT

In return for my new or continued employment with Groupon, Inc., its subsidiaries, affiliates, and acquired entities (collectively, "Groupon"), any other monetary benefits received at the time of signing, and other good and valuable consideration, including but not limited to employee benefits, training, career progression, promotions, access to confidential information and other monetary benefits, the receipt and sufficiency of which I hereby acknowledge, I agree to the following:

**I.      Confidentiality of Proprietary Information and Innovations**

1.      Proprietary Information.      My employment status creates a relationship of confidence and trust between Groupon and me with respect to any information that is not generally known to the public and is otherwise treated by Groupon as confidential or proprietary and is: (a) applicable to the business of Groupon or its subsidiaries; or (b) applicable to the business of any client or customer of Groupon or its subsidiaries, which may be made known to me by Groupon or by any client or customer of Groupon or its subsidiaries, or learned by me in such context during the period of my employment.

All such information has commercial value in the business in which Groupon is engaged and is hereinafter called "Proprietary Information."  By way of illustration, but not limitation, Proprietary Information includes any and all technical and non-technical information including patent, copyright, trademark, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, business methods, processes, apparatus, equipment, algorithms, software programs, domain names, social media handles, code, software source documents, flowcharts, tools, architectures, databases, menu layouts, routines, formats, data compilers and assemblers, and formulae related to the current, future and proposed products and services of Groupon or its subsidiaries, and including, without limitation, respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, job histories, job performance and salary information of employees, business forecasts, sales and merchandising and marketing plans and information.   "Proprietary Information" also includes proprietary or confidential information of any third party who may disclose such information to Groupon or to me under any obligation of confidentiality in the course of Groupon's business.

2.      Ownership and Confidentiality of Proprietary Information.

(a)      All Proprietary Information is the sole property of Groupon, Groupon's assigns, and Groupon's licensors, and Groupon, Groupon's assigns and Groupon's licensors shall be the sole and exclusive owner of all patents, copyrights, trademarks, mask works, trade secrets, domain names, social media handles and other rights in the Proprietary Information.  I hereby grant and assign to Groupon all rights, title and interest I may have or acquire in the Proprietary Information, without further consideration, including all rights to sue for past infringement. Neither the execution and delivery of this Agreement, nor the furnishing of any Proprietary Information to me by Groupon, shall be construed as granting to me either expressly, by

implication, estoppel, or otherwise, any rights or licenses in or to any Proprietary Information other than as may subsequently be executed in writing by Groupon.

(b)     At all times, both during my employment by Groupon and after termination of such employment, I will keep in confidence and trust all Proprietary Information, and, except as necessary to meet Groupon's business needs, I will not: (i) use any Proprietary Information; (ii) directly or indirectly permit a third party to obtain access to any Proprietary Information; or (iii) transmit or disclose any Proprietary Information to any person, concern or entity.  Further, I shall not make use of any Proprietary Information, directly or indirectly, for myself or for others, including, without limitation, in connection with any other employment or consulting capacity, or in connection with soliciting Groupon's customers, prospective customers, vendors, independent contractors, consultants, or business partners or Groupon's employees.  In the event I believe I must disclose or otherwise make available Proprietary Information to any third party in order to meet Groupon's business needs, I shall inform Groupon prior to any such disclosure in order that Groupon may enter into a confidentiality or similar agreement with such third party.  Notwithstanding anything in this paragraph or in this Agreement to the contrary, I understand that I may, without informing Groupon prior to any such disclosure, disclose Proprietary Information in confidence to a Federal, State, or local government official, solely for the purpose of reporting or investigating a suspected violation of law.  Without prior authorization of Groupon's legal department, however, Groupon does not authorize me to disclose to any third party (including any government official) any communications that are covered by Groupon's attorney-client privilege.

(c)     All non-disclosure obligations of paragraph 2(b) above shall apply: (i) as to Proprietary Information other than trade secrets, at all times during my employment and for two (2) years after termination of such employment; and (ii) as to trade secrets, for as long as such trade secrets retain their status as a "trade secret" under applicable law.

3.     <u>Ownership and Return of Materials</u>.  All materials (including, without limitation, documents, drawings, models, apparatus, sketches, designs, lists, emails, hard copy and electronic documents, forms, and all other media of expression) furnished to me by Groupon shall remain the property of Groupon.  Upon termination of my employment, or at any time on the request of Groupon before termination, I will promptly (but no later than five (5) business days after the earlier of said termination or Groupon's request) destroy or deliver to Groupon, at Groupon's option: (a) all materials furnished to me by Groupon, and all copies of these; (b) all media of expression which are in my possession and which incorporate any Proprietary Information or otherwise relate to Groupon's business, and all copies of these; and (c) written certification of my compliance with my obligations under this sentence.

4.     <u>Downloading, Copying or Forwarding of Groupon's Electronic Data</u>.  I agree to abide by any Groupon's policies concerning the downloading, copying and forwarding of Groupon's electronic data, including but not limited to Groupon's Information Security and Privacy Policy, Data Classification Policy, and Device Usage Policy.  During my employment and at the time of my termination, I understand and agree that Groupon has a right to inspect any personal device or electronic data storage that has been used to send/receive Groupon email, files or data, as well as any personal device or electronic data storage that has connected at any time to Groupon wi-fi, servers, or systems.  In the event such devices or storage contain any Groupon

trade secrets or Proprietary Information, I agree to facilitate the return and/or remediation of such Groupon property as may be requested by Groupon.

5.    Prior Work.  All previous work done by me for Groupon or its subsidiaries relating in any way to the conception, reduction to practice, creation, derivation, design, development, manufacture, sale or support of operations, products or services of Groupon, or by Groupon, is the property of Groupon, and I hereby assign to Groupon all of my right, title and interest in and to such previous work, without further consideration, including the right to sue for past infringement.

6.    Creative Works; Innovations.  As used in this Agreement, the term "Creative Works" means all processes, machines, manufactures, compositions of matter, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), moral rights, mask works, trademarks, trade names, trade dress, trade secrets, know-how, ideas (whether or not protectable under trade secret laws), and all other subject matter protectable under patent, copyright, moral right, mask work, trademark, trade secret or other laws, and includes without limitation all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, discoveries, artwork, software, code, software source documents, flowcharts, tools, architectures, databases, menu layouts, routines, formats, data compilers and assemblers, and designs.  The term "Innovations" means all Creative Works that relate to: (a) the business of Groupon or its subsidiaries; (b) any current, future or proposed products or services of Groupon or its subsidiaries; or (c) any product, service, or activity that is similar to or competitive with those offered or proposed to be offered by Groupon or its subsidiaries.  "Innovations" further includes "Inventions," which is defined to mean any inventions protected or protectable under the patent laws of any country.

7.    Creative Works License.  I hereby grant to Groupon and its subsidiaries a royalty free, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice all applicable patent, copyright, trademark, moral right, mask work, trade secret and other intellectual property rights relating to any Creative Works that: (a) were or are conceived, reduced to practice, created, derived, developed, owned, or made by me; (b) are not Innovations assigned to Groupon under paragraph 8; and (c) are used or incorporated with my knowledge during the term of my employment or within three (3) months thereafter, through my actions or inactions, directly or indirectly, into any operation, product or service of Groupon or its subsidiaries.  Notwithstanding the foregoing, I agree that I will not incorporate, direct, permit or allow to be incorporated, any Creative Works, which are not Innovations assigned to Groupon under paragraph 8, in any operation, product or service of Groupon or its subsidiaries without Groupon's prior written consent.

8.    Assignment of Innovations.  I hereby agree promptly to disclose and describe to Groupon, and I hereby grant and assign to Groupon or Groupon's designee, without further consideration, my entire right, title, and interest in and to: (a) with respect to Inventions, each Invention, and any associated intellectual property rights, which I may solely or jointly conceive, reduce to practice, create, derive, develop or make during the period of my employment (whether during business hours or after business hours) with Groupon, except any Invention which meets all of the following criteria (i)-(iii) (as demonstrated by me by evidence meeting the clear and

convincing standard of proof): (i) the Invention does not relate, at the time of conception, reduction to practice, creation, derivation, development, or making of such Innovation, to Groupon's business or actual or demonstrably anticipated research or development; (ii) the Invention was not developed on any amount of Groupon's time or with the use of any of Groupon's equipment, supplies, facilities or trade secret or other Proprietary Information; and (iii) the Invention did not result from any work I performed for Groupon; and (b) with respect to each of the Innovations which is not an Invention, each such Innovation, and any associated intellectual property rights, which I may solely or jointly conceive, develop, reduce to practice, create, derive, develop, or make during the period of my employment (whether during business hours or after business hours) with Groupon (collectively, the Innovations identified in clauses (a) and (b) of this paragraph 8 are hereinafter the "Groupon Innovations"). To the extent any of the rights, title and interest in and to Groupon Innovations cannot be assigned by me to Groupon under applicable law, I hereby grant to Groupon an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to Groupon Innovations can be neither assigned nor licensed by me to Groupon, I hereby irrevocably waive and agree never to assert such non-assignable and non-licensable rights, title and interest against Groupon or any of Groupon's successors in interest to such non-assignable and non-licensable rights.

9.    Future Innovations.  I recognize that Innovations or Proprietary Information that are conceived, reduced to practice, created, derived, developed, or made by me, alone or with others, within three (3) months after termination of my employment may have been conceived, reduced to practice, created, derived, developed, or made, as applicable, in significant part while employed by or working for Groupon.   Accordingly, I agree that such Innovations and Proprietary Information shall be presumed to have been conceived, reduced to practice, created, derived, developed, or made, as applicable, during my employment with Groupon and shall be deemed a work made for hire and made in the course of services rendered as an employee of Groupon and shall be the exclusive property of Groupon.   To the extent that title to such Innovations or Proprietary Information does not vest in Groupon by operation of law, I hereby assign and transfer to Groupon, its successors, legal representatives and assigns, and upon the future creation thereof automatically assign to Groupon, its successors, legal representatives and assigns, without further consideration, my entire right, title, and interest in and to any and all such Innovations or Proprietary Information, including the right to sue for past infringement of same, with no express or implied license to me except as may subsequently be executed in writing by Groupon.  The assignments of paragraph 8 and this paragraph 9 do not apply to any invention that qualifies under 765 Ill. Comp. Stat. §1060, Kan. Stat. Ann. §44-130, Minn. Stat. §181.78, or Wash. Rev. Code §49.44.140, copies of which may be found here: https://skynet.groupon.com/hr/hr_essentials_north_america/stateinventionstatutes.

10.    Cooperation in Perfecting Rights to Proprietary Information and Innovations.

(a)    I agree to perform, during and after my employment, all acts deemed necessary or desirable by Groupon to permit and assist Groupon, at Groupon's expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Proprietary Information, Creative Works, and Innovations assigned or licensed to, or whose rights are irrevocably waived and shall not be asserted against, Groupon under this Agreement.

Such acts may include, but are not limited to, execution of documents and assistance or cooperation: (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications; (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights; and (iii) in other legal proceedings related to the Proprietary Information, Creative Works, or Innovations.

(b)     In the event that Groupon is unable for any reason to secure my signature to any document required to file, prosecute, register, or memorialize the assignment of any patent, copyright, mask work or other applications or to enforce any patent, copyright, mask work, moral right, trade secret or other proprietary right under any Proprietary Information (including improvements thereof) or any Groupon Innovations (including derivative works, improvements, renewals, extensions, continuations, divisionals, continuations in part, continuing patent applications, reissues, and reexaminations thereof), I hereby irrevocably designate and appoint Groupon and Groupon's duly authorized officers and agents as my agents and attorneys-in-fact to act for and on my behalf and instead of me: (i) to execute, file, prosecute, register and memorialize the assignment of any such application; (ii) to execute and file any documentation required for such enforcement; and (iii) to do all other lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of patents, copyrights, mask works, moral rights, trade secrets or other rights under the Proprietary Information, or Groupon Innovations, all with the same legal force and effect as if executed by me.

11.     <u>No Violation of Rights of Third Parties</u>.  My performance of all the terms of this Agreement and as an employee of Groupon does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me prior to my employment with Groupon, and I will not disclose to Groupon, or induce Groupon to use, any confidential or proprietary information or material belonging to any previous employer or others. I am not a party to any other agreement which will interfere with my full compliance with this Agreement.  I agree not to enter into any agreement, whether written or oral, in conflict with the provisions of this Agreement.

## II.     **Restrictive Covenants/Notifications/Certification/Exit Interview**

12.     <u>Restricted Period</u>.  I agree that the Restrictive Covenants in this Section II shall apply during my employment and during the "Restricted Period."  The "Restricted Period" begins as of the date I cease to be employed by Groupon and is defined as eighteen (18) months from the Date of Termination.  Date of Termination is the date recorded in Groupon's internal Human Resources Information Systems that my employment was terminated with Groupon.

13.     <u>Non-Compete, Non-Solicit of Business, Non-Solicit of Employees/Contractors and No-Hire ("Restricted Covenants")</u>.  I acknowledge and agree that during my employment and during the Restricted Period, regardless of the reason for my termination, I will not, without Groupon's consent, other than on behalf of Groupon:

(a)     Directly or indirectly, and whether or not for compensation, own (other than less than 5% ownership in a publicly traded company), manage, operate, consult or

participate in the ownership, management, operation or control of, or be employed by, consult with or contract with any entity which is in competition with Groupon in the Geographic Area. The restriction in the preceding sentence only applies to positions with responsibilities similar to any position I held with Groupon during the twelve (12) months preceding the termination of my employment or relationship with Groupon or in which I would have responsibility for and access to confidential information similar or relevant to that which I had access to during the twelve (12) months preceding the termination of my employment or relationship with Groupon. The Geographic Area shall mean any geographic territory where I was assigned to work and/or over which I had responsibilities during the twelve (12) months preceding the termination of my employment or relationship with Groupon and any area within a 50-mile radius of such geographic territory;

(b)     Directly or indirectly: (i) induce or attempt to induce any merchant, customer, supplier, licensee, or business relation of Groupon to cease doing business with Groupon, or in any way interfere with the relationship between Groupon and any merchant, customer, supplier, licensee, or business relation of Groupon; or (ii) solicit or participate in soliciting the business of any then-current or prospective merchant or customer which was a merchant or customer of Groupon within one year prior to such solicitation, to purchase products or services similar to, or competitive with, the products or services then-offered by Groupon, if I had direct contact with the merchant or customer or any confidential information related to such products or services during the twelve (12) months preceding the termination of my employment or relationship with Groupon;

(c)     Solely or jointly with others, and directly by my own actions or indirectly by the actions of other people or companies acting on my behalf or at my behest solicit, encourage, or take any other action, including but not limited to, using an agent to solicit, which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee or independent contractor/consultant of Groupon to terminate his/her employment with Groupon or to cease providing services to Groupon; and

(d)     Solely or jointly with others, and directly by my own actions or indirectly by the actions of other people or companies acting on my behalf or at my behest hire, contract, take away or cause to be hired, contracted or taken away any employee or independent contractor/consultant of Groupon.

14.     <u>Reasonableness of Restrictive Covenants</u>.   I acknowledge that the Restrictive Covenants contained herein may limit and/or restrict me from soliciting talent, pursuing business relationships and/or pursuing future employment opportunities, despite the fact that those opportunities may be attractive, provide higher compensation, and may not be available at the conclusion of the Restricted Period.   I acknowledge that the Restrictive Covenants are nonetheless reasonable given the nature of Groupon's business; the valuable relationships Groupon has with its employees, contractors/consultants, merchants and customers, which were developed at considerable expense, time and difficulty; my position with Groupon; and my knowledge of Groupon's business, including Groupon's trade secrets.

15.     <u>Notifications, Certification and Exit Interview</u>.  While employed by Groupon and during the Restricted Period, I agree:

(a)     (i) To provide a copy of this Agreement to any person or entity from whom I seek work or employment as an employee, consultant, temporary worker, owner and/or independent contractor in the same or similar industry as Groupon or in a position with the same or similar job responsibilities or duties as I had at Groupon; and (ii) authorize Groupon to provide a copy of this Agreement to any such person or entity and discuss the provisions of this Agreement with said person or entity;

(b)     To identify in writing within three (3) business days of a request by a Human Resources representative: (i) all persons or entities with whom I have accepted or plan to accept employment or work as an employee, consultant, temporary worker, owner and/or independent contractor in the same or similar industry as Groupon or in a position with the same or similar job responsibilities or duties as I have/had at Groupon; and (ii) provide to Groupon a general job description identifying my title and describing my duties and responsibilities in my new engagement;

(c)     To certify my compliance with this Agreement in writing, if requested by a Human Resources representative; and

(d)     To make myself available for an exit interview with a designated Groupon representative at the time of my departure from Groupon.

## III.     **Miscellaneous Employment Provisions**

16.     <u>At-Will Employment</u>.   I will perform for Groupon such duties as may be designated by Groupon from time to time.  I agree that my employment with Groupon is for no specified term, and may be terminated by Groupon at any time, with or without cause, and with or without notice.  Similarly, I may terminate my employment with Groupon at any time, with or without cause, and with or without notice.

17.     <u>Loyalty to Groupon and Other Employment</u>.  While employed by Groupon, I will devote my full professional time, attention and loyalty to Groupon.  I will not be employed by, consult for, contract with or work for, in any capacity, any person or entity that could harm Groupon's reputation or good name or that could be detrimental to Groupon's business, including its relationship with other businesses and its employees, as determined by Groupon. Further, I will not engage in any other employment (or contractor relationship) without the prior written consent of a Groupon Human Resources Business Partner.  I understand that Groupon's Global Code of Conduct contains information about my duty of loyalty, among other things, and agree to review and abide by it.

18.     <u>Return of Equipment</u>.  Upon termination (or reassignment or at the request of Groupon, if directed), I agree to immediately return all Groupon-issued equipment, including my laptop computer, desktop computer, accessories (monitors and keyboards), tablets and cellular devices.  I understand that if I do not return such equipment or if I return such equipment damaged and/or inoperable, Groupon reserves the right to: (i) withhold my wages or other monies owed until all such materials are returned in working order or deduct from my paycheck the fair market value of the equipment, consistent with the requirements of applicable law; and/or (ii) take legal action to recover the equipment or the reasonable cost of the equipment.  I

further agree that if Groupon takes legal action and prevails in such action, I will reimburse Groupon for all costs incurred taking such action, including but not limited to, reasonable attorneys' fees and court costs.

19.    Survival.    This Agreement: (a) shall survive my employment with Groupon; (b) does not in any way restrict my right or the right of Groupon to terminate my employment at any time, for any reason or for no reason; (c) inures to the benefit of successors and assigns of Groupon; and (d) is binding upon my heirs and legal representatives.

20.    Injunctive Relief.    A breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Groupon for which there will be insufficient adequate remedy at law, and Groupon shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).    Groupon shall be irreparably harmed if I were to violate this Agreement and no bond shall be necessary by Groupon in connection with any injunctive relief obtained against me for a violation of this Agreement.    Should Groupon successfully enforce any portion of this Agreement before a trier of fact or in an arbitration proceeding, Groupon shall be entitled to all of its reasonable attorney's fees and costs incurred as a result of enforcing this Agreement against me.

21.    Consideration.    I acknowledge and agree that I have received good and valuable consideration in exchange for entering into this Agreement, including but not limited to my offer of employment, continued employment, employee benefits, training, career progression and promotions, access to confidential information and any other monetary benefits I received at the time of signing this Agreement.

22.    Notices.    Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when delivered personally; (b) by overnight courier, upon written verification of receipt; (c) by telecopy or facsimile transmission, upon acknowledgment of receipt of electronic transmission; (d) by electronic mail, upon acknowledgment of receipt of electronic submission; or (e) by certified or registered mail, return receipt requested, upon verification of receipt. Notices to me shall be sent to any address in Groupon's records or such other address as I may specify in writing.    Notices to Groupon shall be sent to Groupon's Head of Human Resources or to such other address as Groupon may specify in writing.

23.    Governing Law.    I acknowledge and represent that I have substantial material connections to Illinois by way of my employment with Groupon.    As such, I agree that this Agreement shall be governed in all respects by the laws of the United States of America and by the laws of the State of Illinois.    Each of the parties irrevocably consents to the exclusive personal and subject matter jurisdiction of the federal and state courts located in Illinois, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in Illinois, such personal jurisdiction shall be nonexclusive.    The forum for any disputes arising out of this Agreement shall be in the federal and state courts of Illinois.

24.     Severability.  If any provision of this Agreement, including but not limited to the Restrictive Covenants contained in Section II, is held by a court of law to be illegal, invalid or unenforceable, I agree that: (i) the provision shall be deemed amended to achieve as nearly as possible the same economic effect as the original provision; and (ii) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.  If any court of law finds this Agreement to be void for lack of consideration, I agree that I will be bound by any prior agreement I entered into with Groupon containing similar terms.

25.     Waiver; Amendment; Modification.  The waiver by Groupon of a term or provision of this Agreement, or of a breach of any provision of this Agreement by me, shall not be effective unless such waiver is in writing signed by Groupon.  No waiver by Groupon of, or consent by Groupon to, a breach by me, will constitute a waiver of, consent to or excuse of any other or subsequent breach by me.  Groupon's delay or failure to enforce or insist on strict compliance with any provision of this Agreement will not constitute a waiver or otherwise modify this Agreement.  Groupon's waiver of any right granted under this Agreement on one occasion will not: (a) waive any other right; (b) constitute a continuing waiver; or (c) waive that right on any other occasion.  This Agreement may be amended or modified only with the written consent of both Groupon and me.  No oral waiver, amendment or modification shall be effective under any circumstances whatsoever.

26.     Entire Agreement.  This Agreement represents my entire understanding with Groupon with respect to the subject matter contained herein and supersedes all previous understandings, written or oral, other than as provided for in paragraph 24 herein.  Excluded from the subject matter of this Agreement are any "Covered Claims" under Groupon's Mutual Arbitration Agreement.

I certify and acknowledge that I have carefully read all of the provisions of this Confidentiality, Intellectual Property and Restrictive Covenants Agreement and that I understand and will fully and faithfully comply with such provisions.

"COMPANY"                              EMPLOYEE
Groupon, Inc.

*Claudine Kourkoumelis*

Claudine Kourkoumelis              Signature: *Sung Shin*
Chief People Officer                              Sung Shin (Mar 17, 2021 08:56 PDT)
Groupon, Inc.                              Email: sunghshin@gmail.com

# Exhibit B

**GROUPON**

Thursday, February 25, 2021

Sung Shin
sunghshin@gmail.com

Sung,

Groupon, Inc. ("Groupon") is excited to formally offer you an Exempt, Regular, full-time position as a VP, Global Head of Advertising and Ancillary Revenue, reporting to Simon Goodall in Seattle, Washington. The terms of the offer are detailed below.

Your start date will be Tuesday, March 23, 2021 ("Start Date").

Please be aware that this offer is in consideration for and contingent upon: (i) your returning a signed copy of this letter to Groupon no later than 7 days from the date of this letter or 3 business days before your Start Date, whichever comes first; (ii) if applicable, the successful completion of a pre-employment background check and/or drug screen; (iii) your ability to provide appropriate proof of your identity and eligibility to work in the United States; and (iv) your acknowledgement of and agreement to the Confidentiality, Intellectual Property and Restrictive Covenants Agreement ("CIPRA") and (if applicable) the Mutual Arbitration Agreement.

Work Location
Given the pandemic and Groupon's offices are not fully opened at this time, you will be permitted to work remotely in Seattle, Washington. During this time, it is your responsibility to establish an appropriate and safe work environment and to ensure that your desk is adequate and designed to safely accommodate the equipment you will need to use.

Compensation

Your annualized base salary, prorated for your first year of employment, will be $275,000.00, less withholdings and deductions. Groupon utilizes a semi-monthly payroll (24 pay periods per year).

**Groupon Annual Bonus Plan:** In further consideration for your agreeing to the terms of the CIPRA, you will be eligible to participate in the Groupon Annual Bonus Plan (the "ABP") according to the terms and conditions as outlined in the ABP, which you will receive during your on-boarding. Your annual Target Bonus under the ABP will be equal to 40% of your base salary. Your Bonus Payment under the ABP, if any, will be prorated based on your Start Date. We are a pay-for-results company, which means your actual bonus under the ABP, if any, depends on both Groupon's overall performance and your individual performance. Additionally, your actual bonus, if any, is subject to approval by the Compensation Committee and your continuous employment through the payment date of that bonus. As such, any bonus amount is not guaranteed. Provided the Compensation Committee approves the payment of bonuses under the ABP, your bonus, less withholdings and deductions, will be paid prior to the last day of April of the following year. If your Start Date is before October 1st, you are eligible to receive a prorated ABP based on your Start Date. If your Start Date is on or after October 1st, you are not eligible to participate in the ABP until January 1st of the following year.

**Restricted Share Units ("RSUs"):** Upon approval by the Compensation Committee of the Board of Directors or via delegated authority, Groupon, Inc. will grant you RSUs valued at $700,000.00USD pursuant to the Groupon, Inc. 2011 Incentive Plan ("Plan"). The number of RSUs granted will be calculated using the average closing share price of a share of Groupon common stock from the month of your Start Date. This RSU grant will vest one-third annually over the next three years, beginning on March 20, 2022. Such vestings are contingent upon your continuous provision of material services to Groupon as of the applicable vesting dates. The award will be subject to the terms of the Plan and a form of award agreement that you will be required to sign as a condition of receiving the award.

**GROUPON**

**Sign-on Bonus:** In further consideration for your agreement to the terms of the CIPRA, you will be advanced a one-time bonus ("Sign-On Bonus") of $100,000.00 less withholdings and deductions, payable within two pay periods of your Start Date at Groupon.  Because you do not earn your Sign-On Bonus until you have been employed for two years, if your employment terminates for any reason before receiving payment of the Sign-On Bonus, you will no longer be eligible to receive the Sign-On Bonus.  If your employment terminates for any reason within one year of your Start Date, and you have received payment of the Sign-On Bonus, you will be responsible for repaying 100% of the gross Sign-On Bonus, which is due in full on your termination date.  If your employment with Groupon terminates for any reason in between your first and second anniversary, you will be responsible for repaying 50% of the gross amount of the Sign-On Bonus on your termination date.  You will have no obligation to repay the Sign-On Bonus after two years of employment with Groupon.  By signing this offer letter, you agree to the terms relating to your Sign-On Bonus.

- By signing this offer letter, you agree to the terms relating to your Sign-On Bonus**.**

Groupon reserves the right to modify the terms of your compensation and bonus opportunity in the future.

<u>Benefits</u>

You are eligible to participate in the following Groupon employee benefit plans beginning on the 1st of the month following your Start Date: medical insurance, dental insurance, vision insurance, an employee assistance program, flexible spending accounts, life insurance, short and long-term disability programs, and the 401(k) plan. You are eligible for routine time off beginning on your Start Date. Participation in any benefit program is subject at all times to the terms of any applicable plan or policy. Groupon reserves the right to modify, change, or cease these benefits or begin new benefits in the future.

At all times, your employment at Groupon will be "at will", which means either you or Groupon may end the relationship at any time, for any reason or no reason at all, with or without notice. Although your job duties, responsibilities, title, compensation, and benefits may change from time to time, only a duly authorized officer of Groupon can change the "at will" nature of your employment in an express written agreement.

By accepting this offer of employment, you represent and warrant that you will not use or disclose any confidential, proprietary, or trade secret information of any prior employer or use or disclose any information belonging to any third party that Groupon would not have the right to use without restriction.

At all times, you will be subject to all policies, procedures and practices of Groupon, including those in the Global Code of Conduct and Employee Handbook. You also agree that while employed by Groupon, you will: (i) devote your full professional time and attention to Groupon; (ii) not engage in any employment, business or activity that may harm Groupon's reputation or good name; (iii) not engage in any other employment or consult for any other business without prior written consent from Human Resources; (iv) not serve on any board of directors without prior written consent from Groupon's General Counsel; and (v) not assist any person or organization in competing with Groupon, in preparing to compete with Groupon, or in hiring any Groupon employees. If, at the time you receive this letter, you are already serving on advisory boards, non-profit boards, for-profit boards or engaged in some other employment or consulting, please disclose this to Human Resources prior to your Start Date so that those commitments can be evaluated under Groupon's Code of Conduct.

On your Start Date, please provide us with proof of identity and United States work authorization to complete the required Form I-9, Employment Eligibility Verification. Please refer to <u>https://www.uscis.gov/i-9-central/acceptable-documents/acceptable-documents</u> for a complete list of eligible documentation. Any representations that may have been made to you about the terms of your offer that are not contained in this letter are superseded by this offer, and the terms of this letter can only be modified by a written document signed by you and a duly authorized representative of Groupon.

**<u>Please signify your acceptance of this offer by signing and returning this letter to Groupon no later than 7 days from the date of issue or 3 business days prior to your start date; whichever comes first.</u>**

**GROUPON**

Thank you and congratulations!

Sincerely,

*Claudine Kourkoumelis*  Feb 25, 2021 8:37 AM

Claudine Kourkoumelis
Chief People Officer
Groupon, Inc.

Accepted By: *Sung Shin*

Sung Shin (Feb 25, 2021 06:50 PST)

# Exhibit C

**GROUPON, INC. 2011 INCENTIVE PLAN**
**NOTICE OF RESTRICTED SHARE UNIT AWARD**

The Participant (as defined herein) has been granted a Full Value Award of restricted share units ("RSUs") in Groupon, Inc. (the "Company"), subject to the terms and conditions of the Restricted Share Unit Award Agreement (the "Agreement") and the Groupon, Inc. 2011 Incentive Plan, as amended (the "Plan"), as set forth below. Capitalized terms in this Notice of Restricted Share Unit Award (this "Notice"), unless otherwise defined herein, shall have the meanings assigned to them in the Plan.

1. **Name:** SUNG SHIN (the "Participant")

2. **Total Number of RSUs:** 12,613

3. **Grant Date:** 04/21/2021

4. **Vesting:** Unless otherwise provided in the Participant's individual employment, severance or other agreement(s) with the Company, the RSUs will vest per the vesting schedule set forth below ("Vesting Date(s)"), but only if the Participant has continued to provide material services to the Company, whether as an officer, director, employee, consultant, independent contractor or agent (in "Continuous Service Status") as of each applicable Vesting Date, subject to the Company's or the applicable Subsidiary's right, in its discretion, to continue or pause vesting upon an approved leave of absence to the extent permitted under applicable law.

   | | |
   |---|---|
   | 03/20/2022 | 4,204 |
   | 03/20/2023 | 4,204 |
   | 03/20/2024 | 4,205 |

5. **Settlement:** The RSUs shall be converted to Shares contingent upon the Participant's Continuous Service Status through the Vesting Date(s), as applicable, and will be issued to the Participant in the form of Shares as soon as practicable thereafter, subject to any tax withholding obligation with respect to any Tax-Related Items (as defined in Section 3 of the Agreement).

6. **Termination:** Unless otherwise provided in the Participant's individual employment, severance or other agreement(s) with the Company, upon the Participant's Termination Date, all unvested RSUs awarded in this Notice and the Agreement shall be forfeited, and all rights of the Participant to such RSUs shall immediately terminate. In case of any dispute as to whether a Termination Date has occurred, the Committee's determination shall be final, binding and conclusive.

7. **General Terms:** The Participant understands that the Participant's employment with or service to the Company is for an unspecified duration, can be terminated at any time in accordance with applicable law, and that nothing in this Notice, the Agreement, or the Plan

changes the nature of that relationship. The Participant acknowledges that the vesting of the RSUs pursuant to this Notice and the Agreement is conditioned on the occurrence of Vesting Date**(s)**. The Participant understands that this Notice is subject to the terms and conditions of the Agreement and the Plan prospectus that contains the entire plan, both of which are incorporated herein by reference. The Participant represents and warrants that the Participant has received and read this Notice, the Agreement, and the Plan. If there are any inconsistencies between this Notice or Agreement and the Plan, the terms of the Plan will govern.

**PARTICIPANT**

`Signed Electronically`

`05/03/2021`

## GROUPON, INC. 2011 INCENTIVE PLAN
## RESTRICTED SHARE UNIT AWARD AGREEMENT

Capitalized terms in this agreement (this "Agreement"), unless otherwise defined herein, shall have the meanings assigned to them in the Groupon, Inc. 2011 Incentive Plan (the "Plan").

You, as the Participant, have been granted a Full Value Award of restricted share units ("RSUs") in Groupon, Inc. (the "Company") subject to the terms, restrictions and conditions of the Plan, the Notice of Restricted Share Unit Award (the "Notice") and this Agreement.

1. **No Stockholder Rights**.  Unless and until such time as Shares are issued in settlement of vested RSUs, the Participant shall have no ownership of the Shares underlying the RSUs and shall have no right to receive dividends or dividend equivalents with respect to such Shares or to vote such Shares.

2. **No Transfer**.  Awards under the Plan are not transferable except to the Participant's Beneficiary upon the death of the Participant.

3. **Tax Withholding Obligations**.

   (a)  Regardless of any action the Company takes with respect to any or all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), the Participant acknowledges that the ultimate liability for all Tax-Related Items is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company.  The Participant further acknowledges that the Company:  (i) makes no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including the grant, vesting or settlement of RSUs, the subsequent sale of Shares acquired pursuant to such vesting and the receipt of any dividends and/or dividend equivalents; and (ii) does not commit to and is under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result.  Further, if the Participant becomes subject to tax in more than one jurisdiction between the Grant Date and the date of any relevant taxable event, the Participant acknowledges that the Company may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   (b)  Prior to any relevant taxable or tax withholding event, the Participant shall pay or make adequate arrangements satisfactory to the Company to satisfy all Tax-Related Items.  In this regard, the Participant authorizes the Company or its agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or more of the following:

      (i)  Withholding from any wages or other cash compensation paid to the Participant by the Company;

(ii) Withholding otherwise deliverable Shares to be issued upon vesting/settlement of the RSUs; or

(iii) Withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization).

(c) To avoid negative accounting treatment, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of the Participant's participation in the Plan. Finally, the Participant shall pay to the Company any amount of Tax-Related Items that the Company may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to deliver the Shares or proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

(d) Further, to the extent applicable, the settlement of the RSUs is intended to either be exempt from Section 409A of the Code under the "short-term deferral" exemption, or otherwise comply with Section 409A of the Code, and this Agreement will be interpreted, operated and administered in a manner that is consistent with this intent. In furtherance of this intent, the Company may, at any time and without the Participant's consent, modify the terms of the Award as it determines appropriate to comply with the requirements of Section 409A of the Code and the related U.S. Department of Treasury guidance. The Company makes no representation or covenant to ensure that the RSUs, settlement of the RSUs or other payment hereunder are exempt from or compliant with Section 409A of the Code and will have no liability to the Participant or any other party if the settlement of the RSUs or other payment hereunder that is intended to be exempt from, or compliant with, Section 409A of the Code, is not so exempt or compliant or for any action taken by the Company with respect thereto.

4. **Compliance with Laws and Regulations**. The issuance of Shares underlying the RSUs will be subject to and conditioned upon compliance by the Company and the Participant (including any written representations, warranties and agreements as the Committee may request of the Participant for compliance with all applicable laws) with all applicable state, federal, local and foreign laws and regulations of any governmental authority, including adopting any such conforming amendments as are necessary to comply with Section 409A of the Code (if applicable), and with all applicable requirements of any national or regional securities exchange or quotation system on which the Shares may be listed or quoted at the time of such issuance or transfer.

5.    **No Advice Regarding Award**.  The Company is not providing any tax, legal, or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares.  The Participant is hereby advised to consult with the Participant's own personal tax, legal and financial advisors regarding the Participant's participation in the Plan before taking any action related to the Plan.

6.    **Legend on Certificates**.  The certificates and/or book-entry notation representing the Shares issued hereunder shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the Plan, this Agreement or the rules, regulations, and other requirements of the U.S. Securities and Exchange Commission, any national or regional securities exchange or quotation system upon which such Shares are listed, and any applicable federal, state, local and foreign laws, and the Committee may cause a legend or legends, electronic or otherwise, to be put on any such certificates and/or book-entry notation to make appropriate reference to such restrictions.

7.    **Successors and Assigns**.  The Company may assign any of its rights under this Agreement.  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Company.  Subject to the restrictions on transfer set forth herein, this Agreement will be binding upon the Participant and the Participant's heirs, executors, administrators, legal representatives, successors and assigns.

8.    **Entire Agreement; Severability**.  The Plan and the Notice are incorporated herein by reference.  Except with respect to vesting terms specifically provided in the Participant's individual employment, severance or other agreement(s) with the Company, the Plan, the Notice and this Agreement supersede in their entirety all prior undertakings and agreements of the Company and the Participant with respect to the subject matter hereof.  If any provision of this Agreement is determined by a court of law to be illegal or unenforceable, then such provision will be enforced to the maximum extent possible and the other provisions will remain fully effective and enforceable.

9.    **Waiver**.  Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement.  Any waiver must be in writing.

10.   **Governing Law and Venue**.  The validity, interpretation, instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the State of Delaware, without regard to the conflict of law principles, rules or statutes of any jurisdiction.  For the purpose of litigating any dispute that arises under this Agreement, the parties hereby consent to the exclusive jurisdiction and agree that such litigation shall be conducted in the federal or state courts of the State of Illinois.

11.   **Notices**.  Any notice or document required to be filed with the Committee or the Company under the Plan must be in writing and will be properly filed if delivered or mailed to the Company's Legal Department in the Company's principal executive offices.  If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by

mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company, or shall be delivered electronically to the Participant's email address as shown on the Company's records. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally or electronically, on the date delivered. The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan through an on-line or electronic system established and maintained by the Company or its designee. The Company may, by written notice to affected persons, revise its notice procedures from time to time. Any notice required under the Plan (other than a notice of election) may be waived in writing by the person entitled to notice.

12. **Need to Accept Award**. The Participant acknowledges that the Notice and this Agreement must be accepted within 90 days of the Grant Date in order to be eligible to receive any benefits from this Award, unless otherwise determined by the Company in its discretion. If this Award is not accepted within that time period, the Award may be cancelled and all benefits under this Award will be forfeited. To accept this Award, the Participant must access the Fidelity website and follow the instructions for acceptance. If this grant was distributed to the Participant in hard copy format, the Participant must sign the agreement and return it to the Company's Compensation Department within 90 days.

By the Participant's signature and the signature of the Company's representative below and on the Notice, the Participant and the Company agree that this Award of RSUs is granted under and governed by the terms and conditions of the Plan, the Notice and this Agreement. The Participant has reviewed the Plan, the Notice and this Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Agreement, and fully understands all provisions of the Plan, the Notice and this Agreement. The Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Committee upon any questions relating to the Plan, the Notice and this Agreement. The Participant further agrees to notify the Company upon any change in the Participant's residence address or personal email address.

**PARTICIPANT**

Signed Electronically

05/03/2021

## APPENDIX A

## ADDITIONAL TERMS AND CONDITIONS OF THE
## RESTRICTED SHARE UNIT AWARD AGREEMENT FOR NON-U.S. PARTICIPANTS
## UNDER THE
## GROUPON, INC. 2011 INCENTIVE PLAN, AS AMENDED

### General

Please note that the RSUs are not part of Participant's employment relationship with Participant's employer and are completely separate from Participant's salary or any other compensation or benefits provided to Participant by Participant's employer. This means that any gain Participant realizes from the RSUs will not be included if or when any benefits that Participant may receive from Participant's employer are calculated, including but not limited to bonuses, severance payments or similar termination compensation or indemnity, payments during a notice period or payments in lieu of notice.

### Terms and Conditions

This Appendix includes additional terms and conditions that govern the RSUs granted to Participant under the Plan if Participant resides in one of the countries listed below. Capitalized terms used but not defined in this Appendix have the meanings set forth in the Plan, the Notice and/or the Agreement.

### Notifications

This Appendix also includes notifications relating to exchange control and other issues of which Participant should be aware with respect to Participant's participation in the Plan. The information is based on the exchange control, securities and other laws in effect in the respective countries as of January 2020. Such laws are often complex and change frequently. As a result, the Company strongly recommends that Participant not rely on the information noted herein as the only source of information relating to the consequences of Participant's participation in the Plan because the information may be out of date at the time Participant vests in the RSUs, acquires Shares or sells Shares acquired under the Plan.

In addition, the information is general in nature and may not apply to Participant's particular situation, and the Company is not in a position to assure Participant of any particular result. Accordingly, Participant is strongly advised to seek appropriate professional advice as to how the relevant laws in the Participant's country apply to Participant's specific situation.

If Participant is a citizen or resident of a country other than the one in which Participant is currently working, transfers employment after the RSUs are granted, or is considered a resident of another country for local law purposes, the notifications contained in this Appendix A may not be applicable to Participant and the Company shall, in its sole discretion, determine to what extent the terms and conditions contained herein shall be applicable to Participant.

NAI-1510636655v4

## AUSTRALIA

*Terms and Conditions*

**Australian Addendum and Offer Document**.  Participant's right to participate in the Plan and the RSUs granted under the Plan are subject to the terms and conditions stated in the Australian Addendum, the offer document, the Plan, the Notice, the Agreement and this Appendix A.

*Notifications*

**Securities Law Notification**.  If Participant acquires Shares under the Plan and subsequently offers the Shares for sale to a person or entity resident in Australia, such an offer may be subject to disclosure requirements under Australian law and Participant should obtain legal advice regarding any applicable disclosure requirements prior to making any such offer.

**Taxation**.  Participant understands that the RSUs should satisfy the real risk of forfeiture test for deferral concessions as set forth in the Employee Share Scheme legislation effective July 1, 2015 because Participant will forfeit the Award if certain conditions are not met (*i.e.*, Participant must remain continuously employed until the award vests), and accordingly, Participant will be subject to deferred taxation and should generally not be subject to tax when the Award is granted. Furthermore, Participant acknowledges that Participant does not hold a beneficial interest in more than 10% of Groupon, Inc.'s common stock, and Participant is not in a position to cast, or to control the casting of more than 10% of the maximum number of votes that might be cast at a general meeting of Groupon, Inc.

## BELGIUM

*Notifications*

**Tax Reporting Notification**.  If Participant is a Belgian resident, he or she is required to report any bank or brokerage accounts held outside of Belgium on the annual tax return, including any account in which Shares or proceeds from the sale of Shares is held.  In addition, Participant is required to report any taxable income attributable to the grant of RSUs on the annual tax return.

**Stock Exchange Tax**.  Effective January 1, 2017, a stock exchange tax applies to transactions executed through a non-Belgian financial intermediary.  The stock exchange tax will likely apply when Shares are sold.  Participant should consult his/her personal tax advisor to determine his/her obligations with respect to the stock exchange tax.

## EUROPEAN ECONOMIC AREA

*Notifications*

Please consult the notice addressing the EU General Data Protection Regulation (GDPR), which is attached hereto.

## GERMANY

*Notifications*

**Exchange Control Notification**.  Cross-border payments in excess of €12,500 must be reported monthly to the German Federal Bank.  If Participant uses a German bank to transfer a cross-border payment in excess of €12,500 in connection with the sale of Shares acquired under the Plan, the bank will make the report for Participant.  In addition, Participant must report any receivables, payables, or debts in foreign currency exceeding an amount of €5,000,000 in any month.

## INDIA

*Notifications*

**Exchange Control Notification**.  Participant understands that he or she must repatriate any proceeds from the sale of Shares acquired under the Plan to India and convert the proceeds into local currency within a reasonable time following the receipt (i.e., ninety (90) days).  Participant will receive a foreign inward remittance certificate ("FIRC") from the bank where the foreign currency is deposited.  Participant should maintain the FIRC as evidence of the repatriation of the proceeds in the event the Reserve Bank of India or the Employer requests proof of repatriation.

## IRELAND

*Notifications*

If Participant is a director, shadow director or secretary of an Irish subsidiary of Groupon, Inc. who owns more than a 1% interest in Groupon, Inc., Participant is subject to certain notification requirements under the Companies Act, 1990.  Among these requirements is an obligation to notify the secretary of the Irish subsidiary in writing when Participant receives an interest (*e.g.*, RSUs or Shares) in Groupon, Inc. and the number and class of shares or rights to which the interest relates.  In addition, Participant must notify the Irish subsidiary when Participant sells Shares acquired pursuant to any Award granted under the Plan.  Participant must notify the secretary of the Irish subsidiary of the acquisition or disposal of an interest in Shares within five days following the day of acquisition or disposal of the interest in Shares.  These notification requirements also apply to any rights or shares acquired by Participant's spouse or children under the age of 18.

## ITALY

*Notifications*

**Exchange Control Notification**.  Participant is required to report on the RW Form of his/her annual tax return (i) any transfers of cash or Shares to or from Italy and (ii) any foreign investments or investments held outside of Italy (including proceeds from the sale of Company Shares acquired upon the vesting of RSUs), if the investment may give rise to income in Italy.  The foreign investments or investments held outside of Italy are also subject to a 0.2% tax on assets held abroad (IVAFE), which is due annually on the fair market value of the assets at the end of each calendar year that Participant holds the Shares (*i.e.*, December 31) and is subject to pro-ration for the portion of the year that Participant holds the Company Shares received at vesting.

## JAPAN

*Notifications*

**Securities Report**.  If Participant acquires Shares valued at more than ¥100,000,000 in a single transaction, Participant must file a Securities Acquisition Report with the Ministry of Finance through the Bank of Japan within 20 days of the acquisition of the Shares unless a Japanese securities broker or a Japanese branch of a non-Japanese securities broker is involved in the acquisition of the Shares.

## NETHERLANDS

*Notifications*

**Insider Trading Notification**.  Participant should be aware of the Dutch insider-trading rules, which may impact the sale of Shares acquired upon vesting of the RSUs.  In particular, Participant may be prohibited from effectuating certain transactions involving Shares if Participant has inside information about Groupon, Inc.  If Participant is uncertain whether the insider-trading rules apply to Participant, Participant should consult his/her personal legal advisor.  By participating in the Plan, Participant acknowledges having read and understood this notification and acknowledges that it is Participant's responsibility to comply with the Dutch insider-trading rules.

## NEW ZEALAND

*Notifications*

Participant is being offered an opportunity to participate in the Plan.  In compliance with an exemption to the New Zealand Financial Markets Conduct Act 2013, Participant is hereby notified that Participant has the right to receive, free of charge, a copy of Groupon, Inc.'s latest annual report and a copy of the relevant financial statements of Groupon, Inc.  Such documents are available for Participant's review on Groupon, Inc.'s external and/or internal sites at the web addresses listed below.  In addition, in connection with the opportunity to participate in the Plan, Participant is being provided with a copy of the Plan, award agreement, and the Plan prospectus via the netbenefits.com portal.

1. The Company's most recent annual report:

https://investor.groupon.com/financials/annual-reports-and-proxy-statements/default.aspx

2. The Company's most recently published financial statements:

https://investor.groupon.com/financials/sec-filings/default.aspx

**Warning**

This is an offer of options or RSUs.  If the options are exercised or the RSUs vest and Participant receives shares in Groupon, Inc., the shares will give Participant a stake in the ownership of Groupon, Inc. Participant may receive a return if dividends are paid.

If Groupon, Inc. runs into financial difficulties and is wound up, Participant will be paid only after all creditors have been paid. Participant may lose some or all of Participant's investment.

New Zealand law normally requires people who offer financial products to give information to investors before they invest. This information is designed to help investors to make an informed decision.

The usual rules do not apply to this offer because it is made under an employee share scheme. As a result, Participant may not be given all the information usually required. Participant will also have fewer other legal protections for this investment.

Participant should ask questions, read all documents carefully, and seek independent financial advice before committing.

Groupon, Inc.'s shares are listed on the Nasdaq Global Market. This means Participant may be able to sell Groupon, Inc.'s shares, if received with respect to the options or RSUs, on the Nasdaq Global Market if there are interested buyers. Participant may get less than Participant invested. The price will depend on the demand for Groupon, Inc.'s shares.

## POLAND

*Notifications*

**Exchange Control Notifications**.  If Participant transfers funds in excess of €15,000 into Poland in connection with the sale of Shares acquired under the Plan, the funds must be transferred via a bank account.  Participant is required to retain the documents connected with a foreign exchange transaction for a period of five (5) years, as measured from the end of the year in which such transaction occurred.

While Participant is responsible for any exchange control filings, no advance foreign exchange permit is required for the acquisition, holding or disposal of Shares.  However, if the value of Participant's Shares exceeds the equivalent of PLN 7,000,000, Participant will have to notify the National Bank of Poland of such holdings on a quarterly basis.  If such reporting obligation applies to Participant and Participant's shareholding exceeds 10% of the Company's total voting stock, Participant will also be required to notify the National Bank of Poland by the end of May of each subsequent year.

## SPAIN

*Terms and Conditions*

**Nature of Grant**.  Participant understands that the Company has unilaterally, gratuitously and in its sole discretion decided to grant RSUs to individuals who may be Participants of the Company or a Subsidiary throughout the world.  The decision is limited and entered into based upon the express assumption and condition that any grant will not bind the Company or a Subsidiary, other

than as expressly set forth in the Agreement. Consequently, Participant understands that the RSUs are granted on the assumption and condition that the RSUs and any Shares acquired upon settlement of the RSUs are not part of any employment contract (whether with the Company or a Subsidiary) and shall not be considered a mandatory benefit, salary for any purpose (including severance compensation), or any other right whatsoever.

Participant understands and agrees that, as a condition of the grant of the RSUs, except as provided for in termination section of the Notice, Participant's termination of employment for any reason (including for the reasons listed below) will automatically result in the cancellation and loss of any RSUs that may have been granted to Participant and that were not fully vested on the date of termination.

Unless otherwise set forth in the Plan or applicable award agreement, Participant understands and agrees that the RSUs will be cancelled without entitlement to the Shares or to any amount as indemnification if Participant terminates employment by reason of, including, but not limited to: resignation, death, disability, retirement, disciplinary dismissal adjudged to be with cause, disciplinary dismissal adjudged or recognized to be without cause, individual or collective layoff on objective grounds, whether adjudged to be with cause or adjudged or recognized to be without cause, material modification of the terms of employment under Article 41 of the Workers' Statute, relocation under Article 40 of the Workers' Statute, Article 50 of the Workers' Statute, unilateral withdrawal by the Employer, and under Article 10.3 of Royal Decree 1382/1985.

### *Notifications*

**Securities Law Notification**. The RSUs described in the Agreement and this Appendix A do not qualify under Spanish regulations as securities. No "offer of securities to the public," as defined under Spanish law, has taken place or will take place in the Spanish territory. The Agreement (including this Appendix A) has not been nor will it be registered with the *Comisión Nacional del Mercado de Valores*, and does not constitute a public offering prospectus.

**Foreign Asset and Account Reporting**. To the extent that Spanish residents hold rights or assets (*e.g.*, Shares, cash, etc.) in a bank or brokerage account outside of Spain with a value in excess of €50,000 per type of right or asset as of December 31 each year, such residents are required to report information on such rights and assets on their tax return for such year. Shares constitute securities for purposes of this requirement, but unvested rights (*e.g.*, RSUs) are not considered assets or rights for purposes of this requirement.

If applicable, Spanish residents must report the assets or rights on Form 720 by no later than April 30 following the end of the relevant year. After such assets or rights are initially reported, the reporting obligation will only apply for subsequent years if the value of any previously-reported assets or rights increases by more than €20,000. Failure to comply with this reporting requirement may result in penalties.

Spanish residents are also required to electronically declare to the Bank of Spain any securities accounts (including brokerage accounts held abroad), as well as the securities held in such accounts, if the value of the transactions for all such accounts during the prior tax year or the

balances in such accounts as of December 31 of the prior tax year exceeds €1,000,000.  More frequent reporting is required if such transaction value or account balance exceeds €1,000,000.

Spanish residents should consult with their personal tax and legal advisors to ensure compliance with their personal reporting obligations.

**Exchange Control Information**.  All acquisitions of foreign shares by Spanish residents must comply with exchange control regulations in Spain.  Because of foreign investment requirements, the acquisition of Company shares under the Plan must be declared for statistical purposes to the Spanish Direccion General de Politica Comercial y de Inversiones Extranjeras (the "DGPCIE").  If Participant acquires the Shares through the use of a Spanish financial institution, that institution will automatically make the declaration to the DGPCIE.  Otherwise, Participant must make the declaration by filing a form with the DGPCIE.

If Participant imports the Shares acquired under the Plan into Spain, Participant must declare the importation of the share certificates to the DGPCIE.

In addition, Participant must also file a declaration of the ownership of the Shares with the Directorate of Foreign Transactions each January while the Shares are owned.  These filings are made on standard forms furnished by the Directorate of Foreign Transactions.

When Participant receives any foreign currency payments (*i.e.*, as a result of the sale of the Shares), Participant must inform the institution receiving the payment of the basis upon which such payment is made and provide certain specific information (*e.g.*, name, address, and fiscal identification number; the name and corporate domicile of the company; the amount of the payment; the type of foreign currency received; the country of origin; and the reason for the payment).

## UNITED ARAB EMIRATES

*Notifications*

The RSUs and the Shares underlying the Awards have not been reviewed by or registered with the Emirates Securities and Commodities Authority, the Dubai Financial Services Authority, the U.A.E. Central Bank or any other governmental authority in the United Arab Emirates, and have not been authorized or licensed for offering, marketing or sale in the United Arab Emirates.  As such, the Awards and Shares underlying them are not being offered or sold in the United Arab Emirates.  This offering is being made in, and any related materials are subject to, the laws, regulations and rules of a jurisdiction outside the United Arab Emirates.

## UNITED KINGDOM

No country specific terms and conditions apply.

**GDPR Privacy Notice for Participants in the EU**

**RE: Groupon, Inc. 2011 Incentive Plan, as amended (the "Plan")**

Dear Participant:

The EU General Data Protection Regulation (also known as the "GDPR") went into force on May 25, 2018. The GDPR requires that Groupon, Inc. (the "Company") provides certain information about how the Personal Data (as defined below) it uses to EU-based participants in the Plan to which that Personal Data relates. The purpose of this communication is to provide participants with this information. In particular, this communication explains why the Company holds this Personal Data and explains how each participant can raise any questions or exercise their rights regarding the Company's use of Personal Data.

You can find a copy of this privacy notice for viewing online on Groupon's intranet, Skynet, or by request using the contact details set out below.

This communication supplements information relating to the use of your Personal Data set out in the relevant award agreement, or agreements, issued to you under the Plan (the "Agreements"). Should there be any inconsistency between the terms of this privacy notice and the Agreements relating to the Company's use of your Data, the Company will use your Personal Data as described in this privacy notice.

The term "Personal Data" as used in this privacy notice means information which relates to you and which the Company processes in order to provide the Plan. It includes your name, home address, email address and telephone number, date of birth, social insurance number, passport number or other identification number, salary, nationality and job title, as well as details of any shares, directorships, awards or any other equity or share rights you may have in the Company (whether awarded, canceled, exercised, vested, unvested or outstanding). Much of this information is necessary in order for you to participate in the Plan (for example your name, contact details and identification verification, as well as information about your job and investments including your salary and other equity/share rights in the Company). If you do not provide this information, you may not be able to participate in the Plan. If you participate in the Plan, we will extract this information from our existing systems.

**Data Controller Entity**: The Company is the Data Controller. The Company is a Delaware corporation, with its principal United States office at 600 West Chicago Avenue, Suite 400 Chicago, Illinois 60654 U.S.A.

**Purposes for which Personal Data is used**: Personal Data is held for the exclusive purpose of implementing, administering and managing your participation in the Plan. This is necessary for the Company to fulfill its contractual obligations to you under the Agreements related to the Plan.

**International Transfers of Data**: The Company is based in the United States and the Agreements are performed in the United States, so the Company can only meet its contractual obligations to you under the Agreements if the Data is transferred to the United States. The performance of the contractual obligations of the Company to you is one of the legal bases for the transfer of the Data from the European Union to the United States. You should be aware that the United States may

have different data privacy laws and protections than the data privacy laws in place in the European Union.

**Retention Period**: Your Personal Data relating to the Plan will be retained for the purposes described above for ten (10) years after your separation from the Company. Your Personal Data will also be retained for the same time period. When determining this additional period, we take into account our legal obligations which may require us to retain Personal Data relating to the Plan for a longer period and our obligations to maintain records for audit purposes, as well as defending or bringing legal claims about the Plan, and to deal with any complaints about the Plan.

**Other Recipients**: To fulfill its obligations under the Agreements, the Company may share Personal Data with its subsidiary companies who employ participants in the Plan. In addition, Personal Data may be transferred to certain third parties assisting in the implementation, administration and management of the Plan, such as share plan administrators and transfer agents. These third parties will only be permitted to act on the Company's instructions and behalf. At your instruction, the Personal Data will be shared with a broker or other third party whom you have instructed the Company to deposit shares or other securities acquired upon the vesting of any awards under the Agreements.

**Data Subject Rights**: Participants have a number of rights under the GDPR. Depending upon the circumstances, these may include the right of data portability (where the Company helps a participant move Personal Data to someone else at the participant's request), the right to object to the processing of the Personal Data, the right to require the Company to update and correct any Personal Data which is incorrect or out of date, the right to require erasure of the Personal Data and the right for the participant to receive a copy of the Personal Data held by the Company in relation to the Plan. For more information about these rights, or to exercise any of these rights, please contact the Company using the contact details below.

We are committed to working with you to obtain a fair resolution of any complaint or concern about privacy. If, however, you believe that we have not been able to assist with your complaint or concern, you have the right to make a complaint to the data protection authority of the country in which you live.

**Contact**: If you have any questions concerning this privacy notice, you should contact the Groupon Total Rewards Team by using the following contact details: totalrewards@groupon.com. You can also contact our Data Protection Officer at dpo@groupon.com.

**LDZ6JTGI**

**05/03/2021 11:00 AM U.S. Eastern Standard Time**

**ACCEPTED**

# Exhibit D

**SheppardMullin**

Sheppard, Mullin, Richter & Hampton
LLP
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
312.499.6300 main
312.499.6301 fax
www.sheppardmullin.com

Kevin M. Cloutier
312.499.6304 direct
kcloutier@sheppardmullin.com

November 3, 2021

File Number: 51CE-344243

**VIA E-MAIL (SUNGHSHIN@GMAIL.COM) & OVERNIGHT MAIL**

Mr. Sung Shin
1525 C 19th Ave.
Seattle, Washington 98122

Re:     Your Post-Employment Obligations to Groupon, Inc.

Dear Mr. Shin:

Please be advised that Sheppard, Mullin, Richter & Hampton LLP represents Groupon, Inc. ("Groupon" or the "Company"). We understand you resigned from your employment with Groupon as Vice President – Global Head of Advertising and Ancillary Review on October 28, 2021. You announced an intention to commence employment with Yelp, Inc. ("Yelp") to Lead Product Management for Yelp's Enterprise and Multi-Location - Yelp Audiences and In-store Measurement Group. Groupon has serious concerns about the competitive nature of your proposed work with Yelp, a Groupon competitor, which we believe would violate your post-employment obligations to Groupon set forth in your Confidentiality, Intellectual Property and Restrictive Covenants Agreement (the "Agreement"), a copy of which is here attached.

Your compensation (including a $100,000 sign on bonus and your base salary of $275,000, plus a bonus potential of 40% of your base salary, Restricted Share Units valued at $700,000, and perquisites) and your considerable access to Groupon's trade secrets and confidential information, including Groupon's overall advertising strategy, serve as ample consideration for the restrictive covenants in your Agreement. The restrictions set forth in the Agreement are reasonable and remain in full force and effect whether you decide to remain at Groupon or leave to pursue other opportunities.

Groupon expects you to honor and to abide by your post-employment obligations and, if necessary, will legally enforce its rights under the Agreement through Court action, although Groupon hopes that this is not necessary. The Agreement prohibits you from, among other things, engaging in certain competitive activity, including employment with competitors like Yelp, specifically in positions with responsibilities similar to those you held at Groupon or in positions with access to confidential information similar to that which you are privy at Groupon. It also prohibits interference with customer relationships, disclosure of proprietary and confidential information, and solicitation of Groupon employees on behalf of you or a Groupon competitor. In pertinent part, the Agreement states:

**Sheppard**Mullin

Mr. Sung Shin
November 3, 2021
Page 2

13. <u>Non-Compete, Non-Solicit of Business, Non-Solicit of Employees/Contractors and No-Hire ("Restricted Covenants")</u>. I acknowledge and agree that during my employment and during the Restricted Period, regardless of the reason for my termination, I will not, without Groupon's consent, other than on behalf of Groupon:

(a) Directly or indirectly, and whether or not for compensation, . . . be employed by, consult with or contract with any entity which is in competition with Groupon in the Geographic Area. The restriction in the preceding sentence only applies to positions with responsibilities similar to any position I held with Groupon during the twelve (12) months preceding the termination of my employment or relationship with Groupon or in which I would have responsibility for and access to confidential information similar or relevant to that which I had access to during the twelve (12) months preceding the termination of my employment or relationship with Groupon. The Geographic Area shall mean any geographic territory where I was assigned to work and/or over which I had responsibilities during the twelve (12) months preceding the termination of my employment or relationship with Groupon and any area within a 50-mile radius of such geographic territory;

The Agreement also prohibits you from retaining, using and/or disclosing Groupon's proprietary information. In pertinent part, the Agreement states:

2. <u>Ownership and Confidentiality of Proprietary Information</u>.

. . .

(b) At all times, both during my employment by Groupon and after termination of such employment, I will keep in confidence and trust all Proprietary Information, and, except as necessary to meet Groupon's business needs, I will not: (i) use any Proprietary Information; (ii) directly or indirectly permit a third party to obtain access to any Proprietary Information; or (iii) transmit or disclose any Proprietary Information to any person, concern or entity. Further, I shall not make use of any Proprietary Information, directly or indirectly, for myself or for others, including, without limitation, in connection with any other employment or consulting capacity, or in connection with soliciting Groupon's customers, prospective customers, vendors, independent contractors, consultants, or business partners or Groupon's employees.

. . .

(c) All non-disclosure obligations of paragraph 2(b) above shall apply: (i) as to Proprietary Information other than trade secrets, at all times during my employment and for two (2) years after termination of such employment; and (ii) as to trade secrets, for as long as such trade secrets retain their status as a "trade secret" under applicable law.

**Sheppard**Mullin

Mr. Sung Shin
November 3, 2021
Page 3

The Agreement details "Proprietary Information" to include:

[A]ny and all technical and non-technical information including patent, copyright, trademark, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, business methods, processes, apparatus, equipment, algorithms, software programs, domain names, social media handles, code, software source documents, flowcharts, tools, architectures, databases, menu layouts, routines, formats, data compilers and assemblers, and formulae related to the current, future and proposed products and services of Groupon or its subsidiaries, and including, without limitation, respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, job histories, job performance and salary information of employees, business forecasts, sales and merchandising and marketing plans and information. "Proprietary Information" also includes proprietary or confidential information of any third party who may disclose such information to Groupon or to me under any obligation of confidentiality in the course of Groupon's business.

The role at Yelp is directly competitive with your role at Groupon, which similarly focuses on developing innovative advertising strategies to promote offerings to potential customers and to reach consumers throughout the purchase cycle. In Yelp's 2020 10-K, Yelp articulated its overall business strategy and competitive landscape as follows: "Our competitors consist of companies that **help businesses — particularly businesses in our strategically important Services categories and, to a lesser extent, restaurants category — connect and engage with consumers, including...providers of online marketing and tools for managing and optimizing advertising campaigns**, such as Google, Facebook and Twitter, as well as various forms of traditional offline advertising, including radio, direct marketing campaigns, yellow pages and newspapers…" (emphasis added).

Yelp's website further highlights that it is specifically targeting potential merchants to spend their advertising dollars directly with Yelp -- directly competing with Groupon for those limited advertising dollars from merchants. *See* https://business.yelp.com/products/yelp-ads/

Yelp also is advertising "deals" on its online marketing platform, which Yelp describes as, "discounted vouchers that customers can purchase for [merchant] business[es]" which is exactly what Groupon does to "help businesses…connect and engage with consumers."

The parallels between your position at Groupon and your anticipated position at Yelp, coupled with your orchestration and access to Groupon's confidential advertising strategies and plans, raise serious concerns, and it is Groupon's position that you taking this role at Yelp would violate the clear terms of your Agreement. Groupon does not believe you can perform your anticipated role with Yelp without violating the Agreement.

**Sheppard**Mullin

Mr. Sung Shin
November 3, 2021
Page 4

Accordingly, we hereby request you provide us with any information as to why you/Yelp believe this role is not competitive and would not violate your Agreement by November 5, 2021. A copy of this letter also is being provided to Yelp's Chief Administrative Officer and General Counsel and serves as notice of Groupon's position (based on the facts to-date) that your employment would violate your Agreement, and employing you would constitute tortious interference with the Agreement. We will consider any information you or Yelp provide. In the event, however, that we continue to believe this is a competitive activity, we reserve the right to pursue legal and equitable action to prevent a breach of our Agreement, or a tortious interference of our rights under the Agreement.

In addition, you and Yelp are hereby advised to take all necessary and appropriate steps to preserve documents, data and other evidence that may be relevant in this matter, including but not limited to any communications with Yelp related to your offer, your work at Groupon, and/or your Agreement as well as any text messages, emails, call logs relating to your potential work at Yelp or your work at Groupon

Finally, Groupon has already started a dialogue with you about potential options in light of the above. As Groupon discussed with you, Groupon is willing to continue to employ you in your current role provided you are fully committed to do so. If you are intent to leave Groupon, Groupon is willing to consider a transition period where you continue to work at Groupon while you search for other employment that would not violate your Agreement. The restrictions in your Agreement are narrowly tailored and there are *many* opportunities based on your skill set that would not compete with Groupon. Groupon, of course, would expect you to remain fully and faithfully committed to your work, including driving and executing advertising strategy, and it reserves all rights in the event you fail to do so.

If you have questions, please contact me directly. If you are represented by counsel, please forward this letter to your lawyer. Thank you for your prompt attention to this matter.

Very truly yours,

Kevin M. Cloutier
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

Encl.

cc:    Laurence Wilson, Chief Administrative Officer and General Counsel, Yelp
       Meagan LeGear, Groupon (via email only)

## CONFIDENTIALITY, INTELLECTUAL PROPERTY
## AND RESTRICTIVE COVENANTS AGREEMENT

In return for my new or continued employment with Groupon, Inc., its subsidiaries, affiliates, and acquired entities (collectively, "Groupon"), any other monetary benefits received at the time of signing, and other good and valuable consideration, including but not limited to employee benefits, training, career progression, promotions, access to confidential information and other monetary benefits, the receipt and sufficiency of which I hereby acknowledge, I agree to the following:

### I.    Confidentiality of Proprietary Information and Innovations

1.    Proprietary Information.    My employment status creates a relationship of confidence and trust between Groupon and me with respect to any information that is not generally known to the public and is otherwise treated by Groupon as confidential or proprietary and is: (a) applicable to the business of Groupon or its subsidiaries; or (b) applicable to the business of any client or customer of Groupon or its subsidiaries, which may be made known to me by Groupon or by any client or customer of Groupon or its subsidiaries, or learned by me in such context during the period of my employment.

All such information has commercial value in the business in which Groupon is engaged and is hereinafter called "Proprietary Information."  By way of illustration, but not limitation, Proprietary Information includes any and all technical and non-technical information including patent, copyright, trademark, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, business methods, processes, apparatus, equipment, algorithms, software programs, domain names, social media handles, code, software source documents, flowcharts, tools, architectures, databases, menu layouts, routines, formats, data compilers and assemblers, and formulae related to the current, future and proposed products and services of Groupon or its subsidiaries, and including, without limitation, respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, job histories, job performance and salary information of employees, business forecasts, sales and merchandising and marketing plans and information.    "Proprietary Information" also includes proprietary or confidential information of any third party who may disclose such information to Groupon or to me under any obligation of confidentiality in the course of Groupon's business.

2.    Ownership and Confidentiality of Proprietary Information.

(a)    All Proprietary Information is the sole property of Groupon, Groupon's assigns, and Groupon's licensors, and Groupon, Groupon's assigns and Groupon's licensors shall be the sole and exclusive owner of all patents, copyrights, trademarks, mask works, trade secrets, domain names, social media handles and other rights in the Proprietary Information.  I hereby grant and assign to Groupon all rights, title and interest I may have or acquire in the Proprietary Information, without further consideration, including all rights to sue for past infringement. Neither the execution and delivery of this Agreement, nor the furnishing of any Proprietary Information to me by Groupon, shall be construed as granting to me either expressly, by

implication, estoppel, or otherwise, any rights or licenses in or to any Proprietary Information other than as may subsequently be executed in writing by Groupon.

(b)     At all times, both during my employment by Groupon and after termination of such employment, I will keep in confidence and trust all Proprietary Information, and, except as necessary to meet Groupon's business needs, I will not: (i) use any Proprietary Information; (ii) directly or indirectly permit a third party to obtain access to any Proprietary Information; or (iii) transmit or disclose any Proprietary Information to any person, concern or entity. Further, I shall not make use of any Proprietary Information, directly or indirectly, for myself or for others, including, without limitation, in connection with any other employment or consulting capacity, or in connection with soliciting Groupon's customers, prospective customers, vendors, independent contractors, consultants, or business partners or Groupon's employees. In the event I believe I must disclose or otherwise make available Proprietary Information to any third party in order to meet Groupon's business needs, I shall inform Groupon prior to any such disclosure in order that Groupon may enter into a confidentiality or similar agreement with such third party. Notwithstanding anything in this paragraph or in this Agreement to the contrary, I understand that I may, without informing Groupon prior to any such disclosure, disclose Proprietary Information in confidence to a Federal, State, or local government official, solely for the purpose of reporting or investigating a suspected violation of law. Without prior authorization of Groupon's legal department, however, Groupon does not authorize me to disclose to any third party (including any government official) any communications that are covered by Groupon's attorney-client privilege.

(c)     All non-disclosure obligations of paragraph 2(b) above shall apply: (i) as to Proprietary Information other than trade secrets, at all times during my employment and for two (2) years after termination of such employment; and (ii) as to trade secrets, for as long as such trade secrets retain their status as a "trade secret" under applicable law.

3.     Ownership and Return of Materials. All materials (including, without limitation, documents, drawings, models, apparatus, sketches, designs, lists, emails, hard copy and electronic documents, forms, and all other media of expression) furnished to me by Groupon shall remain the property of Groupon. Upon termination of my employment, or at any time on the request of Groupon before termination, I will promptly (but no later than five (5) business days after the earlier of said termination or Groupon's request) destroy or deliver to Groupon, at Groupon's option: (a) all materials furnished to me by Groupon, and all copies of these; (b) all media of expression which are in my possession and which incorporate any Proprietary Information or otherwise relate to Groupon's business, and all copies of these; and (c) written certification of my compliance with my obligations under this sentence.

4.     Downloading, Copying or Forwarding of Groupon's Electronic Data. I agree to abide by any Groupon's policies concerning the downloading, copying and forwarding of Groupon's electronic data, including but not limited to Groupon's Information Security and Privacy Policy, Data Classification Policy, and Device Usage Policy. During my employment and at the time of my termination, I understand and agree that Groupon has a right to inspect any personal device or electronic data storage that has been used to send/receive Groupon email, files or data, as well as any personal device or electronic data storage that has connected at any time to Groupon wi-fi, servers, or systems. In the event such devices or storage contain any Groupon

trade secrets or Proprietary Information, I agree to facilitate the return and/or remediation of such Groupon property as may be requested by Groupon.

5.    Prior Work.    All previous work done by me for Groupon or its subsidiaries relating in any way to the conception, reduction to practice, creation, derivation, design, development, manufacture, sale or support of operations, products or services of Groupon, or by Groupon, is the property of Groupon, and I hereby assign to Groupon all of my right, title and interest in and to such previous work, without further consideration, including the right to sue for past infringement.

6.    Creative Works; Innovations.    As used in this Agreement, the term "Creative Works" means all processes, machines, manufactures, compositions of matter, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), moral rights, mask works, trademarks, trade names, trade dress, trade secrets, know-how, ideas (whether or not protectable under trade secret laws), and all other subject matter protectable under patent, copyright, moral right, mask work, trademark, trade secret or other laws, and includes without limitation all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, discoveries, artwork, software, code, software source documents, flowcharts, tools, architectures, databases, menu layouts, routines, formats, data compilers and assemblers, and designs.  The term "Innovations" means all Creative Works that relate to: (a) the business of Groupon or its subsidiaries; (b) any current, future or proposed products or services of Groupon or its subsidiaries; or (c) any product, service, or activity that is similar to or competitive with those offered or proposed to be offered by Groupon or its subsidiaries.  "Innovations" further includes "Inventions," which is defined to mean any inventions protected or protectable under the patent laws of any country.

7.    Creative Works License.    I hereby grant to Groupon and its subsidiaries a royalty free, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice all applicable patent, copyright, trademark, moral right, mask work, trade secret and other intellectual property rights relating to any Creative Works that: (a) were or are conceived, reduced to practice, created, derived, developed, owned, or made by me; (b) are not Innovations assigned to Groupon under paragraph 8; and (c) are used or incorporated with my knowledge during the term of my employment or within three (3) months thereafter, through my actions or inactions, directly or indirectly, into any operation, product or service of Groupon or its subsidiaries.  Notwithstanding the foregoing, I agree that I will not incorporate, direct, permit or allow to be incorporated, any Creative Works, which are not Innovations assigned to Groupon under paragraph 8, in any operation, product or service of Groupon or its subsidiaries without Groupon's prior written consent.

8.    Assignment of Innovations.    I hereby agree promptly to disclose and describe to Groupon, and I hereby grant and assign to Groupon or Groupon's designee, without further consideration, my entire right, title, and interest in and to: (a) with respect to Inventions, each Invention, and any associated intellectual property rights, which I may solely or jointly conceive, reduce to practice, create, derive, develop or make during the period of my employment (whether during business hours or after business hours) with Groupon, except any Invention which meets all of the following criteria (i)-(iii) (as demonstrated by me by evidence meeting the clear and

convincing standard of proof): (i) the Invention does not relate, at the time of conception, reduction to practice, creation, derivation, development, or making of such Innovation, to Groupon's business or actual or demonstrably anticipated research or development; (ii) the Invention was not developed on any amount of Groupon's time or with the use of any of Groupon's equipment, supplies, facilities or trade secret or other Proprietary Information; and (iii) the Invention did not result from any work I performed for Groupon; and (b) with respect to each of the Innovations which is not an Invention, each such Innovation, and any associated intellectual property rights, which I may solely or jointly conceive, develop, reduce to practice, create, derive, develop, or make during the period of my employment (whether during business hours or after business hours) with Groupon (collectively, the Innovations identified in clauses (a) and (b) of this paragraph 8 are hereinafter the "Groupon Innovations"). To the extent any of the rights, title and interest in and to Groupon Innovations cannot be assigned by me to Groupon under applicable law, I hereby grant to Groupon an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to Groupon Innovations can be neither assigned nor licensed by me to Groupon, I hereby irrevocably waive and agree never to assert such non-assignable and non-licensable rights, title and interest against Groupon or any of Groupon's successors in interest to such non-assignable and non-licensable rights.

9.    <u>Future Innovations</u>.  I recognize that Innovations or Proprietary Information that are conceived, reduced to practice, created, derived, developed, or made by me, alone or with others, within three (3) months after termination of my employment may have been conceived, reduced to practice, created, derived, developed, or made, as applicable, in significant part while employed by or working for Groupon.    Accordingly, I agree that such Innovations and Proprietary Information shall be presumed to have been conceived, reduced to practice, created, derived, developed, or made, as applicable, during my employment with Groupon and shall be deemed a work made for hire and made in the course of services rendered as an employee of Groupon and shall be the exclusive property of Groupon.    To the extent that title to such Innovations or Proprietary Information does not vest in Groupon by operation of law, I hereby assign and transfer to Groupon, its successors, legal representatives and assigns, and upon the future creation thereof automatically assign to Groupon, its successors, legal representatives and assigns, without further consideration, my entire right, title, and interest in and to any and all such Innovations or Proprietary Information, including the right to sue for past infringement of same, with no express or implied license to me except as may subsequently be executed in writing by Groupon.  The assignments of paragraph 8 and this paragraph 9 do not apply to any invention that qualifies under 765 Ill. Comp. Stat. §1060, Kan. Stat. Ann. §44-130, Minn. Stat. §181.78, or Wash. Rev. Code §49.44.140, copies of which may be found here: https://skynet.groupon.com/hr/hr_essentials_north_america/stateinventionstatutes.

10.    <u>Cooperation in Perfecting Rights to Proprietary Information and Innovations</u>.

(a)    I agree to perform, during and after my employment, all acts deemed necessary or desirable by Groupon to permit and assist Groupon, at Groupon's expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Proprietary Information, Creative Works, and Innovations assigned or licensed to, or whose rights are irrevocably waived and shall not be asserted against, Groupon under this Agreement.

Such acts may include, but are not limited to, execution of documents and assistance or cooperation: (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications; (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights; and (iii) in other legal proceedings related to the Proprietary Information, Creative Works, or Innovations.

(b)     In the event that Groupon is unable for any reason to secure my signature to any document required to file, prosecute, register, or memorialize the assignment of any patent, copyright, mask work or other applications or to enforce any patent, copyright, mask work, moral right, trade secret or other proprietary right under any Proprietary Information (including improvements thereof) or any Groupon Innovations (including derivative works, improvements, renewals, extensions, continuations, divisionals, continuations in part, continuing patent applications, reissues, and reexaminations thereof), I hereby irrevocably designate and appoint Groupon and Groupon's duly authorized officers and agents as my agents and attorneys-in-fact to act for and on my behalf and instead of me: (i) to execute, file, prosecute, register and memorialize the assignment of any such application; (ii) to execute and file any documentation required for such enforcement; and (iii) to do all other lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of patents, copyrights, mask works, moral rights, trade secrets or other rights under the Proprietary Information, or Groupon Innovations, all with the same legal force and effect as if executed by me.

11.    <u>No Violation of Rights of Third Parties</u>.  My performance of all the terms of this Agreement and as an employee of Groupon does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me prior to my employment with Groupon, and I will not disclose to Groupon, or induce Groupon to use, any confidential or proprietary information or material belonging to any previous employer or others. I am not a party to any other agreement which will interfere with my full compliance with this Agreement.  I agree not to enter into any agreement, whether written or oral, in conflict with the provisions of this Agreement.

## II.    <u>Restrictive Covenants/Notifications/Certification/Exit Interview</u>

12.    <u>Restricted Period</u>.  I agree that the Restrictive Covenants in this Section II shall apply during my employment and during the "Restricted Period."  The "Restricted Period" begins as of the date I cease to be employed by Groupon and is defined as eighteen (18) months from the Date of Termination.  Date of Termination is the date recorded in Groupon's internal Human Resources Information Systems that my employment was terminated with Groupon.

13.    <u>Non-Compete, Non-Solicit of Business, Non-Solicit of Employees/Contractors and No-Hire ("Restricted Covenants")</u>.  I acknowledge and agree that during my employment and during the Restricted Period, regardless of the reason for my termination, I will not, without Groupon's consent, other than on behalf of Groupon:

(a)     Directly or indirectly, and whether or not for compensation, own (other than less than 5% ownership in a publicly traded company), manage, operate, consult or

participate in the ownership, management, operation or control of, or be employed by, consult with or contract with any entity which is in competition with Groupon in the Geographic Area. The restriction in the preceding sentence only applies to positions with responsibilities similar to any position I held with Groupon during the twelve (12) months preceding the termination of my employment or relationship with Groupon or in which I would have responsibility for and access to confidential information similar or relevant to that which I had access to during the twelve (12) months preceding the termination of my employment or relationship with Groupon. The Geographic Area shall mean any geographic territory where I was assigned to work and/or over which I had responsibilities during the twelve (12) months preceding the termination of my employment or relationship with Groupon and any area within a 50-mile radius of such geographic territory;

       (b)     Directly or indirectly: (i) induce or attempt to induce any merchant, customer, supplier, licensee, or business relation of Groupon to cease doing business with Groupon, or in any way interfere with the relationship between Groupon and any merchant, customer, supplier, licensee, or business relation of Groupon; or (ii) solicit or participate in soliciting the business of any then-current or prospective merchant or customer which was a merchant or customer of Groupon within one year prior to such solicitation, to purchase products or services similar to, or competitive with, the products or services then-offered by Groupon, if I had direct contact with the merchant or customer or any confidential information related to such products or services during the twelve (12) months preceding the termination of my employment or relationship with Groupon;

       (c)     Solely or jointly with others, and directly by my own actions or indirectly by the actions of other people or companies acting on my behalf or at my behest solicit, encourage, or take any other action, including but not limited to, using an agent to solicit, which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee or independent contractor/consultant of Groupon to terminate his/her employment with Groupon or to cease providing services to Groupon; and

       (d)     Solely or jointly with others, and directly by my own actions or indirectly by the actions of other people or companies acting on my behalf or at my behest hire, contract, take away or cause to be hired, contracted or taken away any employee or independent contractor/consultant of Groupon.

     14.    <u>Reasonableness of Restrictive Covenants</u>.  I acknowledge that the Restrictive Covenants contained herein may limit and/or restrict me from soliciting talent, pursuing business relationships and/or pursuing future employment opportunities, despite the fact that those opportunities may be attractive, provide higher compensation, and may not be available at the conclusion of the Restricted Period.  I acknowledge that the Restrictive Covenants are nonetheless reasonable given the nature of Groupon's business; the valuable relationships Groupon has with its employees, contractors/consultants, merchants and customers, which were developed at considerable expense, time and difficulty; my position with Groupon; and my knowledge of Groupon's business, including Groupon's trade secrets.

     15.    <u>Notifications, Certification and Exit Interview</u>.  While employed by Groupon and during the Restricted Period, I agree:

(a)      (i) To provide a copy of this Agreement to any person or entity from whom I seek work or employment as an employee, consultant, temporary worker, owner and/or independent contractor in the same or similar industry as Groupon or in a position with the same or similar job responsibilities or duties as I had at Groupon; and (ii) authorize Groupon to provide a copy of this Agreement to any such person or entity and discuss the provisions of this Agreement with said person or entity;

(b)      To identify in writing within three (3) business days of a request by a Human Resources representative: (i) all persons or entities with whom I have accepted or plan to accept employment or work as an employee, consultant, temporary worker, owner and/or independent contractor in the same or similar industry as Groupon or in a position with the same or similar job responsibilities or duties as I have/had at Groupon; and (ii) provide to Groupon a general job description identifying my title and describing my duties and responsibilities in my new engagement;

(c)      To certify my compliance with this Agreement in writing, if requested by a Human Resources representative; and

(d)      To make myself available for an exit interview with a designated Groupon representative at the time of my departure from Groupon.

## III.    **Miscellaneous Employment Provisions**

16.      <u>At-Will Employment</u>.   I will perform for Groupon such duties as may be designated by Groupon from time to time.  I agree that my employment with Groupon is for no specified term, and may be terminated by Groupon at any time, with or without cause, and with or without notice.  Similarly, I may terminate my employment with Groupon at any time, with or without cause, and with or without notice.

17.      <u>Loyalty to Groupon and Other Employment</u>.  While employed by Groupon, I will devote my full professional time, attention and loyalty to Groupon.  I will not be employed by, consult for, contract with or work for, in any capacity, any person or entity that could harm Groupon's reputation or good name or that could be detrimental to Groupon's business, including its relationship with other businesses and its employees, as determined by Groupon. Further, I will not engage in any other employment (or contractor relationship) without the prior written consent of a Groupon Human Resources Business Partner.  I understand that Groupon's Global Code of Conduct contains information about my duty of loyalty, among other things, and agree to review and abide by it.

18.      <u>Return of Equipment</u>.   Upon termination (or reassignment or at the request of Groupon, if directed), I agree to immediately return all Groupon-issued equipment, including my laptop computer, desktop computer, accessories (monitors and keyboards), tablets and cellular devices.  I understand that if I do not return such equipment or if I return such equipment damaged and/or inoperable, Groupon reserves the right to: (i) withhold my wages or other monies owed until all such materials are returned in working order or deduct from my paycheck the fair market value of the equipment, consistent with the requirements of applicable law; and/or (ii) take legal action to recover the equipment or the reasonable cost of the equipment.  I

further agree that if Groupon takes legal action and prevails in such action, I will reimburse Groupon for all costs incurred taking such action, including but not limited to, reasonable attorneys' fees and court costs.

19.     <u>Survival</u>.   This Agreement: (a) shall survive my employment with Groupon; (b) does not in any way restrict my right or the right of Groupon to terminate my employment at any time, for any reason or for no reason; (c) inures to the benefit of successors and assigns of Groupon; and (d) is binding upon my heirs and legal representatives.

20.     <u>Injunctive Relief</u>.   A breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Groupon for which there will be insufficient adequate remedy at law, and Groupon shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).   Groupon shall be irreparably harmed if I were to violate this Agreement and no bond shall be necessary by Groupon in connection with any injunctive relief obtained against me for a violation of this Agreement.   Should Groupon successfully enforce any portion of this Agreement before a trier of fact or in an arbitration proceeding, Groupon shall be entitled to all of its reasonable attorney's fees and costs incurred as a result of enforcing this Agreement against me.

21.     <u>Consideration</u>.   I acknowledge and agree that I have received good and valuable consideration in exchange for entering into this Agreement, including but not limited to my offer of employment, continued employment, employee benefits, training, career progression and promotions, access to confidential information and any other monetary benefits I received at the time of signing this Agreement.

22.     <u>Notices</u>.   Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when delivered personally; (b) by overnight courier, upon written verification of receipt; (c) by telecopy or facsimile transmission, upon acknowledgment of receipt of electronic transmission; (d) by electronic mail, upon acknowledgment of receipt of electronic submission; or (e) by certified or registered mail, return receipt requested, upon verification of receipt. Notices to me shall be sent to any address in Groupon's records or such other address as I may specify in writing.   Notices to Groupon shall be sent to Groupon's Head of Human Resources or to such other address as Groupon may specify in writing.

23.     <u>Governing Law</u>.   I acknowledge and represent that I have substantial material connections to Illinois by way of my employment with Groupon.   As such, I agree that this Agreement shall be governed in all respects by the laws of the United States of America and by the laws of the State of Illinois.   Each of the parties irrevocably consents to the exclusive personal and subject matter jurisdiction of the federal and state courts located in Illinois, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in Illinois, such personal jurisdiction shall be nonexclusive.   The forum for any disputes arising out of this Agreement shall be in the federal and state courts of Illinois.

24.    Severability.  If any provision of this Agreement, including but not limited to the Restrictive Covenants contained in Section II, is held by a court of law to be illegal, invalid or unenforceable, I agree that: (i) the provision shall be deemed amended to achieve as nearly as possible the same economic effect as the original provision; and (ii) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.  If any court of law finds this Agreement to be void for lack of consideration, I agree that I will be bound by any prior agreement I entered into with Groupon containing similar terms.

25.    Waiver; Amendment; Modification.  The waiver by Groupon of a term or provision of this Agreement, or of a breach of any provision of this Agreement by me, shall not be effective unless such waiver is in writing signed by Groupon.  No waiver by Groupon of, or consent by Groupon to, a breach by me, will constitute a waiver of, consent to or excuse of any other or subsequent breach by me.  Groupon's delay or failure to enforce or insist on strict compliance with any provision of this Agreement will not constitute a waiver or otherwise modify this Agreement.  Groupon's waiver of any right granted under this Agreement on one occasion will not: (a) waive any other right; (b) constitute a continuing waiver; or (c) waive that right on any other occasion.  This Agreement may be amended or modified only with the written consent of both Groupon and me.  No oral waiver, amendment or modification shall be effective under any circumstances whatsoever.

26.    Entire Agreement.  This Agreement represents my entire understanding with Groupon with respect to the subject matter contained herein and supersedes all previous understandings, written or oral, other than as provided for in paragraph 24 herein.  Excluded from the subject matter of this Agreement are any "Covered Claims" under Groupon's Mutual Arbitration Agreement.

I certify and acknowledge that I have carefully read all of the provisions of this Confidentiality, Intellectual Property and Restrictive Covenants Agreement and that I understand and will fully and faithfully comply with such provisions.

"COMPANY"                                    EMPLOYEE
Groupon, Inc.

*Claudine Kourkoumelis*

Claudine Kourkoumelis                        Signature: *Sung Shin*
Chief People Officer                         Sung Shin (Mar 17, 2021 08:56 PDT)
Groupon, Inc.                                **Email:** sunghshin@gmail.com

# Exhibit E

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-Q

☑    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended September 30, 2021

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition period from            to

Commission file number: 001-35444

# YELP INC.

(Exact Name of Registrant as Specified in Its Charter)

| Delaware | 20-1854266 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**140 New Montgomery Street, 14th Floor**
**San Francisco, California 94105**
(Address of principal executive offices) (Zip Code)

**(415) 908-3801**
(Registrant's Telephone Number, Including Area Code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, par value $0.000001 per share | YELP | New York Stock Exchange LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☑ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

As of October 29, 2021, there were 73,016,049 shares outstanding of the registrant's common stock, par value $0.000001 per share.

Table of Contents

YELP INC.
QUARTERLY REPORT ON FORM 10-Q
TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **Part I.** | **Financial Information** | |
| Item 1. | Financial Statements (Unaudited) | |
| | Condensed Consolidated Balance Sheets | 4 |
| | Condensed Consolidated Statements of Operations | 5 |
| | Condensed Consolidated Statements of Comprehensive Income (Loss) | 6 |
| | Condensed Consolidated Statements of Stockholders' Equity | 7 |
| | Condensed Consolidated Statements of Cash Flows | 9 |
| | Notes to Condensed Consolidated Financial Statements | 10 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 35 |
| Item 4. | Controls and Procedures | 35 |
| **Part II.** | **Other Information** | |
| Item 1. | Legal Proceedings | 36 |
| Item 1A. | Risk Factors | 36 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 37 |
| Item 3. | Defaults Upon Senior Securities | 37 |
| Item 4. | Mine Safety Disclosures | 37 |
| Item 5. | Other Information | 37 |
| Item 6. | Exhibits | 38 |
| **Signatures** | | |

_____

Unless the context suggests otherwise, references in this Quarterly Report on Form 10-Q (the "Quarterly Report") to "Yelp," the "Company," "we," "us" and "our" refer to Yelp Inc. and, where appropriate, its subsidiaries.

Unless the context otherwise indicates, where we refer in this Quarterly Report to our "mobile application" or "mobile app," we refer to all of our applications for mobile-enabled devices; references to our "mobile platform" refer to both our mobile app and the versions of our website that are optimized for mobile-based browsers. Similarly, references to our "website" refer to versions of our website dedicated to both desktop- and mobile-based browsers, as well as the U.S. and international versions of our website.

**ITEM 2.**      **MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and related notes appearing elsewhere in this Quarterly Report. This discussion contains forward-looking statements that reflect our plans, estimates and beliefs, and involve risks and uncertainties. Our actual results and the timing of certain events could differ materially from those anticipated in these forward-looking statements as a result of several factors, including those discussed in the section titled "Risk Factors" included under Part I, Item 1A in our Annual Report. See "Special Note Regarding Forward-Looking Statements" in this Quarterly Report.*

**Overview**

As one of the best known internet brands in the United States, Yelp is a trusted local resource for consumers and a partner in success for businesses of all sizes. Consumers trust us for our more than 200 million ratings and reviews of businesses across a broad range of categories, while businesses advertise with us to reach our large audience of purchase-oriented and generally affluent consumers. We believe our ability to provide value to both consumers and businesses not only fulfills our mission to connect consumers with great local businesses, but also positions us well in the local, digital advertising market in the United States.

We generate substantially all of our revenue from the sale of performance-based advertising products, which our advertising platform matches to individual consumers through auctions priced on a cost-per-click ("CPC") basis. In the three months ended September 30, 2021, our net revenue was $269.2 million, up 22% from the three months ended September 30, 2020, and we recorded net income of $18.1 million and adjusted EBITDA of $70.7 million. In the nine months ended September 30, 2021, our net revenue was $758.4 million, which represented an increase of 19% from the nine months ended September 30, 2020, and we recorded net income of $16.5 million and adjusted EBITDA of $178.2 million. For information on how we define and calculate adjusted EBITDA, and a reconciliation of this non-GAAP financial measure to net income (loss), see "Non-GAAP Financial Measures" below.

As a result of our investments in product, marketing and our Multi-location sales team, we made further progress on our revenue growth initiatives in the third quarter of 2021:

- *Improve monetization of our Services categories.* We continued to differentiate the product experience for businesses and consumers in our Services categories in the third quarter. In addition to adding custom search filters to better match consumers with the right Services businesses for their projects, we launched Yelp Project Cost Guides based on data from Request-A-Quote to help consumers make informed decisions when hiring a service professional. We also rolled out a new ad format, Themed Ads, which enables advertisers to highlight their ads in a carousel above search results based on attributes that make their businesses unique, such as "fast responding." These efforts contributed to advertising revenue from our Services categories increasing 18% compared to the third quarter of 2020 and 17% compared to the third quarter of 2019.

- *Expand our Self-serve and Multi-location sales channels.* Advertising revenue from our Self-serve channel increased by more than 45% year over year in the third quarter, as marketing investments such as improvements to our ads purchase flow and business owner platform helped increase the retention rate for non-term advertiser budgets. Advertising revenue from Multi-location customers increased by more than 30% compared to the third quarter of 2020 and by nearly 10% from the second quarter of 2021 due to continued strong interest in recently launched products, such as Yelp Audiences, and improvements to established products, such as Spotlight Ads.

- *Deliver more value to advertisers.* Increasing our value proposition to advertisers by delivering more ad clicks at a lower average price is an important part of our strategy to drive long-term growth and has been a focus of our product investment in recent years. In the third quarter, improvements to our ad system and matching technology, as well as front-end merchandising, drove a 28% year-over-year increase in ad clicks and a 1% year-over-year decrease in average CPC.

Our consistent execution and more strategic initiatives drove a 22% year-over-year increase in net revenue in the third quarter, equal to our record quarterly performance, despite revenue from our Restaurants, Retail & Other categories remaining below pre-pandemic levels due to COVID-19 surges and nationwide labor and supply chain issues. As a result of the structural improvements to our business and continued expense management, our strong revenue performance in the third quarter benefited our bottom line: we delivered net income margin of 7% and adjusted EBITDA margin of 26%. We plan to further invest in our growth initiatives in the remainder of the year.

# Exhibit F

# Competitors

- **Yelp** has localized Instagram accounts making Holiday gifting suggestions, including a larger push to Yelp's Holiday Bazaar

  ○ State Street Brats, an institution in Madison, WI, is shipping nationwide

  ○ The Chicago IG account linked directly to Four Sided Chicago for gifting needs

  ○ The Main Yelp IG account is still sharing amazing and inspiring UGC from their local businesses and have a #MeetTheOwner series running, somewhat similar to our merchant spotlights





**GROUPON**

CONFIDENTIAL - REDACTED

# Exhibit G



# Leading local guide with plenty of room for growth

Mobile reach[1]

| | | | | | | |
|---|---|---|---|---|---|---|
| 36% | 28% | 23% | 12% | 3% | 2% | 2% |
| Yelp | Groupon | TripAdvisor | YP Sites | FourSquare | HomeAdvisor | Angie's List |

[1] As defined by penetration of U.S. smartphones. Source: ComScore, December 2017, Mobile Media Metrix, Browsing + Application Data.



# Exhibit H



### AEGIS CAPITAL CORP

**Internet Media**
**Victor Anthony**
646-502-2452
VAnthony@aegiscap.com

**Company Update**

Octobe  , 20 9

**Key Metr cs**

| Y   P - NYS | $34 75 |
|---|---|
| Pricing Date | Sep 20 2019 |
| Price Target | $45 00 |
| 52-Week Range | $52 19 - $29 33 |
| Shares Outstanding (mm) | 73 0 |
| Market Capita ization (mm) | $2,536 8 |
| 3-Mo Average Dai y Vo ume | 1,413,295 |
| Book Va ue Share | $13 13 |
| Price Book | 2 6x |

**EPS FY: December**

| | 2018A | Prior 2019E | Curr. 2019E | Prior 2020E | Curr. 2020E |
|---|---|---|---|---|---|
| 1Q-Mar | 0 03 | -- | 0 02A | -- | (0 03) |
| 2Q-Jun | 0 12 | -- | 0 16A | -- | 0 13 |
| 3Q-Sep | 0 17 | -- | 0 14 | -- | 0 18 |
| 4Q-Dec | 0 37 | -- | 0 19 | -- | 0 26 |
| FY | 0 64 | -- | 0 49 | -- | 0 54 |
| P | 54 30x | | 70 92x | | 64 35x |

*GAAP EPS*

**Revenue (M)**

| | 2018A | Prior 2019E | Curr. 2019E | Prior 2020E | Curr. 2020E |
|---|---|---|---|---|---|
| 1Q-Mar | 223 1 | -- | 235 9A | -- | 261 0 |
| 2Q-Jun | 234 9 | -- | 246 9A | -- | 271 8 |
| 3Q-Sep | 241 1 | -- | 262 9 | -- | 285 8 |
| 4Q-Dec | 243 7 | -- | 276 2 | -- | 301 6 |
| FY | 942 8 | -- | 1,022 1 | -- | 1,120 2 |

**Company Description:**
*Yelp connects users with local businesses. The site hosts over 115 million user-submitted reviews on a variety of local businesses and has over three million claimed local business locations. Yelp was founded by Jeremy Stoppelman and Russel Simmons in 2004, and is headquartered in San Francisco, California. The company went public on March 2nd, 2012, at $16 per share.*

# Yelp Inc.
# Rating: Buy

### Groupon+Yelp Follow-up; A Combination Is The Best Path Forward

### Investment Highlights:

In  h s no e, we h ghl gh  he ma n  akeaways and ques ons f om  nves o s o ou no e *"Acquisition of Yelp By Groupon Makes Sense; Material Upside For Yelp's Shareholders"* ([l nk])  In  ally,  nves o s we e skep  cal  ha  G oupon could pull off an acqu s  on of Yelp, bu  upon walk ng  h ough  he deal ma h, he  skep  c sm waned  We con  nue  o bel eve  ha  a comb na  on w h G oupon  s he bes  pa h o follow  o unlock value fo  Yelp's sha eholde s

**Can IAC Play A Role?** Wh le   makes sense  ha  IAC would be  n e es ed  n play ng a  ole g ven  he  s ong unde s and ng of  he dynam cs of  he local ma ke   h ough owne sh p of ANGI Homese v ces, and p ev ous asse s such as C  ySea ch/C  yG  d and U banspoon, we bel eve  ha  IAC would mo e l kely be  n e es ed  n acqu  ng  he comb ned Yelp G oupon company  a he  han  he  nd v dual publ c en  es  The syne g es would make  he comb ned company mo e a  ac  ve o IAC  All else, as we s a ed  n ou  p ev ous no e, we bel eve G oupon,  f  acqu ed Yelp, would  mmed a ely en e  n o a pa ne sh p w h ANGI on  he Reques -a-Quo e p oduc

**Why Doesn t Yelp In t ate The Process?** They can  Bu  we bel eve Yelp w ll f nd  l m  ed success f nd ng buye s  Fo  one,  s a eg c buye s l ke T  p and IAC would l kely s uggle  o f nd a pu e  a  onale  o own Yelp  As we no ed above, IAC would  a he  pa nc w h Yelp now on  he  Reques -a-Quo e p oduc  bu  would f nd  he comb ned Yelp  G oupon company mo e a  ac  ve  (Book ngs com  s a w ldca d) Second,  he mega-cap In e ne  compan es l ke Alphabe /Google and Facebook offe  some level of local  ev ews  Of  he  wo, Google would make  he mos  sense bu  we unde s and  ha  hey a e sa sf ed w  h how  he  bus ness ev ews have  ended  Facebook once pushed bus ness  ev ews bu  have s nce scaled back  ha  amb  on  g ven  ha   s no key o he  g ow h s o y  Amazon ex  ed  he deals space and we see no clea  a  onale fo  he company  o own Yelp  Mo eove , g ven  he  egula o y/ an  us backd op, an acqu s  on w h  he local space  s he las  h ng  he mega-cap In e ne  s ocks would pu sue  Th d,  f nanc al buye s a e l kely  o f nd  ha  he leve age buyou  ma h  s no  favo able because  hey canno  cu  cos s w  hou  sac  f c ng  evenue g ow h  Las ly, le 's no  fo ge  ha  Yelp once   ed  o sell  self  n 2015 (WSJ [l nk]) bu  found ze o buye s

**Yelp Should Offer To Buy Groupon**  They can  The ma h can wo k e  he  way

**The Result ng Leverage Levels W ll Be To H gh For Lenders...** In ou  no e, we showed  ha  an all-cash deal would lead  o a p o-fo ma leve age  a  o of 4 5x wh le a cash s ock deal would lead  o a p o fo ma leve age  a  o of 2 7x  Fo   efe ence we po n   o seve al p eceden  deal  ansac  ons w h leve age  a os equal  o o  no  h of ou  es ma es  (1) Shu  e fly's go-p va e  ansac  on was leve ed a  ove  6x  (2) Ma ch G oup wen  publ c w  h a leve age  a  o of 4 5x  and  (3) The XO G oup

Wedd ng W  e  ansac  on had a second l en p o fo ma leve age no   o exceed 5 4x

**...And Interest Expenses W ll Be D ff cult To Serv ce**  W h ou  p o fo ma cos syne gy EBITDA of $770M ($900M  nclud ng  evenue syne g es) and a  ough EBITDA- o-FCF conve s on of 60%,  he comb ned company would have mo e  han enough FCF  o se v ce  he annual n e es  expense  Tha 's e he   n an all-cash deal ($3B  n new deb )  o  he $30 cash-pe  sha e plus G oupon's ock scena  o ($1 7B  n new deb ) we la d ou   n ou  no e  The  ema n ng cash flows would be mo e  han suff c en   o deleve  and  nves  n g ow h  n  a  ves  Valua  on Me hodology and R sk Fac o s on page 12

---

The Disclosure section may be found on pages 12 - 14 of this report.

©2021, A p  aSe  se, I c A   Rg  s Rese ved  A p  aSe  se  s a se v ce   a k of A p  aSe  se, I c A  o e   ade  aks  e  o ed  eo g o  e  espec  ve ow e s

Yelp Inc.                                                                                    October 1, 2019

## Why We Believe Yelp and Groupon Should Combine

- These are two of the best-known brands addressing the online local services market – both with high brand awareness and a shared vision of connecting consumers with local businesses.

- Yelp has a strong position at the top of the funnel with high organic traffic.    Groupon has a strong position at the bottom of the funnel with $3B in annual gross bookings and an effective monetization engine that delivers ROI for suppliers. Groupon struggles with organic traffic growth while Yelp struggles monetizing its merchants.

- Combined they solve their weaknesses, strengthen areas where they are strong, and establish a category leader, where one currently does not exist.

- We see significant synergies – about $200M in cost synergies and about $100M in revenue synergies.     We walk through very detailed math in the note.

- The result would be a scaled Internet company, with a high level of profitability, and material upside for shareholders of both companies.

- We think Groupon can easily finance this deal.

- It's a Win-Win for both group of shareholders.

2  **AEGIS CAPITAL CORP.**

©2021, A p aSe se, I c A  R g  s Rese ved A p aSe se  s a se v ce   a k of A p aSe se, I c A  o e   ade  a ks  e  o ed  e o g o  e espec  ve ow  e s

# Exhibit I



# Yelp Inc.

YELP - NYSE

**Institutional Equity Research**

April 12, 2020

## Adjusting Estimates for Coronavirus Outbreak; BUY

*CONCLUSION: We are reiterating our **BUY** rating for YELP while lowering our price target to $26 from $48. Our new price target is based on our updated discounted cash flow analysis, including our long-term adj. EBITDA margin forecast of 32.5% (unchanged) versus 21.1% in 2019.*

**Details**

- The company filed an 8K last Thursday to indicate the following:
- Yelp was laying off 1K employees
- It was furloughing 1.1K employees
- The company also suspended its $950M repurchase plan effort, which had $269M remaining on its authorization as of January 15th (according to its 10K).
- As of March 31st, it had $491M in cash and was considering additional ways to improve its liquidity.
- Recall, the company had provided an investor update on March 19th, where it suspended its full-year outlook.
- Following the update, we revised our earnings model to reflect the impact of the coronavirus outbreak on its operating results.
- Similar to our other covered companies where we have adjusted numbers, our current assumptions are, the majority of economic weakness will occur in 2Q20 and the first half of 3Q20. We are projecting an improving economy in the second half of 3Q20 and 4Q20. Versus our original projections, we forecast improvements in 2021, but, a still challenging environment, when compared to our original forecast.
- As we have noted in our weekly reports on the impact of the coronavirus outbreak on the Consumer Technology sector, we see GRPN and YELP as having the greatest risk because local businesses are their lifeblood. We made significant adjustments to our operating projections for YELP and are continuing to monitor the situation, in the event additional adjustments are required. Lastly, we are monitoring the CARES Act and potential for additional legislation to support small businesses, which could be beneficial to Yelp.

## Buy

| Price Target | ↓$26.00 |
| --- | --- |
| Price (4/8/20) | $21.64 |
| Industry | CONSUMER |

### Valuation & Performance

| | |
| --- | --- |
| Total Debt/Total Capital | n.a. |
| Cash per share (12/31/19) | $5.29 |
| BV Per Share (12/31/19) | $9.68 |
| Dividend | $0.00 (0.0%) |
| Return on Equity (T-T-M) | 4.5% |

### Trading Data

| | |
| --- | --- |
| Shares Outstanding (M) | 78.0 |
| Market Capitalization ($M) | $1,687.2 |
| 52-week range | $12.89 - $40.99 |
| Avg. Volume (3-mth.) (K) | 2,510.0 |

**Tom Forte, CFA**
MD, Senior Research Analyst
212-223-5364
tforte@dadco.com

**Elliot Alper**
Senior Research Associate
212-223-5363
ealper@dadco.com

### Company Description

San Francisco, CA - Yelp's mission is to connect consumers with great local businesses. With 177M reviews since its launch in 2004, Yelp operates the largest crowd-sourced local business directory in the world. It boasts an audience of 104M monthly mobile users (when combining data on unique visitors and unique devices) and 69M monthly mobile unique users (as of 4Q19). Its headquarters are located in San Francisco, California. Headcount was 5,950 as of 4Q19, including 3,600 for sales. The company went public in 2011.

### Price Performance

NYSE: YELP



| FY (Dec) | | 2019A | 2020E | Previous | Cons. | 2021E | Previous | Cons. |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **EBITDA** | Q1 (Mar) | $39.3 | $37.1E | $37.7 | $34.3 | n.a. | - | n.a. |
| ($M) | Q2 (Jun) | $54.9 | $0.0E | $64.7 | $35.7 | n.a. | - | n.a. |
| | Q3 (Sep) | $58.3 | $25.8E | $65.9 | $54.2 | n.a. | - | n.a. |
| | Q4 (Dec) | $61.0 | $41.5E | $77.7 | $67.2 | n.a. | - | n.a. |
| | | $213.5 | $104.3E | $246.0 | $185.1 | $88.0E | $268.1 | $230.0 |
| *EV/EBITDA* | | *15.2x* | *31.0x* | | | *36.8x* | | |
| **Revenue** | Q1 (Mar) | $235.9 | $251.2E | $255.3 | $239.6 | n.a. | - | n.a. |
| ($M) | Q2 (Jun) | $247.0 | $122.9E | $274.5 | $215.9 | n.a. | - | n.a. |
| | Q3 (Sep) | $262.5 | $169.5E | $289.6 | $249.6 | n.a. | - | n.a. |
| | Q4 (Dec) | $268.8 | $206.9E | $297.8 | $268.7 | n.a. | - | n.a. |
| | | $1,014.2 | $750.5E | $1,117.2 | $945.5 | $610.7E | $1,187.9 | $1,084.0 |
| *EV/Sales* | | *3.2x* | *4.3x* | | | *5.3x* | | |

Adjusted EBITDA

**Please refer to pages 7 - 8 of this report for detailed disclosure and certification information.**

**D.A. Davidson & Co. Member SIPC**

©2021, A p aSe se, I c A R g s Rese ved A p aSe se s a se v ce a k of A p aSe se, I c A o e ade a ks e o ed e o g o e espec ve ow e s

# Exhibit J

# Re: Good Feedback

**email: "sushin@groupon.com Sung Shin"**          **Wednesday, August 4, 2021 at 7:34:07 PM Central Daylight Time**
To: email: "sgoodall@groupon.com Simon Goodall"

Thanks! Appreciate the feedback.

I started digging more into Yelp Audiences this afternoon. From what I can gather, it's not entirely new. My guess is it's an evolution of Yelp Custom Audiences, which they launched in 2017. They built that on top of LiveRamp, which is not surprising

--
Sung Shin
VP, Global Head of Advertising and Ancillary Revenue | **GROUPON**
mobile  240.404.8061
sushin@groupon.com

**CONFIDENTIAL - REDACTED**

# Exhibit K

# Yelp Is Worth Billions More (NYSE:YELP) | Seeking Alpha

**email: "sushin@groupon.com Sung Shin"**                    **Thursday, May 20, 2021 at 11:15:46 PM Central Daylight Time**
To: email: "sushin@groupon.com Sung Shin"

https://seekingalpha.com/article/4188959-yelp-is-worth-billions

------
Sung Shin
(240)404-8061