# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GROUPON, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-06082 |
| | ) | |
| SUNG SHIN, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF GROUPON, INC.'S MEMORANDUM OF LAW IN SUPPORT OF**
**<u>EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................1

FACTUAL BACKGROUND................................................................................3

    I.      GROUPON'S BUSINESS ...................................................................3

    II.     SHIN'S EMPLOYMENT WITH GROUPON.....................................4

          A.     The Offer of Employment.....................................................4

          B.     Shin's Agreement with Groupon...........................................5

          C.     Shin's Role and Duties at Groupon .......................................8

    III.    YELP AND GROUPON ARE DIRECT COMPETITORS.................11

ARGUMENT.....................................................................................................13

    I.      THIS COURT HAS PERSONAL JURISDICTION OVER SHIN. ....13

    II.     ILLINOIS LAW APPLIES NOTWITHSTANDING SHIN'S
          WASHINGTON RESIDENCY.........................................................15

    III.    THE GOVERNING LEGAL STANDARD WARRANTS ISSUANCE OF
          A TRO. ...........................................................................................17

    IV.    GROUPON IS LIKELY TO SUCCEED ON THE MERITS OF ITS
          CLAIMS. .........................................................................................17

          A.     Groupon is Likely to Succeed on the Merits of its Breach of
                  Contract Claim Based on Shin's Breach of the Agreement.....................18

               1.     Shin's Agreement Is a Valid and Enforceable Contract .............18

                        a.     The Non-Competition Covenant in the Agreement
                              is Ancillary to a Valid Relationship and Supported
                              by Adequate Consideration...............................................18

                        b.     The Non-Competition Covenant is Reasonable and
                              Necessary to Protect Groupon' Legitimate Business
                              Interests. .........................................................................19

                        c.     The Temporal and Geographic Limits Are
                                Reasonable Given Shin's Knowledge and the Scope
                              of Groupon' Business. ....................................................21

                        d.     The Agreement's Non-Competition Covenant Is
                                Enforceable Under Washington Law. .............................23

                        e.     Shin's likely reliance on CVS v. Brown is
                                misplaced. .......................................................................24

               2.     Groupon Satisfies the Remaining Elements of its Breach of
                    Contract Claims. .........................................................................25

B.     Groupon Will Succeed on the Merits of Its Claim for Threatened Misappropriation of Trade Secrets Against Shin. ....................................27

      1.     Groupon's Advertising Strategies and the Data From Which They Are Derived Constitute Trade Secrets. ...................27

      2.     Shin's Conduct Creates an Imminent Threat of Misappropriation..............................................................................30

V.      GROUPON WILL SUFFER IRREPARABLE HARM ABSENT A TRO. .........32

VI.     GROUPON LACKS AN ADEQUATE REMEDY AT LAW. ...........................33

VII.    THE BALANCE OF HARDSHIPS FAVORS GROUPON BECAUSE SHIN'S NEW POSITION AT YELP WILL DIMINISH THE VALUE OF GROUPON'S TRADE SECRETS. ....................................................................34

VIII.   ISSUANCE OF A TRO WOULD NOT HARM THE PUBLIC INTEREST. ..........................................................................................................36

CONCLUSION..................................................................................................................37

TABLE OF AUTHORITIES

Page(s)

Federal Cases

*Allied Waste Servs. of N. Am., LLC v. Tibble*
    177 F. Supp. 3d 1103 (N.D. Ill. 2016)..................................................................29

*Bally Export Corp. v. Balicar, Ltd.*
    804 F.2d 398 (7th Cir. 1986) ............................................................................12

*Brunswick Corp. v. Jones*
    784 F.2d 271 (7th Cir. 1986) ............................................................................33

*Computer Assocs. Int'l v. Quest Software, Inc.*
    333 F. Supp. 2d 688 (N.D. Ill. 2004)..................................................................30

*E\*TRADE Fin. Corp. v. Pospisil*
    2018 WL 4205401 (N.D. Ill. Sept. 4, 2018) .......................................................31

*Fire 'Em Up, Inc. v. Technocarb Equipment (2004) Ltd.*
    799 F. Supp. 2d 846 (N.D. Ill. 2011)..................................................................27

*Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*
    2013 WL 1446425 (N.D. Ill. Apr. 9, 2013).........................................................19

*GE v. Uptake Techs., Inc.*
    394 F. Supp 815 (N.D. Ill. 2019) ................................................................ 14, 15

*HCAFranchise Corp. v. Alisch*
    2016 WL 10706285 (N.D. Ind. Aug. 12, 2016)...................................................31

*IDS Fin. Servs., Inc. v. Smithson*
    843 F. Supp. 415 (N.D. Ill. 1994) .....................................................................30

*Inmar, Inc. v. Vargas*
    2018 WL 6716701 (N.D. Ill. Dec. 21, 2018).......................................................28

*Keach v. United States Trust Co.*
    313 F. Supp. 2d 818 (C.D. Ill. 2004)..................................................................22

*La Calhene, Inc. v. Spolyar*
    939 F. Supp. 523 (W.D. Wis. Aug. 23, 1996) ....................................................34

*Long v. Bd. of Educ.*
    167 F. Supp. 2d 988 (N.D. Ill. 2001)............................................................ 16, 31

*Lucini Italia Co. v. Grappolini*
    2003 WL 1989605 (N.D. Ill. April 28, 2003) ........................................................... 34

*Majumdar v. Fair*
    No. 1:21-cv-0928, 2021 WL 4864147 (N.D. Ill. Oct. 19, 2021) ............................................ 12

*Mickey's Linen v. Fischer*
    2017 WL 3970593 (N.D. Ill. Sep. 8, 2017) ..................................................................... 19, 29

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*
    No. 16 C 03545, 2017 WL 1954531 (N.D. Ill. May 11, 2017) ........................................... 29

*My Favorite Muffin, Too, Inc. v. Maosheng Wu*
    2002 WL 826483 (N.D. Ill. Apr. 29, 2002) ........................................................................ 20

*Packaging Corp. of Am., Inc. v. Croner*
    419 F. Supp. 3d 1059 (N.D. Ill. 2020) ................................................................................ 25

*PepsiCo, Inc. v. Redmond*
    54 F.3d 1262 (7th Cir. 1995) ................................................................................. 25, 28, 29

*Reeve v. Ocean Ships, Inc.*
    Case No. 10 C 8147, 2011 WL 3165765 (N.D. Ill. July 27, 2011) ..................................... 12

*Stuller, Inc. v. Steak N Shake Enterps., Inc.*
    695 F.3d 676 (7th Cir. 2012) ............................................................................................. 33

*Tekway Inc. v. Agarwal*
    No. 19-CV-6867, 2020 WL 5946973 (N.D. Ill. Oct. 7, 2020) ...................................... 13, 14

*Traffic Tech, Inc. v. Kreiter*
    No. 14-cv-7528, 2015 U.S. Dist. LEXIS 169248 (N.D. Ill. Dec. 18, 2015) ....................... 18

*Vencor, Inc. v. Webb*
    33 F.3d 840 (7th Cir. 1994) .............................................................................................. 30

*Vendavo, Inc. v. Long*
    397 F. Supp. 3d 1115 (N.D. Ill. 2019) ............................................................................... 28

*W. Capra Consulting Grp., Inc. v. Snyder*
    2019 WL 3935045 (N.D. Ill. Aug. 20, 2019) ............................................................... 32, 33

*W.S.R. v. Sessions*
    318 F. Supp. 3d 1116 (N.D. Ill. 2018) ............................................................................... 32

*Winter v. Natural Resources Defense Council, Inc.*
    555 U.S. 7 (2008) .............................................................................................................. 30

State Cases

*Abel v. Fox*
654 N.E.2d 591 (Ill. App. Ct. 4th Dist. 1995) ...................................................17

*Cent. Water Works Supply, Inc. v. Fisher*
240 Ill. App. 3d 952 (Ill. App. Ct. 4th Dist. 1993) ..........................................21

*Dancor Constr., Inc. v. FXR Constr., Inc.*
64 N.E.3d 796 (2d Dist. 2016) ........................................................................14

*McElroy, Inc. v. Delaney*
72 Ill. App. 3d 285 (Ill. App. Ct. 1st Dist. 1979) .......................................20, 21

*McInnis v. OAG Motorcycle Ventures, Inc.*
35 N.E.3d 1076 (Ill. App. Ct. 2015) .................................................................18

*McRand, Inc. v. van Beelen*
486 N.E.2d 1306 (Ill. App. Ct. 1st Dist. 1985) ................................................19

*Prairie Rheumatology Assocs., S.C. v. Francis*
24 N.E.3d 58 (Ill. App. Ct. 3d Dist. 2014) ......................................................17

*Reliable Fire Equip. Co. v. Arredondo*
965 N.E.2d 393 (Ill. 2011) ......................................................... 17, 18, 19, 33

*Solargenix Energy, LLC v. Acciona Solar Energy, LLC*
2020 IL App (1st) 180176 ................................................................................14

*Torrence v. Hewitt Assocs.*
493 N.E.2d 74 (Ill. App. Ct. 1st Dist. 1986) ...................................................21

*Tyler Enterps. of Elwood, Inc. v. Shafer*
573 N.E.2d 863 (Ill. App. Ct. 3d Dist. 1991) ..................................................30

*Wolff v. Bethany N. Suburban Grp.*
2021 IL App (1st) 191858 (Ill. App. Ct. 1st Dist. 2021) ....................................17

Federal: Statutes, Rules, Regulations, Constitutional Provisions

18 U.S.C. § 1836(b)(3) ............................................................................................28

18 U.S.C. § 1839(3) ...............................................................................................27

DTSA ................................................................................... 16, 25, 26, 28

Federal Rules of Civil Procedure Rule 65 .............................................................1

State: Statutes, Rules, Regulations, Constitutional Provisions

735 ILCS 1065/2(d) ..................................................................................26

735 ILCS 1065/3(a) ..................................................................................28

ITSA ..............................................................................................*passim*

16W 49.62.010(4) ....................................................................................22

RCW 49.62.020 .......................................................................................22

RCW 49.62.050 .......................................................................................23

RCW §§ 49.62.005-49.62.900 Chapter 49.62 ....................................15, 16

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Groupon, Inc. ("Groupon") respectfully moves for a temporary restraining order enjoining Defendant Sung Shin ("Shin") from breaching his contractual obligations to Groupon and from using Groupon's trade secrets.

## PRELIMINARY STATEMENT

This Court should temporarily enjoin Defendant, Sung Shin, from working for one of Groupon's main competitors, Yelp, Inc. ("Yelp"). Shin, a highly-compensated Groupon executive, is poised to join Yelp in nearly the same role he held at Groupon and, in so doing, he will violate a valid and enforceable contract.

Shin joined Groupon just seven months ago after negotiating a significant compensation package worth almost a million dollars, including a large, upfront $100,0000 sign-on bonus and $700,000 in equity. In return for that lucrative package, Shin agreed to a valid and reasonable non-compete agreement, contained within the Confidentiality, Intellectual Property and Restricted Covenants Agreement ("Agreement"). Then, before his first anniversary at Groupon, Shin abruptly announced he was leaving the company to join Yelp, in violation of the Agreement. Shin has also refused to return the $100,000 sign-on bonus, in violation of another promise.

To be clear, Groupon does not seek to prohibit Shin from gainful employment. When Shin announced his resignation, Groupon offered Shin the opportunity to remain employed at Groupon; it even offered to continue to employ Shin (and provide him with his full base pay of $275,000, annual bonus eligibility, retention of $100,000 sign-on bonus, and benefits) while he searched for employment that did not infringe on his post-employment obligations to Groupon. Shin refused these reasonable overtures, and now Groupon is left with no alternative but to seek emergency injunctive relief.

-1-

Shin is obligated to honor the express promises he made to Groupon and for which he collected a considerable amount of cash in his seven months of service. Shin acknowledged in writing that, if he broke these promises, Groupon would suffer irreparable harm. And Shin's employment with Yelp will undoubtedly cause Groupon irreparable harm in that it will inevitably require him to use, divulge and reference Groupon's critical trade secrets.

Groupon and Yelp directly compete in the hyper-competitive consumer-to-merchant online marketplace and in the corresponding online advertising space. Shin himself acknowledged while at Groupon that Yelp is a direct competitor. He routinely used Yelp as a direct comparator in his work at Groupon to define, hone and execute Groupon's digitalized advertising strategy. Shin's characterization is not surprising; Groupon has long viewed Yelp as a competitor. Yelp's 10-K also reflects it competes directly for the same digitalized advertising spend from a limited set of merchants. And, the market analysts who follow both companies view Groupon and Yelp as direct competitors.

Shin, Groupon, Yelp's 10-K, and the market are not wrong; Yelp and Groupon are direct competitors. Both platforms seek to derive revenue and good will by connecting merchants to customers in similar verticals (e.g., food and drink, health, beauty and wellness, home and automotive) through targeted digitalized advertising, developed and executed to drive revenue to one company over another.

Shin led this advertising team for Groupon and he now seeks to leverage Groupon's hard-earned confidential information and trade secrets for Yelp to do the same thing. Although Shin only worked at Groupon for seven (7) months, he was the architect of Groupon's digitalized advertising strategies. He used his unfettered access to Groupon's most confidential data and

analytics to specially develop and lead a vital advertising strategy for Groupon. Now Shin will, intentionally or inevitably, unfairly use these trade secrets to help Yelp unfairly compete.

This is precisely what Shin agreed not to do when he accepted his contract with Groupon (along with more than a million dollars in compensation and stock), and it is precisely the sort of conduct that Illinois courts do not allow. Shin's attempt to contravene his contractual obligations to Groupon—obligations consistent with and upheld by Illinois law—will irreparably harm Groupon and diminish the value of Groupon's trade secrets and confidential information.

Groupon seeks limited emergency relief from this Court enforcing reasonable and necessary restrictive covenants and prohibiting threatened and inevitable trade secret disclosure. Under clearly established Illinois law and Illinois Supreme Court direction, immediate injunctive relief is warranted to enjoin Shin's unlawful actions and to preserve the *status quo*.

## FACTUAL BACKGROUND

### I. GROUPON'S BUSINESS

Groupon is an online marketplace where multi-location enterprise merchants and small businesses advertise their products and services to earn consumer spend. Groupon operates in three main categories: Local, Goods, and Travel. In these market segments, Groupon targets merchants for advertising spend to facilitate consumer engagement and to drive consumer purchasing.

Small and enterprise merchants use Groupon's advertising platform to promote their local offerings to potential customers and to expose themselves to consumers throughout the purchase cycle. Consumers use Groupon's platforms to search for and discover enterprise and small businesses' services and deals, primarily in the food and beverage, home services, beauty, health, and wellness, and automotive verticals.

Groupon's Local category is its largest and most profitable. This category includes offerings from local merchants and national merchants with a local presence, and comprises multiple verticals of local experiences.

To leverage its competitive advantage in its market segments, particularly Local, Groupon provides merchants targeted and specialized cost per click, cost per impression, and cost per action advertising. To achieve merchant objectives, maintain Groupon's existing advertising relationships, and foster new ones, Groupon has invested years and substantial resources to study and scrutinize small and enterprise merchants' preferences, advertising spends, and returns on advertising spend.

## II.     SHIN'S EMPLOYMENT WITH GROUPON

### A.     *The Offer of Employment*

On February 24, 2021, Groupon extended a verbal offer of employment to Shin. On February 25, 2021, Groupon formally extended Shin an offer of employment as its Vice President – Global Head of Advertising and Ancillary Revenue and, as part of its offer process, sent him a formal Offer Letter (the "Letter") and the Agreement. The Letter expressly stated Groupon's offer of employment was contingent upon Shin's acknowledgement of, and acceptance of, the Agreement, as described herein. *See* Cmplt., ¶ 22, Exhibit B thereto.

The Letter acknowledged that due to the COVID-19 pandemic, Shin would commence his employment remotely. *See* Cmplt., ¶ 22, Ex. B. The Letter set forth Shin's annualized base salary of $275,000 and further detailed Shin's eligibility to participate in Groupon's Annual Bonus Plan with an annual Target Bonus equal to 40% of his base salary as consideration for agreeing to the terms of the Agreement. *Id.* Accordingly, Shin's cash compensation package amounted to

$385,000 per year, if he achieved his target bonus (and he already received $45,000205 in his first tranche of the target bonus).

The Letter further detailed Groupon's grant to Shin of Restricted Share Units valued at $700,000, which was contingent upon his acknowledgement and execution of the Agreement. *Id.* The Letter also detailed Groupon's grant to Shin of a sign-on bonus of $100,000 as additional consideration for the Agreement. *Id.* The Letter explained that if Shin's employment with Groupon were to terminate within two years, the sign-on bonus must be repaid. *Id.*

Groupon provided Shin with the Agreement on February 25, 2021 at the same time it tendered the Letter. Shin signed the Letter that same day. *Id.* He signed the Agreement on March 17, 2021. On March 30, 2021, Groupon paid Shin his $100,000 sign-on bonus. On April 21, 2021, Groupon granted Shin 12,613 restricted share units, as outlined in the Letter. On May 3, 2021, Shin signed the Groupon, Inc. 2011 Incentive Plan Notice of Restricted Share Unit Award and the Groupon, Inc. 2011 Incentive Plan Restricted Share Unit Award Agreement.

### B. Shin's Agreement with Groupon

In consideration for Shin's employment with Groupon, annual compensation of $275,000, a $100,000 sign-on bonus, Restricted Share Units valued at $700,000, an annual bonus target of 40% of his base salary ($110,000), and access to Groupon's trade secrets and proprietary information, Shin executed the Agreement on March 17, 2021, nearly a month after he was presented with it (pre-acceptance) and before he commenced his first day of work on March 23, 2021[1].

The Agreement contains, among other things, provisions to protect Groupon's Proprietary

---

[1] Shin executed the same version of the Agreement presented to him when Groupon extended its offer of employment.

Information (as defined therein).  In it, Shin also agreed not to compete against Groupon for a period of eighteen (18) months following his separation from Groupon.  The non-competition provision provides, in pertinent part:

> 13.   <u>Non-Compete, Non-Solicit of Business, Non-Solicit of Employees/Contractors and No-Hire ("Restricted Covenants")</u>.   I acknowledge and agree that during my employment and during the Restricted Period, regardless of the reason for my termination, I will not, without Groupon's consent, other than on behalf of Groupon:
>
> (a)   Directly or indirectly, and whether or not for compensation, . . . be employed by, consult with or contract with any entity which is in competition with Groupon in the Geographic Area. The restriction in the preceding sentence only applies to positions with responsibilities similar to any position I held with Groupon during the twelve (12) months preceding the termination of my employment or relationship with Groupon or in which I would have responsibility for and access to confidential information similar or relevant to that which I had access to during the twelve (12) months preceding the termination of my employment or relationship with Groupon. The Geographic Area shall mean any geographic territory where I was assigned to work and/or over which I had responsibilities during the twelve (12) months preceding the termination of my employment or relationship with Groupon and any area within a 50-mile radius of such geographic territory;

*See* Cmplt., ¶ 1, Exhibit A thereto, ¶ 13(a).

The Agreement provides the following on the Restricted Period:

> 12.   <u>Restricted Period</u>. I agree that the Restrictive Covenants in this Section II shall apply during my employment and during the "Restricted Period." The "Restricted Period" begins as of the date I cease to be employed by Groupon and is defined as eighteen (18) months from the Date of Termination. Date of Termination is the date recorded in Groupon's internal Human Resources Information Systems that my employment was terminated with Groupon.

*See* Cmplt., ¶ 1, Ex. A ¶ 12.

The Agreement further prohibits Shin from using, disclosing or transmitting Groupon's Proprietary Information. *See* Cmplt., ¶ 1, Exh. A ¶ 2(b).

The Agreement details Proprietary Information to include:

-6-

> [A]ny and all technical and non-technical information including patent, copyright, trademark, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, business methods, processes, apparatus, equipment, algorithms, software programs, domain names, social media handles, code, software source documents, flowcharts, tools, architectures, databases, menu layouts, routines, formats, data compilers and assemblers, and formulae related to the current, future and proposed products and services of Groupon or its subsidiaries, and including, without limitation, respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, job histories, job performance and salary information of employees, business forecasts, sales and merchandising and marketing plans and information. "Proprietary Information" also includes proprietary or confidential information of any third party who may disclose such information to Groupon or to me under any obligation of confidentiality in the course of Groupon's business.

*See* Cmplt., ¶ 1, Ex. A ¶ 1.

By executing the Agreement, Shin acknowledged the Agreement's covenants were reasonable in light of "the nature of Groupon's business; the valuable relationships Groupon has with its . . . merchants and customers, which were developed at considerable expense, time and difficulty; [Shin's] position with Groupon; and [Shin's] knowledge of Groupon's business, including Groupon's trade secrets." *See* Cmplt., ¶ 1, Ex. A, ¶ 14. Shin also agreed violations or attempted violations of his contractual obligations would cause irreparable and continuing damage to Groupon for which there would be insufficient adequate remedy at law. He further agreed Groupon shall be entitled to injunctive relief and/or a decree for specific performance should he violate his contractual obligations to Groupon. *See* Cmplt., ¶ 1, Ex. A, ¶ 20.

Shin further acknowledged that he has substantial material connections to Illinois by way of his employment with Groupon. He agreed the Agreement shall be governed by Illinois law, and he irrevocably consented to the exclusive personal and subject matter jurisdiction of the federal and state courts located in Illinois. He further agreed that the forum for any disputes arising out

of the Agreement shall be in the federal and state courts in Illinois.  *See* Cmplt., ¶ 1, Ex. A, ¶ 23.

### C.  *Shin's Role and Duties at Groupon*

Shin worked for Groupon from March 23, 2021 to November 12, 2021.  Shin announced his resignation on October 28, 2021[2].

Throughout his tenure at Groupon, Shin led Groupon's global advertising business and oversaw multiple teams at Groupon including Content Marketing, Digital Advertising, Affiliates, Content Operations, and Advertising Revenue with over 30 employees on his team.  Shin reported directly to Groupon's Illinois-based Chief Revenue Officer (one of eight members of Groupon's executive team). The Chief Revenue Officer reports directly to Groupon's Interim Chief Executive Officer, also based in Illinois.  Unlike an advertising role focused on advertisements' creative components, Shin's role was to analyze and use Groupon's business performance data and metrics, such as merchant-by-merchant analyses of advertising spend, return on advertising spend, and advertising preferences, to develop and implement day-to-day and long-term advertising strategies catered to its former, current and prospective merchants and customers.

One of Shin's primary objectives was to develop and implement a multi-year advertising model.  This model facilitated audience extension by providing Groupon's merchants with a mechanism to reach potential customers beyond Groupon's website.  To implement the plan, Shin used the same specialized, merchant-by-merchant analyses he relied upon to develop Groupon's granular, day-to-day advertising strategy, as described herein.

---

[2] Pursuant to Groupon's offer, Shin would have retained his $100,000 signing bonus so long as his employment did not terminate within two years of its commencement, consistent with the terms of the Letter.  However, because Shin announced the termination of his employment at Groupon less than one year after its commencement, on November 10, 2021, Groupon requested Shin repay the net $100,000 sign-on bonus, consistent with the terms set forth in the Letter.  Shin refused to repay the sign-on bonus. Shin's annual bonus was and is paid out, *pro rata*, in two installments pursuant to the 2021 Annual Bonus Plan ("ABP") terms.  He received $45,205 bonus in August 2021.  By resigning, he forfeited the second installment of the ABP to be paid in early 2022.

The access to confidential information and specialized training Groupon provided to Shin throughout his employment underscores the uniqueness of Shin's advertising position at Groupon. To facilitate his development and curation of Groupon's advertising platform, Groupon educated Shin on its historical advertising strategies. Shin had unfettered access to a wide array of Groupon's proprietary data, including merchant revenues, merchant balance sheets and advertising spend by market segment. Groupon also trained Shin on Groupon's specific advertising methodology, including cost per click, cost per impression, and cost per action, as well as the efficacy of each method. Shin's access to and knowledge of this information enabled him to develop Groupon's multi-year and day-to-day advertising strategies.

Shin regularly consulted with executives on Groupon's sales, production and business operations teams to build and implement Groupon's advertising platform. Shin solicited proprietary feedback from these teams, such as merchant-by-merchant analyses of advertising preferences, objections, spend, and returns on spend, to tailor Groupon's advertising pitches and overall strategy to former, current, and prospective advertising clients. Shin fused his advertising expertise with the knowledge he acquired from Groupon's sales, products and business operations teams to curate Groupon's short- and long-term advertising plans.

Shin learned the identities of Groupon's former, current, and prospective advertising merchants. He also learned their advertising needs and the strategies, both effective and ineffective, utilized to achieve those advertising objectives. He is also intimately familiar with their specific sales objections to Groupon's online platform and advertising offerings and Groupon's strategies to overcome those objections. Shin used these historical, merchant-by-merchant analyses to anticipate potential and current clients' advertising needs or objections, and ultimately to develop Groupon's advertising strategies to drive revenue.

Groupon also provided Shin with highly confidential financial data to craft and implement his advertising strategy. Groupon disclosed to Shin its global financials and specific advertising financial data, including merchant-by-merchant revenue generated, money spent, ad fulfillment, and return on spend. Shin also had access to market analyses on the efficacy of a variety of advertising strategies in different locations, geographically-based consumer survey results, repeat-consumer business experience data, average consumer spend, and merchant and client survey data on sponsored ads. Only select, high-level executives in Groupon's finance, sales and advertising teams had access to this sensitive information. Shin used this confidential information to craft an advertising plan tailored to former, current, and prospective merchants' advertising needs. With this information, he crafted an advertising strategy to give Groupon a tactical advantage over its competitors, including Yelp, for merchants' advertising dollars. In sum, Shin had intimate access to and knowledge of Groupon's most confidential information so that he could execute his high-level duties.

Shin's regular participation in Groupon's executive meetings provided him with insights into Groupon's high-level business operations. During Groupon's Global Weekly Business Reviews and Monthly Business Reviews, in which Shin participated, Groupon's executives and team leads regularly discussed Groupon's specific sales and advertising performance as well as global strategy details. Shin also learned, on a more granular level, the precise account margins and metrics for Groupon's collective business. Shin's participation in these high-level meetings exposed him to critical performance metrics of Groupon's *entire* business, not only its advertising space. Shin combined Groupon's individual metrics, such as merchant-by-merchant analyses of advertising spend and profitability, with Groupon's holistic performance to drive its advertising game plan.

Shin was the primary architect of Groupon's advertising strategies, and he intimately knows the specific details and the collection of individual metrics relied upon to develop those strategies.

### III.     YELP AND GROUPON ARE DIRECT COMPETITORS.

In announcing his resignation, Shin informed Groupon he was leaving to work for Yelp in a high-level role to Lead Product Management for Yelp's Enterprise and Multi-Location - Yelp Audiences and In-store Measurement Group.[3]  In this role, Shin will undoubtedly provide Yelp with expertise to develop advertising strategies to compete for the same advertising spend as its online marketplace competitors, namely Groupon.

Groupon historically has considered Yelp to be one of its primary competitors.  *See* Cmplt., ¶ 72, Exhibit F thereto. At its core, Yelp, like Groupon, is a "marketplace," that provides small and enterprise merchants with a platform to engage consumers by advertising merchant services and ultimately driving customers to purchase those services.  Both Groupon and Yelp facilitate the merchant-consumer connection.  More specifically, Yelp and Groupon have built-in, overlapping consumer bases that utilize the respective platforms to connect with, discover, and engage enterprise and local verticals.

Both Yelp's and Groupon's platforms provide targeted and specialized advertising services to draw in consumers for their merchant clients based on collected, processed, and analyzed information concerning the consumer and the likelihood the advertisement will attract the particular consumer.  Merchants, in turn, advertise on Yelp and Groupon to attract consumers to

---

[3] On November 3, 2021, Groupon's counsel sent Shin and Yelp a letter regarding Shin's post-employment obligations. The correspondence also informed Shin and Yelp that Shin's role at Yelp will lead to Shin's certain breach of those obligations. Shin and Yelp both acknowledged receipt of the letter. In the letter, Groupon also offered Shin the opportunity to remain employed at Groupon; it even offered to continue to employ Shin (and provide him with his full base pay and benefits) while he searched for other employment that did not infringe on his post-employment obligations to Groupon. Shin refused both options.

merchants' services and ultimately to facilitate purchase of their products.

Yelp's advertising platform also operates in the same verticals. Yelp offers and publicizes merchant "deals" on its advertising platform, which Yelp describes as "discounted vouchers that customers can purchase for [merchant] business[es]." Such "deals" services are at Groupon's core. (https://www.yelp-support.com/article/How-do-I-post-a-Yelp-Deal-or-GiftCertificate?l=en_US (last visited November 10, 2021)).

Recent analyst reports similarly describe Yelp and Groupon as competitors in the online local marketplace spaces. *See* Cmplt., ¶ 75, Exhibit H thereto ("These are two of the best-known brands addressing the online local services market – both with high brand awareness and a shared vision of connecting consumers with local businesses.").

Yelp's 10-Q, filed on November 5, 2021, further underscores the parallels and inherently competitive dynamic between Yelp and Groupon. "We generate substantially all of our revenue from the sale of performance-based advertising products, which our advertising platform matches to individual consumers through auctions priced on a cost-per-click ("CPC") basis." *See* Cmplt., ¶ 65, Ex. E thereto. Groupon similarly generates revenue through performance-based advertising.

Groupon and Yelp also are direct competitors in mobile reach, vying to be the "leading local guide" connecting consumers to merchants in local markets. *See* Cmplt., ¶ 74, Ex. G thereto. For instance, Groupon and Yelp both have consumer-driven blogs, showcasing the gamut of merchant products and services, from wellness products to food and beverage locales. *See* https://www.groupon.com/thegist/ (showcasing food and beverage guides, such as "Phoenix Phoodies: These Are the 10 Best Restaurants in the Valley of the Sun") (last visited November 10, 2021); https://blog.yelp.com/category/community/ (highlighting locale-driven food and beverage spots, such as "A vegan road trip through the Midwest") (last visited November 10, 2021).

Shin himself acknowledged Yelp as a competitor and specifically compared Yelp's and Groupon's platforms. *See* Cmplt., ¶ 80, Exhibits J, K thereto. In fact, in an August 4, 2021 email, Shin discussed Yelp's "Yelp Audiences" platform and compared it to Groupon, stating that it "aligns with the data roadmap we [Groupon] built out." Shin will lead this *same* group at Yelp as its Lead Product Management for Yelp's Enterprise and Multi-Location - *Yelp Audiences* and In-store Measurement Group (emphasis added). *See* Cmplt., ¶ 80, Ex. J. As Shin acknowledged, Yelp and Groupon are direct competitors.

<u>**ARGUMENT**</u>

I. **THIS COURT HAS PERSONAL JURISDICTION OVER SHIN.**

This Court may properly exercise personal jurisdiction over Shin because he has sufficient minimum contacts with Illinois. A federal district court sitting in diversity looks to the long-arm statute of the state in which it is sitting to determine whether it has personal jurisdiction over the defendant. *Bally Export Corp. v. Balicar, Ltd*., 804 F.2d 398, 399 (7th Cir. 1986).

The Illinois long-arm statute provides in relevant part that a nonresident submits to the jurisdiction of the Illinois courts by transacting business within the state. *Id.* It also provides that making a promise substantially connected with Illinois is sufficient to establish personal jurisdiction. *See Reeve v. Ocean Ships, Inc*., Case No. 10 C 8147, 2011 WL 3165765 (N.D. Ill. July 27, 2011). Under these analyses, a court's determination centers on whether the defendant has sufficient minimum contacts with Illinois such that the maintenance of the suit does not offend traditional notions of fair play and justice. *Majumdar v. Fair,* No. 1:21-cv-0928, 2021 WL 4864147 (N.D. Ill. Oct. 19, 2021). This Court has personal jurisdiction over Shin based on both bases.

First, Shin had considerable contacts with Illinois and his Chicago-based employer, Groupon.[4] Illinois courts regularly exercise personal jurisdiction over individual defendants in these exact circumstances, pursuant to its long-arm statute. In *Liqui-Box Corp. v. Scholle IPN Corp.*, the court found substantial contacts with Illinois where the defendant regularly communicated with the employer's employees in Illinois, reported to a supervisor in Illinois, used back office services in Illinois, including payroll processing, was paid from the employer's Illinois bank accounts, and accessed confidential information and emails stored in the employer's servers in Illinois. No. 1:19-cv-4069, 2021 WL 5006692 (N.D. Ill. Oct. 28, 2021).

Similarly, in *Tekway Inc. v. Agarwal*, No. 19-CV-6867, 2020 WL 5946973, at *6 (N.D. Ill. Oct. 7, 2020), this Court found personal jurisdiction over an out-of-state employee because the employee reached out to in-state employees to apply for a job, signed a contract with a choice-of-law clause, and communicated regularly by phone, email and messaging applications with in-state employees. No. 19-CV-6867, 2020 WL 5946973, at *6 (N.D. Ill. Oct. 7, 2020).

Here, Shin's contacts are *more* sufficient than those in *Liqui-Box* and *Tekway*. Shin knowingly joined an Illinois-based company. Shin interviewed with employees (save one) based in Illinois, he signed the Agreement with an Illinois choice of law, and he communicated regularly with Illinois employees, including his subordinates and supervisor. His access to the very confidential information and trade secrets at the heart of this dispute came from his Illinois-based employment with Groupon and originated in Illinois. Shin's compensation and sign-on bonus was paid from Illinois. He received equity in an Illinois company. His supervisor, the Chief Revenue Officer, and also the majority of Groupon's leadership, are located in Illinois. Thus, this Court's exercise of personal jurisdiction over Shin fully comports with Illinois law.

---

[4] Shin worked remotely from Washington because of the COVID-19 pandemic and the concomitant inability to travel to Illinois during his short tenure.

Second, this Court has personal jurisdiction over Shin because he entered into the Agreement, in which he consented to Illinois' personal jurisdiction. In connection with his execution of the Agreement, Shin expressly acknowledged he has substantial material connections to Illinois by way of his employment with Groupon. *See* Agreement at ¶23. He agreed the Agreement would be governed by Illinois law, and he irrevocably consented to the exclusive personal and subject matter jurisdiction of the federal and state courts located in Illinois. *Id.* He further agreed that the forum for any disputes arising out of the Agreement would be in the federal and state courts in Illinois. *Id.* Illinois courts have found consent to a forum selection clause within a contract constitutes implied consent to personal jurisdiction within that forum. *Solargenix Energy, LLC v. Acciona Solar Energy, LLC,* 2020 IL App (1st) 180176. Thus, this court has personal jurisdiction over Shin.

## II.  ILLINOIS LAW APPLIES NOTWITHSTANDING SHIN'S WASHINGTON RESIDENCY.

Under Illinois choice of law principles, Illinois law applies to the Agreement. Illinois generally follows the Restatement (Second) of Conflict of Laws in making choice-of-law decisions. *Dancor Constr., Inc. v. FXR Constr., Inc.*, 64 N.E.3d 796, 812 (2d Dist. 2016). Section 187 of the Restatement applies when, as here: (i) the parties have made an express choice of law in the Agreement; (ii) Illinois law has a substantial connection to the parties, notwithstanding Shin's Washington residency; and (iii) the application of Illinois law is not fundamentally contrary to Washington law.

In Illinois, a contract's choice of law provision controls unless the chosen state has no substantial relationship to the parties or transaction or the application of the chosen law would be contrary to a fundamental public policy of a state with a materially greater interest in the issue in dispute. *GE v. Uptake Techs., Inc.,* 394 F. Supp 815, 825 (N.D. Ill. 2019). Here, each of these

prongs is satisfied. Shin acknowledged and agreed the Agreement would be governed by Illinois law and as discussed directly *supra*, Illinois has a substantial relationship to the parties and Shin's employment.. *See* Agreement at ¶ 23.

Shin resides in Washington, but there are no other factors present that would afford Washington a materially greater interest. Moreover, application of Illinois law would not be contrary to a fundamental public policy of Washington. *See* Chapter 49.62 RCW §§ 49.62.005-49.62.900. In *Uptake Techs*, the court applied Illinois law to determine whether New York law (the agreed upon choice of law) or California law (where the employees resided) applied to certain employee contracts. The court determined the agreements were enforceable under New York law but void under California law. However, because California courts disagreed whether employee non-solicitation provisions were prohibited, the court could not conclude that applying New York law was clearly contrary to fundamental California public policy. Thus, the court did not deviate from the parties' choice of New York law. 394 F. Supp. at 825-29.

Similarly, here, Illinois law applies because the application of Illinois law would not violate fundamental Washington public policy. Illinois and Washington are indeed quite similar with respect to the protections they afford employees in the non-competition context. For instance, they both require non-competition covenants to be reasonable and necessary to protect a legitimate business interest, they both have salary thresholds (indeed, Shin easily eclipses both salary thresholds), and they require temporal and geographic scopes and activity restraints to be reasonable. Illinois's recently enacted amendments to the Freedom to Work Act will also require employers to provide certain advance disclosures. As such, Illinois and Washington law are not so fundamentally different that application of Illinois law would be contrary to Washington's fundamental public policy. Lastly, Washington's non-compete law does not require application

of Washington law. *See* Chapter 49.62 RCW §§ 49.62.005-49.62.900. Groupon is well within its rights to litigate the enforceability of the Agreement in an Illinois court and under Illinois law.

## III. THE GOVERNING LEGAL STANDARD WARRANTS ISSUANCE OF A TRO.

The Court should exercise its discretion to grant the requested temporary restraining order to prevent further harm to Groupon' legitimate business interests. To obtain a TRO, a movant must establish: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Long v. Bd. of Educ.*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001). If the court is satisfied these requirements have been met, it must then consider the irreparable harm the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Id.* Finally, the court must also consider how the public's interests would be affected by granting or denying the preliminary relief. *Id.* Groupon is entitled to a temporary restraining order because this Motion satisfies each element required for issuance of a TRO under Illinois and Seventh Circuit law.

## IV. GROUPON IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

Groupon's Verified Complaint creates a strong *prima facie* showing that Shin has breached and will continue to breach his Agreement by virtue of his work for Yelp. Groupon will also likely succeed on the merits of its threatened misappropriation of trade secrets claims under the Illinois Trade Secrets Act ("ITSA") and Defend Trade Secrets Act ("DTSA"). Without immediate injunctive relief preventing Shin from working for Yelp, Shin will continue to breach his contractual post-employment non-compete obligations to Groupon and threaten to misappropriate Groupon's trade secret and confidential information for Yelp's benefit.

**A.** **Groupon is Likely to Succeed on the Merits of its Breach of Contract Claim Based on Shin's Breach of the Agreement.**

Shin unquestionably breached and will continue to breach the Agreement, which is a valid and enforceable contract. The essential elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting injury to the plaintiff. *Wolff v. Bethany N. Suburban Grp.*, 2021 IL App (1st) 191858, ¶ 62 (Ill. App. Ct. 1st Dist. 2021). Groupon's Verified Complaint satisfies all four elements.

1. Shin's Agreement Is a Valid and Enforceable Contract

   a. *The Non-Competition Covenant in the Agreement is Ancillary to a Valid Relationship and Supported by Adequate Consideration.*

The Agreement's restrictive covenant is supported by valid consideration and is reasonably necessary to protect Groupon's legitimate business interests. Under Illinois law, "a restrictive covenant will be upheld if it contains a reasonable restraint and the agreement is supported by consideration." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). Prior to undertaking this reasonableness analysis, Illinois courts make two determinations.

First, the court must find that the covenant is ancillary to either a valid transaction or a valid relationship; second, the court must determine whether there is adequate consideration to support the covenant." *Prairie Rheumatology Assocs., S.C. v. Francis*, 24 N.E.3d 58, 62 (Ill. App. Ct. 3d Dist. 2014). Both determinations are satisfied here.

First, the Agreement's non-compete covenant is clearly ancillary to a valid relationship. It is contained within the Agreement, which clarifies the terms of the employment relationship between Shin and Groupon. *See, e.g.*, *Abel v. Fox*, 654 N.E.2d 591, 597 (Ill. App. Ct. 4th Dist. 1995) (a

"noncompetition covenant entered into by an at-will employee, whether the employee is employed under a written or oral agreement, complies with the requirement of ancillarity").

Second, adequate consideration supports the Agreement's restrictive covenant. In exchange for entering into the Agreement, Groupon provided Shin with a $100,000 sign-on bonus, a $275,000 base salary, eligibility for an annual bonus with a target of 40% of this base salary ($110,000 target of which he already has received $45,000), Restricted Share Units valued at $700,000, and access to Groupon's trade secrets and confidential information, as described herein. These benefits undoubtedly constitute adequate consideration to support a restrictive covenant under Illinois law.[5]  *See McInnis v. OAG Motorcycle Ventures, Inc.*, 35 N.E.3d 1076, 1084 (Ill. App. Ct. 2015) (highlighting additional incentives, such as a bonus, are adequate consideration for a restrictive covenant); *Traffic Tech, Inc. v. Kreiter*, No. 14-cv-7528, 2015 U.S. Dist. LEXIS 169248, at *63 (N.D. Ill. Dec. 18, 2015) (finding consideration was likely adequate where an employer provided an employee a sign-on bonus, the employee worked for nine months, and the employee voluntarily resigned). The Agreement's express terms condition Shin's compensation upon his execution of the Agreement, and state that Shin enters into the Agreement "[i]n return for my new or continued employment with Groupon, Inc. . . . any other monetary benefits received at the time of signing, and other good and valuable consideration, including but not limited to employee benefits, training, career progression, promotions, access to confidential information." *See* Cmplt., ¶ 1, Ex. A.

> b. *The Non-Competition Covenant is Reasonable and Necessary to Protect Groupon' Legitimate Business Interests.*

---

[5] To the extent Shin argues the Agreement lacks sufficient consideration because he has not been employed for two years pursuant to *Fifield*, 993 N.E.2d 938 (Ill. App. Ct. 2013), he is flatly incorrect. Groupon gave Shin separate, independent consideration beyond at-will employment in exchange for his execution of the Agreement, including a sign-on bonus, eligibility for annual bonus (of which $45,000 was paid to him in June 2021), equity and access to trade secrets and confidential information.

The Agreement also satisfies the reasonableness requirement under Illinois law, as it is "no greater than is required for the protection of a legitimate business interest of the employer-promisee. . . ." *Reliable Fire*, 965 N.E.2d at 396 (citations omitted). The Illinois Supreme Court has held "whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case." *Id.* at 403. Accordingly, "[e]ach case must be determined on its own particular facts" and "[r]easonableness is gauged not just by some but by *all* of the circumstances." *Id.* (internal quotations and citation omitted); *see also Zabaneh Franchises*, 972 N.E.2d 344, 350 (Ill. App. Ct. 4th Dist. 2012) (courts determine the reasonableness of restrictive terms in light of the competing interests between the unfair restraint of employee's trade and employer's interest in protecting proprietary information"). Acquisition of confidential information is a protectable interest under Illinois law. *Reliable Fire*, 965 N.E.2d at 403.

The non-compete obligations in Shin's Agreement are reasonably related to the protection of Groupon's legitimate business interests. Shin had unfettered access to a wide array of proprietary data, specifically Groupon's global financials, in addition to its specific advertising financial data, including merchant-by-merchant revenue generated, money spent, ad fulfillment, and return on spend. Shin also had access to market analyses on the efficacy of a variety of advertising strategies in different locations, geographically-based consumer survey results, repeat-consumer business experience data, average consumer spend, and merchant and client survey data on sponsored ads.

Shin's role at Groupon exposed him to the identities of Groupon's former, current and prospective advertising clients. Groupon also exposed Shin to client's advertising needs and strategies, both effective and ineffective, utilized to achieve those advertising objectives. It also gave him access to client's specific sales objections to Groupon's online platform and advertising offerings and Groupon's strategies to overcome those objections. It is well-settled in Illinois that

long-term customer relationships constitute protectable interests justifying enforcement of a non-compete. *See, e.g.*, *McRand, Inc. v. van Beelen*, 486 N.E.2d 1306, 1311 (Ill. App. Ct. 1st Dist. 1985).

In synthesizing these various forms of proprietary information, Shin developed a specialized expertise of Groupon's historic advertising practices and the metrics used to drive Groupon's multi-year and day-to-day advertising strategies. *See, e.g., Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*, 2013 WL 1446425, at *3 (N.D. Ill. Apr. 9, 2013) ("There is no question that protecting confidential operational and customer information is a legitimate, protectable business interest of an employer"); *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *17 (N.D. Ill. Sep. 8, 2017) (finding a restrictive covenant reasonable and enforceable against a former employee where an employer had a legitimate interest in confidential information).

Even though he was employed by Groupon for a relatively short period of time, Shin had expansive access to and continues to have knowledge of Groupon's advertising strategies and the metrics from which those strategies are derived. This access gives Shin the precise tools and information to help Yelp unfairly compete with Groupon for merchants' limited advertising dollars. *See McElroy, Inc. v. Delaney*, 72 Ill. App. 3d 285, 292-93 (Ill. App. Ct. 1st Dist. 1979) (holding the "advantage gained by the potential use of confidential information is a legitimate business interest protectable by [restrictive] covenant").

      c.    *The Temporal and Geographic Limits Are Reasonable Given Shin's Knowledge and the Scope of Groupon' Business.*

Here, the temporal and geographic limitations are commensurate with those regularly enforced by Illinois courts. Given the highly confidential and specialized nature of Shin's knowledge, the temporal and geographic limitations of the Agreement's non-compete provision are valid and enforceable under Illinois law.

The eighteen-month temporal limitation of Shin's non-compete covenant is presumptively enforceable under Illinois law.  Illinois courts regularly uphold time restrictions for two years or longer.  *See, e.g.*, *Mohanty*, 225 Ill. 2d at 78 (three- and five-year restrictions); *Zabaneh,* 972 N.E.2d 344 (two years); *My Favorite Muffin, Too, Inc. v. Maosheng Wu*, 2002 WL 826483 (N.D. Ill. Apr. 29, 2002) (two years). Shin's relatively short period of employment does not impact the reasonableness of the restricted period given the nature of his role at Groupon and his unfettered access to the Company's proprietary information, especially where, as here, Shin had the option to remain employed at Groupon while he searched for a non-competitive role with his full base pay, bonus, and benefits intact.

Similarly, the geographic scope of the non-compete provision is reasonable given Shin's extensive knowledge of Groupon's advertising roadmap and the data from which it is derived.  In general, a geographic limitation is not unreasonable if it is coextensive with the area in which the employer does business.  *See, e.g.*, *Torrence v. Hewitt Assocs.*, 493 N.E.2d 74, 78 (Ill. App. Ct. 1st Dist. 1986); *McElroy*, 72 Ill. App. 3d at 293.  Here, the Agreement's geographic scope is "any geographic territory where I was assigned to work and/or over which I had responsibilities during the twelve (12) months preceding the termination of my employment or relationship with Groupon and any area within a 50-mile radius of such geographic territory," *see* Cmplt., ¶ 1, Ex. A, ¶ 13(a), and thus falls squarely within Illinois law's parameters.

Shin's job duties and responsibilities provided him extensive knowledge of Groupon's advertising business Company-wide and, as such, likely justify an even broader geographic restriction tracking the full geographic scope of Groupon's business operations.  Indeed, by virtue of his title as Vice President – *Global* Head of Advertising and Ancillary Revenue (emphasis added), Shin's role had no geographic parameters.  *See Cent. Water Works Supply, Inc. v. Fisher*,

240 Ill. App. 3d 952, 958-59 (Ill. App. Ct. 4th Dist. 1993) (upholding non-compete clause with restricted area as "the geographical area in which the Company is then doing business" where plaintiff had a protectable interest and would be injured by former employer working for competitor in same geographical area).

        d.        *The Agreement's Non-Competition Covenant Is Enforceable Under Washington Law.*

Although Illinois law plainly applies to the Agreement and this dispute, if analyzed under Washington law, the Agreement's non-competition covenant is equally valid and enforceable. Washington law provides that non-compete agreements are presumptively unenforceable unless: (i) the employee's earnings exceed $100,000 (in total annualized compensation, not just base salary) per year; (ii) the restricted time period does not exceed 18 months after termination of employment; and (iii) the terms of the non-compete agreement were disclosed no later than when the offer was accepted. *See generally* RCW 49.62.020.

The Agreement's protective covenant satisfies each of these elements. First, Shin earned $275,000 annually as base compensation, well in excess of the $100,000 threshold. Second, the covenant's restricted period lasts eighteen (18) months after Shin's termination, in accordance with the statute. Third, Groupon disclosed the Agreement to Shin concurrently with his offer of employment and before he accepted the employment.

The Washington statute does not require a Washington choice of law or require Washington as the forum for adjudication. Rather, the Washington statute deems a forum selection *clause* unenforceable if it requires adjudication outside of Washington *and* it deprives the

employee of the protections or benefits under RCW 49.62.020. The Agreement does not deprive Shin of the law's benefits because it is valid and enforceable under Washington law.[6]

> e.      *Shin's likely reliance on CVS v. Brown is misplaced.*

Shin will likely attempt to rely on the *CVS Pharmacy, Inc. v. Brown* case to evade his lawful obligations. No. C21-306 MJP, 2021 U.S. Dist. LEXIS 49450 (W.D. Wash., Mar. 16, 2021). Any such reliance would be misplaced. In holding the *entire* non-compete unenforceable due to a Rhode Island venue and choice of law provision, the Court ignored the plain language of the statute, which provides that only that *provision* is void and unenforceable if it deprives the employee of the protections afforded under Washington law. Here, applying Illinois law does not deprive Shin of any rights to which he is otherwise entitled under Washington law. *See* RCW 49.62.050.

Additionally, the Washington court misapplied the express language of the Washington statute in concluding CVS's non-compete to be unenforceable. In a single comment, the court concluded the entire non-compete to be unenforceable because it selected a venue other than Washington. But that is not the requirement under Washington's non-compete statute. The Washington non-compete statute expressly provides that *a provision* in a non-compete signed by an employee who is Washington-based is void and unenforceable "(1) [i]f the covenant requires the employee or independent contractor to adjudicate a noncompetition covenant outside of this state; *and* (2) [t]o the extent it deprives the employee or independent contractor of the protections or benefits of this chapter." RCW 49.62.050 (emphasis added).

---

[6] Additionally, Groupon maintains the Washington statute is inapplicable to the Agreement in the first instance. The Washington statute expressly does not apply to a covenant entered into by a person acquiring an ownership interest. *See* RCW 49.62.010(4). In exchange for his execution of the non-compete, among other things, Groupon granted Shin RSUs valued at $700,000. His grant of equity was contingent on Shin signing the Agreement. These RSUs constituted an ownership interest in Groupon. *See Keach v. United States Trust Co.*, 313 F. Supp. 2d 818, 837 (C.D. Ill. 2004) (describing restricted stock as a kind of "ownership interest"). As a result, by its own express terms, the Washington statute is inapplicable to the Agreement.

As such, the court incorrectly deemed the entire non-compete void and unenforceable rather than the specific venue provision. It further incorrectly deemed the non-compete unenforceable without undertaking the appropriate analysis of whether the agreement deprived the employee of the protections and benefits of the statute. Here, as discussed, Groupon did not deprive Shin of *any of* the protections and benefits of the statute nor would applying Illinois law, which is entirely consistent with Washington law.

2.     Groupon Satisfies the Remaining Elements of its Breach of Contract Claims.

Groupon performed its obligations under the Agreement. Despite the binding nature of this Agreement, Shin has materially breached, and continues to breach, it in several ways.

The Agreement's non-competition provision provides that Shin shall not "[d]irectly or indirectly, and whether or not for compensation, . . . be employed by, consult with or contract with any entity which is in competition with Groupon in the Geographic Area. The restriction in the preceding sentence only applies to positions with responsibilities similar to any position I held with Groupon during the twelve (12) months preceding the termination of my employment or relationship with Groupon or in which I would have responsibility for and access to confidential information similar or relevant to that which I had access to during the twelve (12) months preceding the termination of my employment or relationship with Groupon." Shin has breached both aspects of the Agreement's non-competition covenant.

First, Shin's role at Yelp, Lead Product Management for Yelp's Enterprise and Multi-Location - Yelp Audiences and In-store Measurement Group, is directly competitive with his former role at Groupon. At their cores, Yelp and Groupon are online marketplaces that connect consumers to local small and enterprise businesses in the same verticals.

-25-

Yelp and Groupon also offer competing advertising services. Merchants advertise on Yelp and Groupon to connect with consumers throughout the purchase cycle and to drive consumer spend. To determine the advertisements most effective to attract consumers to merchants' services, both platforms use collected, processed, and analyzed information about consumer responses to advertisements. Ultimately, Yelp and Groupon compete for merchants' finite advertising dollars.

Shin's role at Yelp directly competes with his former role at Groupon. Shin was Groupon's lead advertising architect, and he developed and implemented Groupon's advertising strategy to compete for merchants' limited advertising dollars, specifically by promoting their specific services and facilitating consumer spend. Similarly, in his new role at Yelp, Shin will develop and implement advertising strategies tailored to attract small and enterprise merchants, the *same* merchants Groupon targets and for which Groupon and Yelp compete for advertising spend.

Second, and also in violation of the Agreement's non-competition provision, Shin will be responsible for and access confidential information similar to that which he had access at Groupon. At Yelp, Shin will use and rely on data-driven metrics to curate and implement advertising strategies. Just as in his role at Groupon, Shin will study and analyze merchants' advertising objectives and outcomes, *i.e.*, their advertising successes and failures, and develop strategies to overcome objections to drive revenue to Yelp (and away from its competitor Groupon).

Both roles require Shin to access and to rely upon financial data, such as merchant advertising spend and return on advertising spend. Ultimately, and in direct violation of the Agreement, Shin's role at Yelp mirrors that of his former role at Groupon and demands he assume responsibility for and access data relating to merchant preferences, profitability and advertising spend.

Shin has breached his obligations under the Agreement and will continue to breach by performing the same or similar job duties and responsibilities with Yelp, and by necessarily using Groupon's confidential information and trade secrets. Shin's use and disclosure of Groupon's confidential information has, and will continue to, harm Groupon. Accordingly, Groupon has demonstrated a substantial likelihood of success on the merits of this breach of Agreement claim[7].

**B.      *Groupon Will Succeed on the Merits of Its Claim for Threatened Misappropriation of Trade Secrets Against Shin.***

Shin's role at Yelp threatens to misappropriate Groupon's trade secrets in violation of the ITSA and DTSA. Under the ITSA, to establish trade secret misappropriation, a plaintiff must show (1) the existence of a trade secret and (2) misappropriation. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995). Likewise, to establish trade secret misappropriation under the DTSA, a plaintiff must prove (1) that the relevant information is a trade secret and (2) that the defendant misappropriated the trade secret within the meaning of § 1836(b)(1). *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020). Groupon is able to demonstrate a likelihood of success as to each of these elements because Shin's employment with Yelp creates a real and imminent threat of misappropriation.

1.      <u>Groupon's Advertising Strategies and the Data From Which They Are Derived Constitute Trade Secrets.</u>

Groupon's Verified Complaint establishes a likelihood of success on the merits of its misappropriation claims because its advertising strategies, curated from merchant-by-merchant

---

[7] Groupon also brings a claim for breach of the Letter. Although Groupon does not seek a temporary restraining order on this basis, it likely also will succeed on this claim because it meets each of the four requisite elements.

analyses and Groupon's holistic performance metrics, constitute trade secrets under Illinois and federal law. The ITSA defines a "trade secret" as:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

735 ILCS 1065/2(d).

Illinois courts consider six factors when deciding whether a trade secret exists: (1) the extent to which the information is known outside the plaintiff's business; (2) the extent to which it is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and to the plaintiff's competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Liebert Corp. v.* Mazur, 357 Ill. App. 3d 265, 277 (2005).

Under the DTSA, a trade secret is defined as follows:

> "[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if – (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]"

18 U.S.C. § 1839(3). The information at issue satisfies either definition.

Shin used Groupon's confidential information and trade secrets to specially develop a lucrative advertising strategy for Groupon. To develop and implement Groupon's advertising strategies, Shin studied and relied upon Groupon's financial data on both global and granular levels. Shin's participation in Groupon's high-level executive meetings exposed him to critical performance metrics of Groupon's *entire* business, not only its advertising space.

On a more granular level, Shin learned particularized merchant-by-merchant revenue generated, money spent, ad fulfillment and return on spend. These numeric analyses fostered Shin's understanding of merchants' advertising select needs; the strategies, both effective and ineffective, utilized to achieve advertising objectives; specific sales objections to Groupon's online platform and advertising offerings; and Groupon's strategies to overcome those objections.

Shin also relied upon Groupon's historic advertising methodology to curate its day-to-day and multi-year advertising strategies. Groupon exposed Shin to historic market analyses on the efficacy of various advertising strategies, including cost per click, cost per impression and cost per action in different locations; geographically-based consumer survey results; repeat-consumer business experience data; average consumer spend; and merchant and client survey data on sponsored ads.

Groupon invested years as well as substantial resources and money to generate these particularized metrics – metrics from which Shin developed Groupon's advertising strategies to compete for merchants' advertising spend. Groupon derives independent economic value from these Groupon-specific and non-public metrics. As a result, this information constitutes trade secrets. *See, e.g.*, *See Fire 'Em Up, Inc. v. Technocarb Equipment (2004) Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011) (among other things, combinations or compilations of materials necessary to create product or perform certain services; programs, methods, techniques and

-29-

devices used to create product and render services; financial data, marketing plans and advertising strategies constitute trade secrets)*; PepsiCo, Inc.*, 54 F.3d at 1265-66 (strategic goals including pricing, distributing, and marketing plans and funding plans for specific markets, and plans regarding innovations in selling and delivery systems constituted trade secrets); *Inmar, Inc. v. Vargas*, 2018 WL 6716701, at *3 (N.D. Ill. Dec. 21, 2018) (business development plans and marketing and pricing strategies constituted trade secrets).

This information undoubtedly is valuable to Groupon competitors, such as Yelp, as it enables them to tailor their advertising strategies to merchant-specific needs and objectives by unfairly tapping into Groupon's analyses of merchants' historic advertising practices, successes, failures and advertising spends. More specifically, Yelp, through Shin's Groupon advertising expertise and know-how, will gain insights into the metrics and data underlying Groupon's advertising strategies and will enable Yelp to shortcut the years and substantial resources Groupon invested to develop its curated and particularized advertising strategies.

Groupon has taken various, reasonable measures to protect the confidentiality of its advertising strategies and the metrics from which they are derived including password-protecting all Groupon-issued devices and applications on which a Groupon employee may access Groupon's confidential information and requiring employees to execute confidentiality and restrictive covenant agreements.

To further safeguard its advertising know-how, only select, high-level executives in Groupon's finance, sales and advertising teams have access to the same sensitive information Shin had access. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1135 (N.D. Ill. 2019) (sales strategies that are intended to be kept secret qualify as trade secrets).

<u>2.</u>     <u>Shin's Conduct Creates an Imminent Threat of Misappropriation.</u>

Both the ITSA and DTSA permit injunctive relief in order to prevent actual and threatened misappropriation. 735 ILCS 1065/3(a); 18 U.S.C. § 1836(b)(3). Here, Shin poses a significant threat to misappropriate Groupon's trade secrets. In Illinois, the inevitable disclosure of a plaintiff's trade secrets is enough to show threatened misappropriation under the ITSA. *PepsiCo., Inc.*, 54 F.3d at 1268; *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) (noting that under a theory of inevitable disclosure, plaintiff must merely show that the employee "cannot operate without inevitably disclosing the confidential information").

Courts consider three factors when evaluating whether an employee's new employment inevitably will lead to disclosure of his former employer's trade secrets: (1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer. *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *5 (N.D. Ill. May 11, 2017) (quotation marks and citation omitted). Courts give less weight to the third factor, because "a complaint is not likely to contain any allegations about what, if anything, the competitor did to safeguard the plaintiff's secrets." *Id.* at *7.

Groupon satisfies the requisite elements to establish the inevitable disclosure of its trade secrets. First, Groupon and Yelp are direct competitors in the online local marketplace space, competing in the same verticals for the same advertising spend. *See* Cmplt., ¶ 65. Second, Yelp has hired Shin to lead the same advertising initiatives as Shin spearheaded at Groupon, specifically to earn merchants' limited advertising dollars by determining the most effective ways to lure consumers to merchants' services on Groupon's website. Third, despite knowledge of Shin's post-

-31-

employment obligations to Groupon, Yelp hired Shin in a directly competitive role. Thus, Yelp has taken no action to prevent Shin's unlawful disclosure of Groupon's trade secrets.

In his role at Yelp, Shin cannot help but use and rely upon the specialized and proprietary information he learned while serving as Groupon's advertising architect. Shin inevitably will draw upon Groupon's particularized advertising strategies based on analyses and performance data of Groupon's former, current and prospective advertising clients to compete *with Groupon* for merchants' advertising spend. *See, e.g.*, *Mickey's Linen*, 2017 WL 3970593, at *13 (former employer established former employee and competitor threatened misappropriation by demonstrating employee was a key account representative before joining former employer's competitor in a comparable role and failing to return former employer's confidential documents). Undoubtedly, Shin's role at Yelp will lead to the inevitable disclosure of Groupon's trade secrets.

## V.    GROUPON WILL SUFFER IRREPARABLE HARM ABSENT A TRO.

Groupon has and will continue to suffer irreparable harm as a result of Shin's actions. After demonstrating a likelihood of success on the merits of its case, a plaintiff must also demonstrate irreparable harm is "likely" if the court denies its request for injunctive relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Here, Groupon meets its burden of establishing it has been, and will continue to be, irreparably harmed by Shin's misconduct.

First, Groupon establishes threatened misappropriation of its trade secrets. Groupon's Verified Complaint demonstrates that Shin has accepted employment with Groupon's direct competitor in a role where he will necessarily rely upon and divulge Groupon's trade secrets. In cases of threatened trade secret misappropriation, there is a presumption of irreparable harm. *See, e.g.*, *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004); *IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994) (finding that "the threat

is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable").

Second, Shin is armed with specialized, intimate knowledge of the data driving Groupon's advertising strategies. To develop and implement Yelp's advertising strategies, Shin necessarily will use and rely upon his knowledge of Groupon's merchant analyses, among other things, to compete for the *same* advertising spend as Groupon. In such a situation, irreparable harm is likewise demonstrated. *See, e.g.*, *Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir. 1994) (holding that having an employee who had access to confidential information work for a competitor constituted an "irreparable injury" that "could not be undone"); *Tyler Enterps. of Elwood, Inc. v. Shafer*, 573 N.E.2d 863, 866 (Ill. App. Ct. 3d Dist. 1991) (presuming irreparable harm where a former employee with specialized knowledge of employer lured away former customers through a competing business).

Indeed, upon executing the Agreement, Shin acknowledged that a "breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Groupon." *See* Cmplt., ¶ 1, Ex. A, ¶20.

## VI.     GROUPON LACKS AN ADEQUATE REMEDY AT LAW.

Groupon has no adequate remedy at law. To establish its entitlement to a TRO, a movant must demonstrate no adequate remedy at law exists. *Long*, 167 F. Supp. 2d at 990. Because the full extent of Groupon's injuries resulting from Shin's conduct are not easily ascertainable, Groupon lacks an adequate remedy at law.

Groupon has and will suffer irreparable harm based on the improper use and misappropriation of its trade secrets and confidential information. It has and will suffer irreparable harm as a result of Shin's employment with Yelp, which will require Shin to rely upon and use

Groupon' confidential information. Both of these categories of harm are ongoing. As such, it is impossible to foresee the extent of damages, monetary and otherwise, Groupon will suffer as a result of Shin's misconduct. *See, e.g.*, *E*TRADE Fin. Corp. v. Pospisil*, 2018 WL 4205401, at *5 (N.D. Ill. Sept. 4, 2018) (finding no adequate remedy at law for employee who used misappropriated trade secret information to compete with former employer because "ongoing competition itself" constitutes "a sufficient basis for relief"); *HCAFranchise Corp. v. Alisch*, 2016 WL 10706285, at *7 (N.D. Ind. Aug. 12, 2016) (former employer had no adequate remedy at law for former employee's misappropriation of trade secrets because "monetary damages are insufficient to compensate for trade secret misappropriation").

To this end, Shin agreed that "[a] breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Groupon for which there will be insufficient adequate remedy at law." *See* Cmplt., ¶ 1, Ex. A, ¶20. Because Groupon's injury is irreparable, it lacks an adequate remedy at law. Shin's conduct must be enjoined to prevent further irreparable harm to Groupon.

## VII. THE BALANCE OF HARDSHIPS FAVORS GROUPON BECAUSE SHIN'S NEW POSITION AT YELP WILL DIMINISH THE VALUE OF GROUPON'S TRADE SECRETS.

The balance of hardships also weighs in Groupon's favor given the clear and actual threat that Shin's employment with Yelp presents to Groupon. Yelp and Groupon are online marketplaces operating in the same verticals and competing for the same advertising spend. Shin's role at Yelp, like his role at Groupon, is to drive advertising strategy to earn merchants' limited advertising dollars. The threat Shin's misconduct poses to Groupon overwhelmingly outweighs any harm a TRO poses to him.

To balance the hardships, a court must compare the irreparable harm risked by the moving party in the absence of injunctive relief against the irreparable harm risked by the nonmoving party if injunctive relief is granted. *W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1127 (N.D. Ill. 2018). The Seventh Circuit "employs a sliding scale approach for this balancing: if a movant is more likely to win, the balance of hardships can weigh less heavily in its favor, but the less likely a movant is to win the more that balance would need to weigh in its favor." *W. Capra Consulting Grp., Inc. v. Snyder*, 2019 WL 3935045, at *7 (N.D. Ill. Aug. 20, 2019) (internal citations and quotations omitted). Here, Groupon presents a strong likelihood of success on the merits of both its claims and need not make as strong of a showing on the balance of hardships in order to be entitled to injunctive relief. Regardless, the balance of hardships weighs strongly in Groupon's favor with respect to its request for a TRO.

Here, the requested injunctive relief merely seeks to ensure Shin abides by what he already is legally obligated to do. If entered, the TRO would require Shin to adhere to and uphold his contractual obligations under the Agreement. Shin would not be prevented from seeking employment in his given profession, or industry-wide; he would simply be prohibited from holding a role with similar responsibilities as he held at Groupon, or in which he will access and have responsibility for confidential information similar to that he used and relied upon at Groupon. *See* Cmplt., ¶ 1, Ex. A, ¶ 13(a). Shin has countless opportunities for employment, which will not run afoul of the Agreement; instead he chose to work for Groupon's admitted, direct competitor, Yelp, in a virtually identical role.

Because the potential harm to Groupon from Shin's employment with Yelp and his use of its trade secret information is great, and the potential harm to Shin is negligible, the balance of harms weighs in favor of injunctive relief. *See, e.g.*, *Brunswick Corp. v. Jones*, 784 F.2d 271, 275

(7th Cir. 1986) (balance of irreparable harms weighed "heavily" in employer's favor where former employee possessed confidential information directly relevant to new position with competitor); *W. Capra*, 2019 WL 3935045, at *12-*13 (balance of harms weighed in favor of former employer where employee's enforceable non-compete only prohibited seeking similar employment with competitors; employee's eventual harm would be reparable and compensable, whereas former employer's harm was irreparable).

## VIII.   ISSUANCE OF A TRO WOULD NOT HARM THE PUBLIC INTEREST.

Finally, Groupon's request should be granted because a TRO enforcing the Agreement to prevent misappropriation of Groupon's confidential and trade secret information would not harm the public interest.

In ruling on a motion for a TRO, the court must consider the public interest in granting or denying an injunction.  *Stuller, Inc. v. Steak N Shake Enterps., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012).  Here, the public interest would not be harmed by a TRO enforcing Shin's restrictive covenant.  Groupon has clearly demonstrated that its restrictive covenant conforms to Illinois law's standard of reasonableness and also is fully enforceable under Washington law, and therefore is not "injurious to the public."  *Reliable Fire*, 965 N.E.2 at 325.  And here, there is no evidence that enforcement of the non-compete covenant would "deprive the public of unique skills or services," or allow Groupon to "unduly corner the market" on its online marketplace services.  *W. Capra*, 2019 WL 3935045, at *13.  Similarly, the public interest is served by preventing misappropriation of Groupon's trade secrets.  *See, e.g.*, *La Calhene, Inc. v. Spolyar*, 939 F. Supp. 523, 531 (W.D. Wis. Aug. 23, 1996) ("The public interest favors enforcement of contracts and the protection of trade secret information gathered and developed by a company at significant expense"); *Lucini Italia Co. v.*

*Grappolini*, 2003 WL 1989605, at *18 (N.D. Ill. April 28, 2003) (public interest was served by issuance of an injunction protecting plaintiff from future misuse of its trade secret information).

Because the protection of Groupon's trade secret information and the enforcement of its reasonable restrictive covenant is not injurious to the public interest, Groupon's request for a TRO should be granted.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Groupon, Inc. respectfully requests this Court enter an Order: (i) granting Groupon's Motion for a Temporary Restraining Order in its entirety; (ii) prohibiting Shin from employment with Yelp pending adjudication of the merits of Groupon's claims; (iii) prohibiting Shin from using, referencing or misappropriating Groupon's trade secrets, proprietary and confidential information; (iv) prohibiting Shin from soliciting Groupon's customers or employees; (v) awarding Groupon attorneys' fees and costs incurred in bringing this motion; and (vi) awarding any other relief this Court deems equitable and just.


Dated:  November 12, 2021                          Respectfully submitted,

                                                   GROUPON, INC.


                                                   By:  */s/ Kevin M. Cloutier*
                                                            One of Its Attorneys


                                                   Kevin M. Cloutier (6273805)
                                                   Shawn D. Fabian (6310637)
                                                   **SHEPPARD MULLIN RICHTER & HAMPTON LLP**
                                                   70 West Madison Street, 48th Floor
                                                   Chicago, Illinois 60602
                                                   Tel: (312) 499-6300
                                                   Fax: (312) 499-6301
                                                   kcloutier@sheppardmullin.com
                                                   sfabian@sheppardmullin.com