IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GROUPON, INC. | ) |
|       Plaintiff, | ) Case No. 1:21-cv-06082 |
| v. | ) Honorable Judge Charles P. Kocoras |
| SUNG SHIN, | ) |
|       Defendant. | ) |

## DECLARATION OF SUNG SHIN

I, Sung Shin, declare the following:

1. I am the defendant in the above-captioned case. I have read and reviewed Plaintiff Groupon's Verified Complaint, Emergency Temporary Restraining Order ("TRO"), and accompanying documents. (*See* Dkt Nos. 1, 4, 5, 6). I hereby give this declaration in support of Defendant's Opposition to Groupon's Emergency TRO.

2. I am a senior business leader with product, operations, and technical background. I have over 25 years of experience driving organizational development and product/services innovation from conception to execution that turn into productivity improvements or significant revenue opportunities that impact overall profit and loss analysis. I have held positions as a continental and international general manager product manager, director of product management, head of product development, technical sales manager, sales engineer, client services manager, and vice president of product management. My skillset centers around organizational design, business planning, managing profit and loss, and driving business operations. My functional experience spans software development, technical consulting, professional services, sales, and product management. I am a graduate of the University of Virginia and obtained my BS in Electrical Engineering in 1996. I obtained my Master's in Business Administration from the University of Maryland in 2007.

3. At all times herein, I have been domiciled in Washington state, in the cities of

Seattle and Grapeview (hereinafter collectively referred to as "Seattle").

4. I interviewed with management at Groupon via satellite from my domicile in Washington state. During the interview process, the majority of the interviewers were Illinois based, but not all.

5. I signed the employment contract in Seattle, Washington. I began my employment with Groupon on or about March 23, 2021. My position at Groupon was Vice President, Global Head of Advertising and Ancillary Revenue. At the time I started working at Groupon, I had over 25 years of experience in advertising, marketing, sales, and product management. There were two product managers assigned to advertising that I frequently worked with, as well as the VP of Engineering, and the main Director of Advertising. All four were Seattle based.

6. The entirety of my employment with Groupon took place in my domicile in Seattle, Washington state via "remote" work. In other words, my position was 100% remote. Groupon provided an allowance for office expenses, and provided a laptop. On my last day with Groupon, December 12, 2021, I returned the laptop via FedEx per the shipping label provided to me by Groupon. I had email, Google drive, Google docs, calendar, and slack associated with Groupon on two (2) personal devices. On my last day at Groupon, on both personal devices, I went into the IOS settings and removed the entire google Groupon account. I also completely uninstalled the slack application from my personal devices. These steps removed all Groupon associated accounts from all personal devices. Since the time of removal, I have had no access or connection to Groupon information.

7. When I was employed with Groupon, I never physically entered the state of Illinois. I did have remote meetings with other employees of Groupon who lived in Illinois. However, my duties as the Global Head of Advertising and Ancillary Revenue were not based out of Illinois or connected directly to Illinois. The majority of my communications were directed to colleagues and subordinates in Washington and California, to develop the business outside of Illinois. The communications with supervisors in Illinois were logistical "check in" meetings. Additionally, the back-office personnel management (Human Resources support) occurred in Florida, not Illinois.

8. In my experience with Groupon, I foresaw and anticipated that any complaints regarding my employment would originate in the Washington-based office.

9. I gave my notice of resignation on or about October 28, 2021 in King County, Washington, and I stated that I would be going to Yelp. Groupon did not change or restrict access to information after receiving notice of my resignation, or notice of my intent to start my position at Yelp on November 15, 2021.

10. At the time of my notice of resignation, I had worked at Groupon for approximately seven (7) months. My last day at Groupon was November 12, 2021. Since the end of my employment with Groupon, I have not had any contact with people who reside in Illinois. Since the end of my employment with Groupon, I have not had any sales in Illinois. Since the end of my employment with Groupon, I have not have conducted any business in Illinois.

### Differences Between Role at Groupon vs. Role at Yelp

11. My role at Groupon was distinctly different than my current role at Yelp. My current role at Yelp supervises the product management team in the technical department, and there is no comparable role at Groupon that own the same technology or subject matter.

   a. Groupon: My role at Groupon was as General Manager of the advertising business. I managed *business* operations and driving revenue. The product and technology Departments were not owned or supervised by me. The product and technology Departments at Groupon were in the *technology* organization, which was under a completely different leader.

   b. Yelp: At Yelp, I will be managing a product management team. At Yelp, product management is a technological role. I did not oversee the technical department or participate in the technical design work at Groupon because I was managing the business department. Specifically, I will manage Yelp audiences and instore measurement, of which there is no comparable department, responsibilities, or strategy at Groupon. Again, I never held a role and/or responsibilities at Groupon that related to a technical role.

12. My overall department is different from the department I supervised at Groupon. I am no longer working in the business and advertising department, and I have switched to product management.

   a. <u>Groupon</u>: I oversaw the advertising business that was based on sponsored advertisements (advertisements in search results), in email, and display advertisements on the desktop/mobile websites.

   b. <u>Yelp</u>: I will not be product manager of the advertising technologies that I oversaw at Groupon, as stated above. I will manage Yelp Audiences and Instore measurement. There is no comparable department or responsibilities at Groupon. Therefore, nothing particular to my job at Groupon is transferable to this new role and department at Yelp.

**General Principles in Marketing that are the Quintessential eCommerce Advertising Blueprint**

13. Groupon stated that "Yelp uses a near-identical advertising and marketing platform to compete in connecting consumers to business." (Verified Complaint, Dkt. No. 1, ¶ 1). Groupon also stated that it "uses innovative marketing and advertising strategies . . . to reach consumers throughout the purchase cycle." (*Id*. at ¶ 18). This generalized definition of advertising and marketing platforms is overbroad and essentially characterizes all eCommerce businesses in the 21st century. For example, getting advertising in search results and developing audiences for targeting, those are all fairly standard tactics in digital advertising. In fact, on or about August of 2021, I recall Simon Goodall and Aaron Cooper (Groupon's Interim CEO) repeatedly stating that Groupon's model was following an "eCommerce advertising blueprint." That is because the advertising model was fairly simplistic and not at all unique. It was the same model that is used across all eCommerce platforms, namely, to maximize return on ad spend ("ROAS") by using advertisement dollars to drive sales on the platform. This same model was used at Amazon when I worked there from 2013-2021. Again, this is effectively the eCommerce Advertising "Blueprint."

14. Another example of the general blueprint for eCommerce is generating revenue from the sale of performance-based advertising products. This means that eCommerce advertising

platforms match to individual consumers through auctions priced on a cost-per-click ("CPC"). This applies equally to all online business platforms, not just Groupon, and not just Yelp. For example, in Paragraph 68 of Groupon's complaint it reads, "Consumers specifically utilize Yelp's platforms to search for, discover, and engage with enterprise and small businesses in order to ultimately purchase their services and deals, primarily in the food and drink, home services, beauty, health, and wellness verticals." Groupon's overly broad category definition of all bricks and mortar businesses could apply to any directory or advertising service, to newspaper classifieds, to Yellowpages, to Google. Based on my knowledge, training, and experience, this characterization is no different than stating utility companies all compete for the same households, without differentiating between cable, internet, or electricity companies.

15. Groupon acknowledges redemption, online appointment setup, in-store redemption, and other "information" used for specialized marketing. Groupon alleged that I synthesized various forms of proprietary information that I developed a specialized expertise of Groupon's historic advertising practices and metrics to drive the company. (Groupon TRO at p. 21). First, I do not possess any specialized data. Second, I do not know how that information would be relevant to any business outside of Groupon. The historic practices and metrics Groupon contends are specialized expertise are standard eCommerce advertising metrics. Groupon's assertion of some special "synthesis" is no more than best practices in advertising. Third, it is especially not relevant for my new position with Yelp, which is a completely different business model. For example, Groupon sells discount vouchers online that need to be redeemed by the consumer for the merchant to get paid. Yelp does not. Yelp makes 95% of their revenue from selling ads. Groupon makes only 1% from ads, with the vast majority of revenue from the sale of these discount vouchers. Regardless, I would not and will not use any marketing information specifically acquired from Groupon in my new position at Yelp. As stated above, this marketing information is not specialized or created by/for Groupon. These advertising methods are standard and generally used throughout most eCommerce businesses in present date.

16. Groupon alleged that I "developed a multi-year advertising model that provided audience extension features allowing Groupon's merchants and clients to reach potential customers beyond just Groupon's website" (Verified Complaint, Dkt. No. 1, ¶ 40). I drafted a pre-hire business plan *before* I began working at Groupon as a part of the interview and hiring process. The plan makes assumptions on what was and was not available at Groupon based on my prior knowledge, and from the outside looking in without any internal knowledge of Groupon's business model. What I proposed is the standard playbook in eCommerce to explore audience extension using a company's data. Based upon my personal experience, web publishers have been doing that since early 2000s in some form. Additionally, I never contributed to specific Groupon plans. The specific technical details of that strategy were owned by a completely independent and separate management team apart from my department of advertising. I explained that the general premise of the plan was a possibility, but given Groupon's platform, would most likely not be successful or even feasible. In other words, I was involved in general conversations related to the multi-year strategy, but I was never involved in deep, detailed designs. I disagree with the characterization that I was the "architect" of the multi-year strategy. And, significantly, at the time of my departure, there was no implementation of any "multi-year advertising model." No resources had been assigned to the data roadmap to proceed on this front, and I had not been involved in the design or engineering aspect for this development, either. Groupon was slow to invest in data scientists to be able to think about any sort of algorithmic differentiation. And, the advertisement products Groupon had built were so basic that there were no algorithms or machine-learning technology. Because the platform and roadmap of Groupon were so basic, I cannot think of anything highly technical that would be legitimately considered trade secrets within our marketing and advertising industry. Moreover, based upon my training, knowledge and experience, Groupon was so far behind the curve that there was no "special sauce" that we could build until the foundational platform was built. That foundational platform does not require a highly technical expert to build. Most of the technology can be bought (a data platform, and email advertisement server).

17. Overall, Groupon's strategy, as I've stated above, was simply "best practices." Most of the technology for their core advertising product, Sponsored Listings Product, Groupon purchased. The "Programmatic" technology Groupon references in Paragraph 16 was also purchased. So, any strategy referenced by Groupon was not building some technical differentiation, it was combining off-the-shelf parts of the adtech stack that most companies have in place, but Groupon did not. As stated previously, advertising needs and strategies are simple and the same as any eCommerce platform – to maximize ROAS. In sum, I contend that Groupon's plan was basic. There was no special sauce I could layer into the plan because Groupon was so far behind, and given I was only there for seven months with little resource investment, there was nothing feasible to even build in that short time that would be considered differentiation by any reasonable person. I believe that the knowledge that I brought to Groupon (that I have used in previous employment) is considered "best practices" in the industry. I brought my acquired business acumen to Groupon and I am leaving with that same acumen and nothing more.

**7-Month Tenure at Groupon: Client Meetings and Access to Information**

18. Groupon stated that I "…develop[ed] and nurture[ed] merchant and client relationships and their advertising objectives…" (Verified Complaint, Dkt. No. 1, ¶ 2). However, I only met with one client during my time at Groupon. I attended a golf outing that I had been invited to by one of Groupon's heads of sales. I do not recall the client's name. I did not even make a LinkedIn connection.

19. Groupon alleged that I "… learned the identities of Groupon's former, current, and prospective advertising clients and merchants, their advertising needs, the strategies that worked and did not work to achieve those advertising needs, their specific sales objections to Groupon's online platform and advertising offerings." (Verified Complaint, Dkt. No. 1, ¶ 38). I can only recall a few of the clients by company name. I have no documentation of who those clients are, or what the company names are. Presuming that I could recall the broad company name, I would only be able to identify a few clients. I have zero Groupon clients in my address book or on LinkedIn. My role at Groupon was not to build customer relationships. In my very short tenure at

the company, I did not do so. In sum, I do not, will not, and have not sought to solicit contracts with any known Groupon clients, agents, or contractors.

20. Groupon also referenced how "Programmatic Advertising uses software specially coded to follow trends and patterns…" (Verified Complaint, Dkt. No. 1, ¶ 16). Groupon did use programmatic advertising software; however, Groupon mainly used Google's programmatic solution, which means the algorithms they reference are solely Google's.

21. Groupon explained that it utilizes "Pay for Performance Advertising." (Verified Complaint, Dkt. No. 1, ¶ 17). Based upon my knowledge, training, and experience, there are no real trade secrets associated with this model. This is strictly arbitrage, which means Groupon pays for traffic, and collects a commission from merchants and makes profits on the difference. That is the generic model for arbitraging performance advertising. It's like saying Groupon sells things and gets money for its products.

22. Groupon stated that I "…will use and/or disclose Groupon's highly technical and hard-earned confidential and proprietary information and trade secrets for Yelp's benefit." (Verified Complaint, Dkt. No. 1, ¶ 2). To the best of my knowledge, I never once saw a technical design document. The Product and Engineering departments considered me to be accountable to the business side of Groupon. Therefore, there was never a need for me to view or acquire confidential or proprietary information or trade secrets from the product department or engineering department. Additionally, the platform and roadmap of Groupon were so basic, I cannot think of anything highly technical that would be legitimately considered trade secrets within our marketing and advertising industry. I have already declared that any knowledge acquired from Groupon is not relevant to my role at Yelp. I have already declared that I will not use or disclose any proprietary information of Groupon.

23. Groupon stated that my primary role was to "build and implement the Company's advertising strategy by carefully consulting with Groupon's sales and production teams as well as its business operations." (Verified Complaint, Dkt. No. 1, ¶ 37). While I may have had access to information related to sales, production, or business operations, I knew very little about how they

may have affected the overall business strategy. CPCs (cost per click), CPMs (cost per thousand impressions), CPAs (cost per acquisition) are well known benchmarks across the industry. These do not provide any specialized knowledge or real competitive advantage because it is standard across the business industry. As such, I used only my own personal advertising expertise—which I did not acquire from Groupon's sales, products, and business operations teams—to propose standard advertising campaign models for Groupon, although it did not have an anticipated platform for years to come.

24. To the best of my knowledge, I did not retain any confidential documents or information obtained from or through my employment with Groupon. I do not want or need any information I obtained from Groupon for my new position at Yelp, which is distinctly different and not similar in any way in function or purpose to the position I held at Groupon. I told Groupon several times during the two weeks' advance notice of my intent to resign, in addition to my signing a declaration, that I did not take any proprietary information, and that I would not use any alleged proprietary information at Yelp. I offered an inspection of my personal devices, at Groupon's expense, as needed. At no time did Groupon specifically identify to me any particular information, documents, data, or files that it sought to protect.

### No Competition Between Yelp and Groupon

25. I have reviewed Exhibit J and Exhibit K to the Verified Complaint, that contain email messages from me. Mentioning Yelp in an email does not mean that I considered Yelp a competitor to Groupon.

    a. <u>Exhibit J</u>: This email is heavily redacted, and most of the content is not visible. The email is dated August 4, 2021, and due to the redactions, it is difficult for me to remember the exact context of the conversation in the email thread. A question had been posed as to (1) whether Yelp had launched an audiences product, and (2) could Groupon launch an audiences product. In my response, I do not recall ever mentioning Yelp as a competitor. So, in that email response, I am stating that I looked into this audience product because I had been directly asked to look into this audience product. In subsequent discussions, I mentioned that Groupon

may not be able to launch the same type of product due to the Groupon's customer base and size. Lastly, as stated above, developing an audience product is standard best practices in eCommerce. It is called "Audience Extension." Based upon my knowledge, training, and experience, audience extension has been employed by publishers since the early 2000s. (*See e.g.*, https://retargeter.com/blog/a-definitive-guide-to-audience-extension/) (explaining that "3 out of 4 digital publishers currently offer[] audience extension to their advertising partners," and that "it is clear that this technology is gaining traction and providing attractive results to many players in the digital realm"). Audience extension does not have a specialized method or execution strategy. "All publishers have to do to begin extending ads to their audience is place a few lines of code in the HTML of their website, which tags people who visit their site with a special retargeting cookie." (*Id*.). Lastly, it was well understood by product and executive leadership that the likely path would be to "buy" rather than "build." This is fairly standard best practices in the industry and requires no novel methods. My email alludes to this standard in the last sentence, which states "They built that on top of LiveRamp, which is not surprising." LiveRamp is a third party data platform that allows for synchronization of a website's audiences with the broader internet.

        b. <u>Exhibit K</u>: This email appears to be an email that I sent to myself while doing research. I believe that this research related to a planning exercise to review simple benchmarks of Internet advertising companies to understand their average revenue per user ("ARPU"). The article I forwarded to myself had Monthly Active User and ARPU benchmarks of not just Yelp, but also Facebook, Twitter, and Snapchat. The ARPU benchmarks were used to validate that the financial forecast of revenue for Groupon's ad business were not unrealistic. During this exercise, finance concluded that Yelp was *not* a good comparison for benchmarking because the business models were so different from Groupon's. This was communicated to executive leadership with no objections.

26. Exhibit F – Groupon includes in exhibit F a slide with from their sales team titled "Competitors". There is nothing I see that would indicate direct competition. The slide points out that Yelp is using their social media account on Instagram to share holiday gift suggestions from

local businesses. It is unclear how a slide that Groupon produced, itself, that simply states that Yelp is posting things on social media, would be considered evidence of a competitive relationship.

27. Exhibit G – Groupon includes a mobile reach Graph titled "Leading local guide…" as its evidence of direct competition. Again, as stated above, this is overly broad. Local guides is a broad category and does not define a direct competitive set. Each of those companies may do business in the local space. However, their business models are materially different. They each target different audiences, different categories of businesses, and provide different types of information/products for consumers to come to those platforms to discover or purchase.

28. Exhibit H appears to be an Aegis Capital Corp. Report suggesting that Yelp and Groupon combine "synergies" due to opposite strengths and weaknesses. Based upon my training, knowledge, and experience, this report outlines how the two companies are complementary to one another, rather than competitors. The analyst even explicitly states there are material differences in the business models and offerings of the two companies: "Yelp has a strong position at the top of the funnel with high organic traffic. Groupon has a strong position at the bottom of the funnel…" That statement alone would validate that even an objective, third party analyst views there is no competitive relationship between the two companies.

29. Exhibit I appears to be a report for adjusted estimates for the corona virus outbreak– this again attempts to use an overly broad universe of category/marketplace definition both companies target to assert direct competition. The analyst simply talks about how both Yelp and Groupon serve the local business market, and thus would be impacted by the corona virus pandemic. The same could be said for any number of eCommerce businesses that service local.

**November 15, 2021: Begin Employment with Yelp**

30. On Monday, November 15, 2021, I started my employment with Yelp in King County, Washington.

31. On Tuesday, November 16, 2021, I returned my sign-on bonus to Groupon. At no time did I ever refuse to pay back the bonus.

32. I herein aver that I have not taken any information or materials from Groupon, and that my new role renders my knowledge about Groupon's business unhelpful and generally irrelevant, particularly since (1) my role is in a completely new technical department, to which Groupon has no equivalent, and (2) due to the material differences to the business models between both companies. Any information or documents that I acquired from Groupon have been deleted from all devices.

33. To the best of my knowledge, Yelp's headquarters are in San Francisco, California. The team that I manage is distributed across Hamburg, Germany, and New York, USA, and is not in Illinois. My employment with Yelp is also remote, and I complete my work for Yelp in Grapeview, Washington.

34. As of the Court's Order granting Groupon's Temporary Restraining Order, Dkt. No. 11, I will refrain from working at Yelp until the TRO expires or is vacated.

35. Groupon is far more economically resilient to suffer any potential loss of market share given its annual revenue compared to my personal salary. Should the Court not vacate the TRO, I will be out of work. I also will be barred from using my decades of non-Groupon-related knowledge and experience to earn a living in the profession to which I have dedicated the last 25 years of my life.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Dated this 21st day November, 2021, at Grapeview, Washington.

Sung Shin (Nov 21, 2021 15:41 PST)
Sung Shin