IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GROUPON, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 21-cv-06082 ) |
| SUNG SHIN, | ) Honorable Judge Charles P. Kocoras ) ) |
| Defendant. | ) ) |

**PLAINTIFF GROUPON, INC.'S REPLY IN SUPPORT OF**
**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

In his Opposition to Groupon's Emergency Motion for Temporary Restraining Order ("Groupon's Motion"), Shin mischaracterizes Groupon's and Yelp's platforms. His assertions are belied by Yelp's own publicly filed documents and the words of Yelp's Chief Product Officer. Shin also minimizes his high-level and strategic role at Groupon, disregards the real issue at the heart of Groupon's misappropriation claim, and, once again, misquotes the law.

**I.    GROUPON AND YELP ARE DIRECT COMPETITORS.**

Groupon and Yelp compete as online "marketplaces." Both platforms facilitate consumer-merchant engagement to drive consumer spend. *See* Declaration of Simon Goodall, attached hereto as **Exhibit A,** ¶ 22. More specifically, Groupon and Yelp compete for the same merchants and clients to provide services that bolster consumer engagement and inform advertising practices through incremental customers and monetary spend through their similar marketplace platforms, regardless of the revenue model used by the companies. *Id.*, ¶ 24. Yelp and Groupon, in turn, compete for the same merchants' limited advertising dollars. *Id.*, ¶ 6. Contrary to Yelp's assertions, Groupon has expanded beyond its Deal business, started in 2008, and now provides merchants far more offerings, such as advertising strategies specifically developed by Shin, that are competitive with Yelp's offerings. (Patel Decl., ¶ 11); *Id.*, ¶ 19. Indeed, advertising is one

of Groupon's core strategic growth initiatives. *See* Declaration of Simon Goodall, attached as Exhibit A to Groupon's Response in Opposition to Motion to Dismiss, ¶ 16. Yelp's own 10-Q, filed this month, reflects this inherent competition:

> We [Yelp] generate substantially all of our revenue from advertising. If we fail to maintain and expand our base of advertisers, our revenue and our business will be harmed. In order to maintain and expand our advertiser base, we must convince existing and prospective advertisers alike that our advertising products offer them a material benefit and generate a competitive return relative to other alternatives.

Cmplt., Ex. E thereto; *compare with* Groupon Annual Repot 2020, https://annualreport.stocklight.com/NASDAQ/GRPN/20625796.pdf ("Our [Groupon's] Local category includes offerings from local and national merchants, and other revenue sources that are primarily generated through our relationships with local and national merchants, including advertising revenue.").

Further, Yelp's 10-Q and its Chief Product Officer's description of the Yelp Audiences platform, in particular, demonstrate, like Groupon, Yelp competes for merchants' advertising spend. *See* https://www.businesswire.com/news/home/20211116005328/en/Yelp-Announces-New-Ad-Products-to-Help-National-Advertisers-Connect-at-the-Local-Level (quoting Yelp's Chief Product Officer as stating "[w]ith each *new ad product* we roll out, we're further enabling national and multi-location advertisers to tell their story on Yelp")(emphasis added).

Industry publications similarly describe Yelp's platform as "the company that connects people with great local businesses." *See* Yelp Announces New Ad Products to Help National Advertisers Connect at the Local Level | Business Wire (stating that "Yelp provides a one-stop local platform for consumers to discover, connect and transact with local businesses of all sizes"). That is exactly what Groupon does. Investment advisors characterize Yelp and Groupon as "two of the best-known brands addressing the online local services market - both with high brand

awareness and a shared vision of *connecting consumers with local businesses*." Cmplt., Ex. H thereto (emphasis added).

Shin's roles at Groupon and Yelp overlap in the most material ways, notwithstanding Shin's different titles. Shin's title at Yelp and Yelp's organizational structure in which Shin will work and report are irrelevant. Shin operated in a "product development role" at Groupon, just as he will at Yelp. **Ex. A**, ¶ 11; (Resp., p. 4). Groupon's product (*i.e.*, the system facilitating the merchant-consumer connection) was central to and drove Shin's role at Groupon. **Ex. A**, ¶ 7. Shin collaborated with Groupon's Product team to implement and execute the strategies he derived from studying the Company's merchant-specific analyses and global financial metrics. *Id.*, ¶ 11.

As a Groupon Vice President, Shin operated cross-functionally; he did not work in a vacuum, and he was not siloed from the Company's other departments. *Id.*, ¶ 10. This aspect of his cross-functional role dealt primarily with how a transaction is consummated, how a merchant provides details of a product, and the tools and systems Groupon uses to drive consumer spend. *Id.*, ¶ 11. Shin was accountable for the delivery of the entire business, not just Groupon's business operations. *Id.,* ¶ 12. This included the technical aspects of implementing the strategies Shin specifically crafted on behalf of Groupon. *Id.* To do this, Shin collaborated with Groupon's Vice President of Engineering and directed the Product Team to work with the Engineering Team to implement the strategy Shin developed. *Id.*

Shin will lead advertising initiatives at Yelp directly competitive with those he led at Groupon, such as Yelp Audiences. *Id.,* ¶ 8; (Resp., p. 4). Tom Foran, Yelp's Senior Vice President and Head of Go-To-Sponsored Collections, explained Yelp Audiences as "enabl[ing] *advertisers* to create meaningful connections with local businesses and consumers." (emphasis

3

added). See https://www.businesswire.com/news/home/20211116005328/en/Yelp-Announces-New-Ad-Products-to-Help-National-Advertisers-Connect-at-the-Local-Level.

Advertising, and more specifically, driving impression extension strategies, serves as the foundation of Shin's role at Yelp. Shin himself acknowledged that Yelp Audiences "aligns with the data roadmap we [Groupon] built out." Cmplt., Ex. J thereto.

## II. THE NON-COMPETE IS REASONABLE AND ENFORCEABLE, AND SHIN'S EMPLOYMENT AT YELP CONSTITUTES A BREACH.

As Yelp's and Groupon's publicly filed documents make clear, Shin will have business accountabilities to outcomes and results, which mirrors his responsibilities during his employment with Groupon and will lead to certain breach of the Agreement. Yelp's *own* characterizations of its advertising platform and objectives, and its representations with respect to Shin's role at Yelp underscore that Shin's job at Yelp falls squarely within the prohibitions of the Agreement's narrowly tailored activity restraint and constitutes a breach of the Agreement. Cmplt., Ex. A, ¶ 13.

Shin's non-competition covenant also is reasonably tailored to protect Groupon's legitimate business interests. Shin mischaracterizes Groupon's protectible interests as *tangible* "documents, files . . . about Groupon." (Resp., p. 3). Groupon's legitimate business interest is the protection of its confidential and proprietary information and trade secrets and its goodwill and relationship with its merchants and customers. **Ex. A**, ¶¶ 13, 15. Shin disregards the real issue. The trade secrets and confidential information at issue are not contained on a single piece of paper or in a solitary spreadsheet. Rather, Groupon seeks to safeguard the *intangible* trove of merchant-specific data and metrics Shin regularly accessed, studied and relied upon to develop and implement Groupon's current and long-term advertising strategies. **Ex. A**, ¶ 15. Groupon's

4

advertising methodology is not proprietary. Rather, the data and metrics from which the methodology is derived is proprietary and what Groupon seeks to protect.

Shin acquired knowledge, solely by virtue of his employment with Groupon, of Groupon's historical and current advertising data, such as merchant-by-merchant analyses of advertising spend, return on spend, preferences, objectives, obstacles, successes and failures to craft advertising strategies. **Ex. A**, ¶ 15. Groupon provided Shin with its holistic financial and performance data to analyze the interplay of Groupon departments, such as the Engineering and Product departments, and to assess their impact on Groupon's advertising platform. *Id.*, ¶¶ 12, 15. These are recognized protectable interests. *See, e.g., Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*, 2013 WL 1446425, at *3 (N.D. Ill. Apr. 9, 2013) ("There is no question that protecting confidential operational and customer information is a legitimate, protectable business interest of an employer"). The synthesis of this information drove Shin's role at Groupon; he cannot now unlearn this sensitive and proprietary information.

Additionally, the Agreement is supported by sufficient consideration (as further discussed below), and the restrictions are narrowly tailored to safeguard Groupon's protectible interests. Contrary to Shin's contentions about the breadth of the activity restraint, Shin's non-compete applies only to positions with responsibilities similar to any position he held with Groupon during the twelve (12) months preceding his termination or in which he would have responsibility for and access to confidential information similar or relevant to that which he had access to during the twelve (12) months preceding his termination. Cmplt., Ex. A, ¶ 13. This is a limited and reasonable activity restraint.

### III. THE AGREEMENT IS VALID AND ENFORCEABLE UNDER WASHINGTON AND ILLINOIS LAW.

Once again, Shin misquotes the Washington non-compete statute and ignores that the Agreement satisfies each of the requisite elements under RCW 49.62.020. Shin's non-compete satisfies the salary threshold, satisfies the time limitation and satisfies the notice requirement. *See* RCW 49.62.020.

The Washington statute does not require application of Washington law or selection of a Washington venue. The statute is clear. It plainly states, "[a] *provision* in a noncompetition covenant . . . is void and unenforceable: (1) If the covenant requires the employee or independent contractor to adjudicate a noncompetition covenant outside of this state; *and* (2) To the extent it deprives the employee or independent contractor of the protections or benefits of this chapter." RCW 49.62.050. The Agreement in no way deprives Shin of the benefits or protections set forth in RCW 49.62.020.

Contrary to Shin's haphazard analysis, the Agreement is valid and enforceable under Illinois law. The non-compete is narrowly tailored to restrict only that activity which is reasonably necessary to protect Groupon's legitimate interests, as explained *supra*. The covenant's 18-month temporal restriction is also reasonable under Illinois law, *see My Favorite Muffin, Too, Inc. v. Maosheng Wu*, 2002 WL 826483 (N.D. Ill. Apr. 29, 2002) (upholding a restriction of two years). *See also* RCW 49.62.020(2) (finding temporal restrictions of eighteen months presumptively valid and enforceable under Washington law). The Agreement is also supported by adequate consideration. Shin cites to *Fifield* to argue the non-compete is unenforceable because Shin was not employed for two years. But Shin ignores that his Offer Letter specifically stated it was conditioned upon his execution of the Agreement and provided additional consideration in exchange for Shin's agreement and acceptance of the terms of the Agreement, such as a $275,000

6

salary, a sign-on bonus[1], eligibility for annual bonus (of which over $45,000 was paid to him in June 2021), RSUs valued at $700,000 and access to Groupon's trade secrets and confidential information. *See McInnis v. OAG Motorcycle Ventures, Inc.*, 35 N.E.3d 1076, 1084 (Ill. App. Ct. 2015) (highlighting additional incentives, such as a bonus, are adequate consideration for a restrictive covenant even in absence of two years of employment).

## IV. ACTUAL MISAPPROPRIATION IS NOT REQUIRED.

Shin's contention that he has not actually misappropriated any tangible document from Groupon is immaterial. The *threatened* misappropriation of Groupon's trade secrets is sufficient to establish a violation of the ITSA and DTSA. *See* 735 ILCS 1065/3(a); 18 U.S.C. § 1836(b)(3). The global and advertising-specific metrics Shin learned and relied upon to target merchants for advertising spend are valuable to competitors, namely Yelp, and fall squarely within the parameters of recognized "trade secrets." *See, e.g.*, *See Fire 'Em Up, Inc. v. Technocarb Equipment (2004) Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011) (among other things, combinations or compilations of materials necessary to create product or perform certain services; programs, methods, techniques and devices used to create product and render services; financial data, marketing plans and advertising strategies constitute trade secrets).

Groupon's data paints a portrait of Groupon's advertising clients (*i.e.*, the *same* merchants Yelp targets for advertising spend), and is comprised of their respective preferences, objectives, obstacles and advertising profitability. Shin cannot help but use and rely upon this information to perform his duties for Yelp. He can and necessarily will mold Yelp's advertising strategies by anticipating merchant objections and catering to their objectives, information derived solely by virtue of his Groupon employment, to achieve Yelp's goal of "generat[ing] a competitive return

---

[1] While Shin contends he repaid his sign-on bonus when Groupon commenced this litigation, to date, Groupon has not received such repayment.

relative to other alternatives." Cmplt., Ex. E. *See Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) (noting that under a theory of inevitable disclosure, plaintiff must merely show that the employee "cannot operate without inevitably disclosing the confidential information").

### V. GROUPON WILL SUFFER IRREPARABLE HARM ABSENT CONTINUATION OF THE TRO.

Shin's employment at Yelp undoes the competitive advantage Groupon derived from the years and significant resources it invested in learning and analyzing, among other things, merchant preferences, objectives and objections. First, Shin spent many months learning the intimate details of Groupon's advertising and revenue business, and used this confidential information to develop and help implement targeted advertising methods that connect consumers to merchants – the same merchants Yelp competes with for advertising spend. As the Vice President and general manager of Groupon's advertising business, Shin worked directly with and oversaw Groupon's Product Team in order to define business strategy and requirements. **Ex. A**, ¶ 12. In doing this, Shin developed Groupon's system that facilitates a merchant connecting with a customer. *Id.,* ¶ 6. He was accountable for the delivery of the entire business, not just Groupon's business operations. *Id.,* ¶ 12. This included the technical aspects of implementing the strategies Shin specifically crafted for Groupon. *Id.* To do this, Shin collaborated with Groupon's Vice President of Engineering and directed the Product Team to work with the Engineering Team to implement his multi-year strategies. *Id.* He will inevitably take these strategies to Yelp, resulting in irreparable harm to Groupon.

Second, Groupon allowed Shin to continue to work during his notice period because it needed him to effectively transition his work. Shin is a Vice President and the Global Head of Advertising. He is not a low-level employee who can resign effective immediately with little to

no consequences or residual effect on Groupon's workforce. Also, Shin did not participate in the sensitive weekly and monthly meetings during his notice period. Shin himself acknowledged he should not be a part of those meetings because he knew those meetings centered around Groupon's confidential and proprietary information. Expecting Shin to not steal trade secrets in the last two weeks of his employment has nothing to do with Groupon's legitimate concerns that he will use his expansive pre-notice knowledge base to unfairly compete at Yelp. Moreover, during the notice period, Groupon offered to continue to employ Shin and to provide him with his full base pay and incentive compensation while he searched for other employment that did not violate his post-employment obligations to Groupon. Cmplt., ¶ 3. It was not until the end of his notice period when Shin rejected Groupon's offers. The fact that Shin worked his notice period has no bearing on the irreparable harm Groupon will suffer absent continuation of the TRO.

## VI. GROUPON ATTEMPTED TO AVOID THIS LITIGATION.

Groupon made several, reasonable overtures to Shin to avoid this litigation. When Shin announced his resignation, Groupon offered Shin the opportunity to remain employed at Groupon with full benefits while he searched for employment that did not violate his post-employment obligations to Groupon. Cmplt., ¶ 1. At the end of his notice period, Shin refused these reasonable overtures. *Id.* On the evening of November 12, 2021 – Shin's last day at Groupon – Shin's counsel informed Groupon's counsel that Shin was not interested in discussing a resolution and would commence employment with Yelp on November 15, 2021. *See* Declaration of Kevin Cloutier, attached hereto as **Exhibit B**, ¶¶ 8-9. Groupon filed its motion for temporary restraining order that same evening, and waited for a judge assignment and hearing date. *Id.*, ¶ 10.

Groupon's counsel served Shin's counsel with the suite of filings on November 14, 2021, promptly after Shin's counsel confirmed in writing Shin would begin his employment at Yelp the

following day. *Id.* Groupon informed Shin's counsel prior to Shin's commencement of employment with Yelp that it had filed its Motion. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiff Groupon, Inc. respectfully requests this Court enter an Order: (i) extending this Court's Order granting Groupon's Motion for a Temporary Restraining Order in its entirety; (ii) prohibiting Shin from employment with Yelp pending adjudication of the merits of Groupon's claims; (iii) prohibiting Shin from using, referencing or misappropriating Groupon's trade secrets, proprietary and confidential information; (iv) prohibiting Shin from soliciting Groupon's customers or employees; (v) awarding Groupon attorneys' fees and costs incurred in bringing this motion; and (vi) awarding any other relief this Court deems equitable and just.

Dated: November 22, 2021

Respectfully submitted,

GROUPON, INC.

By: */s/ Kevin M. Cloutier*
      One of Its Attorneys

Kevin M. Cloutier (6273805)
Shawn D. Fabian (6310637)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
Tel: (312) 499-6300
Fax: (312) 499-6301
kcloutier@sheppardmullin.com
sfabian@sheppardmullin.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 22, 2021, a copy of the foregoing was filed with the Court's CM/ECF system, which will serve all counsel of record.

                                       */s/ Kevin M. Cloutier*
                                       Kevin M. Cloutier