# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GROUPON, INC. ) | |
| ) | |
| Plaintiff, ) | Case No. 1:21-cv-06082 |
| ) | |
| v. ) | Honorable Judge Charles P. Kocoras |
| ) | |
| SUNG SHIN, ) | |
| ) | |
| Defendant. ) | |

### DECLARATION OF RAHUL HAMPOLE

I, Rahul Hampole, declare as follows:

1. Until recently, I was a Vice President of Product Management at Yelp. I resigned from my employment at Yelp effective December 1, 2021. I worked for Yelp for eight years, since December 2013. I have a Bachelor of Engineering degree, a Master of Science degree in computer science from the University of Southern California, and a Master of Business Administration degree in corporate strategy from the University of California at Los Angeles's Anderson School of Management. I make this declaration based on my personal knowledge.

2. So far as I know, I have no contractual or legal obligations to Yelp or to anyone else that would require me to submit a declaration or give testimony in connection with this lawsuit. I no longer work for Yelp in any capacity.

3. Rather, I submit this declaration because I think it is important that the Court understand the responsibilities Sung Shin will actually have if he is allowed to work at Yelp, as well as my own complete absence of experiences regarding Groupon while I had similar responsibilities at Yelp—quite simply, I cannot recall Groupon ever coming up in any competitive context whatsoever.

4. As Yelp's Vice President of Product Management, I had responsibilities over both Yelp's multiple-location product business and its advertising business. On the product side, my main responsibilities were to lead a portfolio of products offered to our customers with multiple

locations; for example, enterprises and other big brands. I also managed a group of Yelp's product leaders and product managers, which included helping them with execution efficiency when launching new products; in other words, I made sure that Yelp's product management team was working well with its engineering team. On the advertising side, I was in charge of the delivery of the advertising budget (i.e., the price that an advertiser pays when a user clicks or sees an ad) to our customers across all businesses: small, medium, and large.

5. At the time I left Yelp, I reported to Vivek Patel, our Chief Product Officer.

6. While working at Yelp, I—along with Mr. Patel—was closely involved in the interview process for my replacement. As we started the interview process, Yelp made the decision to divide the multiple-location and advertising functions of my job, so that we would be hiring, for the first time, a Vice President of Product Management, Multi-Loc, who would not have responsibility for the advertising function.

7. When an executive leaves Yelp, it is a good opportunity to reassess the team's roles and responsibilities based on business need. For example, my predecessor, Bill Heil, had been in charge of multiple-location, local (i.e., products for small businesses), and advertising. When he departed Yelp, I inherited multiple-location and advertising, but not local.

8. We communicated Yelp's decision to separate out the multiple-location and advertising components of the Vice President of Product role to candidates as part of the interview process, because we wanted to set appropriate expectations with candidates as to what they would be responsible for if Yelp hired them as its new Vice President of Product Management, Multi-Loc: specifically, the multi-location responsibilities I describe in paragraph 4. The candidate was not to inherit any of my advertising responsibilities. The responsibilities belong solely to Josh Braverman, a Director of Product at Yelp.

9. Although I interviewed dozens of candidates during the months it took to fill the role of Vice President of Product Management, Multi-Loc, I did not actually interview Mr. Shin. However, I thought he was a suitable candidate for the role based on his resume: the seven-plus years he had spent at Amazon, and the three years he spent as a Vice President of Product

Management at Resonate Networks in particular. His seven months at Groupon was not relevant to my own analysis, other than to understand why he was considering leaving after a comparatively short stint at the company.

10. During the candidate evaluation process, it never occurred to me to ask if Mr. Shin had a non-compete agreement with Groupon because Groupon and Yelp do not compete. There is certainly no meaningful competition between the two companies in either the multiple-location or advertising components of my old job as Vice President, Product Management.

11. For example, I witnessed Yelp execute a Google Vault search of all of my emails for the 18 months prior to Mr. Shin's expected start date (i.e. from May 15, 2020 to November 15, 2021) for the term "Groupon". (Google Vault is an information governance and eDiscovery tool, which allows for searching of emails, Google Docs, Presentations, and other documents. I understand that the results of this search were provided to Groupon last week as part of this lawsuit.) Based on the results of the Google Vault search, I did not mention Groupon even a single time in an email in connection with my job duties and responsibilities. Based on the search, the first time and only time I sent emails mentioning Groupon was because of Mr. Shin's candidacy for the Vice President of Product Management, Multi-Loc position. I witnessed the same search of my documents on Google Drive for "Groupon" over the same time period. That search yielded no results at all.

12. These results corroborate my own recollection. To the best of my memory, I have not had a single communication with anyone during my time as a Vice President, Product Management relating to any supposed competition between Yelp and Groupon at all, let alone in the multiple-location space.

13. These results are also consistent with Yelp's independent research. Yelp, like any other website that offers advertising, is interested in knowing who its customers consider Yelp's competitors to be. While I worked at Yelp, we commissioned a Multi-Location Survey that took place over three months, from December 2020-February 2021. The primary objective of the research was to provide a baseline understanding of how our customers view the multiple-location

segment and how they perceive Yelp and its products in a competitive context. A company called Lieberman Research Worldwide (https://lrwonline.com/) administered the survey, in part to ensure impartiality. Our customers did not identify Groupon as a perceived competitor to Yelp; they did identify companies like Google and Microsoft Search (Bing). I understand that the results of this survey have been provided to Groupon as part of this lawsuit.

14. One of the products that I helped bring to market while I worked at Yelp is called Yelp Audiences. Yelp Audiences is one of Yelp's implementations of off-platform advertising. It allows some of the bigger brands that Yelp works with to reach an audience "off-platform"—meaning off of Yelp—based on their search activity on Yelp. For example, let's say you are a Yelp user who turns to Yelp to find a well-reviewed dog groomer. Through Yelp Audiences, a brand like BarkBox—a monthly subscription service for dog products—can reach you off of Yelp based on your search for pet-services on Yelp.

15. Off-platform advertising is an extremely common method of advertising on the internet. If you have a Facebook account, or have purchased something on Amazon, or have searched for a product on Google—just to name a few—you have probably experienced off-platform advertising.

16. I understand, from having read the November 22, 2021 Declaration of Simon Goodall (Dkt. No. 25-1 at ¶ 8), that Groupon contends that Yelp Audiences is an "impression extension strategy and plan." I am not certain what Groupon means by "impression extension" in this context, but Yelp Audiences is neither a "strategy" nor a "plan." Yelp Audiences is a product that Yelp spent years developing. That development work is entirely complete and Yelp Audiences was released to the market several months ago. *See, e.g.*, https://blog.yelp.com/news/yelp-svp-and-head-of-gtm-national-discusses-yelp-audiences/; https://blog.yelp.com/news/yelp-svp-and-head-of-gtm-national-discusses-yelp-audiences/. To the extent that Groupon is developing its own off-platform advertising product right now, there would be nothing as part of that development that would be of any value to Yelp because Yelp has already launched its product, before it had any discussions with Mr. Shin.

-5-

17. In sum, I do not believe that any knowledge of Groupon that Mr. Shin may have in his head would be helpful in the performance of his job responsibilities as Yelp's Vice President, Product Management, Multi-Loc. My belief is informed by my own performance of those same job responsibilities while I was at Yelp, the fact that the advertising component of my job responsibilities was assigned to Josh Braverman (and was never intended for Mr. Shin), the dearth of discussions I had about Groupon in the 18 months preceding Mr. Shin's hiring, and my familiarity with Yelp's enterprise and multiple-location advertisers, who never raised Groupon as a competitor when Yelp surveyed them in the December 2020-February 2021 time period.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 13, 2021 in Oakland, California.

Rahul Hampole