## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GROUPON, INC.                          )
                                    )
          Plaintiff,         )
                                    )
          v.                 )          21 C 6082
                                    )
SUNG SHIN,                             )
                                    )
          Defendant.         )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Plaintiff Groupon, Inc.'s Motion for Preliminary Injunction and Motion to Strike Defense Exhibit No. 34. For the following reasons, the Court grants the Motion for Preliminary Injunction and denies the Motion to Strike.

## BACKGROUND

Sung Shin, the Defendant in this case, signed an employment agreement, the Confidentiality, Intellectual Property and Restrictive Covenants Agreement (the "CIPRA"), with the Plaintiff, Groupon, Inc. ("Groupon") on February 25, 2021. His salary was set at $275,000 per year, along with a bonus plan of up to $110,000 per year. Mr. Shin also received a signing bonus of $100,000 in return for, among other things, agreeing not to compete with Groupon for a period of 18 months should he leave its employ. He was also required to pay back the signing bonus if he left Groupon before two years. Part of the employment agreement Mr. Shin accepted was that any dispute

that may arise between himself and Groupon would be resolved under Illinois law and in Illinois-based courts. Groupon's domicile was in Illinois, while Mr. Shin's domicile was in the State of Washington.

In addition to the described contractual terms, Mr. Shin was the beneficiary of a stock purchase plan which, when fairly measured, would boost his earnings to almost $1 million while at Groupon. Around the time of his hire, Groupon paid an employment agency about $58,000 for its services in the Shin hiring.

Mr. Shin's tenure at Groupon lasted about seven months. He was hired by Yelp at an annual salary of $355,000, along with the option of purchasing stock in the company, and a signing bonus of $150,000. In his testimony Mr. Shin offered three reasons why he left Groupon. The reasons had to do with differences of opinion with other management personnel, the sharing of customer information with third parties (privacy matters), and the apparent initial belief that Groupon was a small company but with large resources. Not mentioned in his testimony was the enhanced financial benefit to him by jumping ship from Groupon after only seven months of service there.

Groupon commenced this action seeking damages and injunctive relief for Mr. Shin's purported breach of the CIPRA; violation of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*; and violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.* The Court granted Groupon's motion for a temporary restraining order on November 16, 2021. Groupon now moves for a

preliminary injunction to enjoin Shin from violating his contractual obligations to Groupon and from misappropriating Groupon's trade secret information.

Groupon alleged in its Motion for Preliminary Injunction that Mr. Shin's employment with Yelp violates his contractual obligation to refrain from working at Yelp because it is a competitor in the field in which Groupon operates, that Mr. Shin was entrusted with a host of confidential information and trade secrets while employed at Groupon, and that information has been and will be used while employed at Yelp. An evidentiary hearing on the motion for preliminary injunction was held by videoconference on December 14, 2021. The Court heard testimony from Claudine Kourkoumelis, Groupon's Chief People Officer; Simon Goodall, Groupon's Chief Revenue Officer; Vivek Patel, Yelp's Chief Product Officer; and Mr. Shin.[1] The parties then submitted written closing arguments.

## LEGAL STANDARD

To obtain a preliminary injunction, Groupon must show "(1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). To meet this standard, Groupon must show that "its claim has some likelihood of success on the merits, not merely a 'better than negligible' chance." *Id.* at 822 (cleaned up). If Groupon makes such a showing, "the court

---

[1] Mr. Shin also submitted as an exhibit the expert declaration of Uptal M. Dholakia (Def. Ex. 34). Groupon moved to strike the exhibit (Dkt. # 39). The Court denies the motion to strike. The Court considered the expert declarations submitted by both parties.

proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.* at 818. This approach involves a sliding scale: "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id.*

## DISCUSSION

As a threshold matter, the Court must first determine whether to apply Illinois or Washington law. As the law of the forum state, Illinois law governs this analysis. *Amakua Dev. LLC v. Warner*, 411 F. Supp. 2d 941, 948 (N.D. Ill. 2006). Under Illinois law, a choice of law provision will be given effect unless: "(1) the chosen state has 'no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice,' or (2) its application 'would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue.'" *Old Republic Ins. Co. v. Ace Prop. & Cas. Ins. Co.*, 389 Ill. App. 3d 356, 363 (2009) (quoting Restatement (Second) of Conflict of Laws, § 187 (1971)).

Here, the CIPRA specifies that Illinois controls and neither of the two exceptions apply. First, Illinois has a substantial relationship to the parties. Groupon is headquartered in Illinois; its management and nerve center are in Illinois; the majority of Mr. Shin's direct reports (i.e., subordinates) were located in Illinois; and Simon Goodall, Groupon's Chief Revenue Officer and Mr. Shin's direct supervisor, is based

4

in Illinois. Furthermore, the trade secrets at issue were generated by Groupon primarily in Illinois.

Second, Mr. Shin's argument that application of Illinois law contravenes Washington public policy is unpersuasive. Mr. Shin first argues the CIPRA is void under Revised Code of Washington Section 49.62.020. Under this section, a noncompete clause is void unless: (1) the noncompete was disclosed prior to beginning employment or independent consideration was given if the noncompete was disclosed after beginning employment; (2) the employee earns more than $100,000; or (3) the employee is terminated as the result of a layoff. Wash. Rev. Code § 49.62.020. Additionally, a noncompete clause is presumed void if its duration exceeds 18 months. *Id.* Here, though, the facts show there can be no dispute the CIPRA is valid under this section. Mr. Shin was given—and signed—the CIPRA prior to beginning his employment, he earned substantially more than $100,000, he was not terminated as the result of a layoff, and the noncompete clause lasts exactly 18 months.

Next, Mr. Shin argues the CIPRA is void under Section 49.62.050, which states:

A provision in a noncompetition covenant signed by an employee or independent contractor who is Washington-based is void and unenforceable:

(1) If the covenant requires the employee or independent contractor to adjudicate a noncompetition covenant outside of this state; *and*

(2) To the extent it deprives the employee or independent contractor of the protections or benefits of this chapter.

5

Wash. Rev. Code § 49.62.050 (emphasis added). Mr. Shin posits it is only necessary for a noncompete covenant to be adjudicated outside Washington for this section to apply, but such a reading would violate the Washington legislature's clear intent. It is a basic tenet of statutory construction that use of "and" is a conjunctive, not a disjunctive as Shin argues. *See Ski Acres, Inc. v. Kittitas Cnty.*, 827 P.2d 1000, 1003 (Wash. 1992) ("The statute contains an 'and', not an 'or'. We thus read the 'and' as simply being an 'and'. The Legislature would have used the word 'or' if it had intended to convey a disjunctive meaning."); *Ahten v. Barnes*, 242 P.3d 35, 40 n.5 (Wash. Ct. App. 2010) ("'And' conveys a conjunctive meaning, otherwise the legislature would have used 'or' if it meant to convey a disjunctive meaning."). Thus, the CIPRA must be adjudicated outside Washington *and* deprive Mr. Shin of the benefits and protections of Washington law for Section 49.62.050 to apply.

Here, while the CIPRA is being adjudicated outside Washington, Mr. Shin is not being denied of any benefits or protections of Washington law because Illinois law and Washington law are substantially similar in the determination of the reasonableness of a noncompete agreement. *See Cambridge Eng'g, Inc. v. Mercury Partners 90 BI*, 378 Ill. App. 3d 437, 447 (1st Dist. 2007) (stating general considerations for determining the validity and reasonableness of a noncompete agreement under Illinois law); *Emerick v. Cardiac Study Ctr., Inc, P.S.*, 357 P.3d 696, 701 (Wash. Ct. App. 2015) (noting three-part test for determining the reasonability of a noncompete agreement under Washington law). Therefore, the choice of law provision does not violate Washington

public policy; and Illinois law applies to the claims. With that issue settled, the Court turns to the requirements for the issuance of a preliminary injunction.

## I. Likelihood of Success on the Merits

Groupon brings three claims against Mr. Shin: breach of contract, and two claims of misappropriation of trade secrets under the ITSA and DTSA. To succeed on its breach of contract claim, Groupon must show: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resultant injury to the plaintiff. *Pepper Const. Co. v. Palmolive Tower Condos., LLC*, 2016 IL App (1st) 142754, ¶ 85. A noncompete agreement is valid if it is reasonable and necessary to protect the legitimate business interests of the employer. *Cambridge Eng'g*, 378 Ill. App. 3d at 447. "Relevant considerations include the hardship caused to the employee, the effect upon the general public, and the scope of the restrictions. This requires the courts to consider the propriety of the limitations in terms of their length in time, their territorial scope, and the activities that they restrict." *Id.*

Here, as the Court previously found, the CIPRA is reasonable and enforceable. The CIPRA prevents Mr. Shin from working in a position similar to his role at Groupon with any competitors of Groupon for 18 months. The CIPRA also prevents Mr. Shin from disclosing any proprietary information learned during his employment to any third parties. And, as discussed further below, Mr. Shin should have no problem finding a job that does not infringe on the CIPRA. Thus, under standard limitations of time and

7

geography generally used by courts in assessing such restrictions, Groupon's limitations are manifestly reasonable. *See Cambridge Eng'g*, 378 Ill. App. 3d at 448–52. So, Mr. Shin may be in breach of the CIPRA if Yelp is a competitor of Groupon and his position at Yelp is similar to his position at Groupon.

To succeed on its trade secrets claims, Groupon must show: (1) the existence of a trade secret and (2) actual or threatened misappropriation of the trade secret. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995) (ITSA); *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020) (DTSA). As discussed in more detail below, the record here clearly establishes the existence of protectable trade secrets, such as proprietary information about Groupon's advertising strategy, which Mr. Shin may use at Yelp, whether intentionally or unintentionally. *See PepsiCo*, 54 F.3d at 1270. In order to determine whether disclosure of such trade secrets may occur under the circumstances presented here, the Court considers: "(i) the level of competition between the former employer and the new employer; (ii) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (iii) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *20 (N.D. Ill. 1996).

The remaining issue for each of Groupon's claims is Mr. Shin's principal argument that Groupon and Yelp are not competitors and that any information that he was entrusted with at Groupon was not or could not be helpful in his employment at

8

Yelp. His testimony at the Court's hearing on the Motion was quite firm and explicit that *nothing* he learned at Groupon was of any use whatsoever, and that the two companies did not compete. To put it directly, that testimony was absurd. Both the evidence presented at the hearing and the use of reason and common sense belie the truth of Mr. Shin's testimony on those issues.

As a matter of fact, one exhibit received in evidence is responsive to both contentions by Mr. Shin. A Yelp internal email circulated among its own sales team plainly shows Yelp attempting to poach and divert a Groupon customer and its $1 million advertising spend to Yelp with the proclamation, "the opportunity here is large!" *See* Pl. Ex. 2.

The evidence establishes clearly and unequivocally that both companies seek to pair merchants with consumers. They are after the same dollars in the same or similar marketplace, even though the principal means each employs have a different emphasis. Groupon frequently relies on promotions and coupons offered by merchants to generate sales and revenues, while Yelp mainly relies on reviews of merchants to induce purchasers of products.

As Mr. Goodall testified, Yelp and Groupon regularly have sales employees calling on the very same merchants for advertising services. Both connect merchants to consumers so they can discover service offerings in the same local and enterprise verticals (food and beverage, things to do, beauty and wellness, home and automotive). Mr. Goodall explained that the two companies may have different "hooks," but they

9

compete for the very same merchant spend. In fact, in slides created by Mr. Shin and his team at Groupon, he admits Yelp is a competitor of Groupon. *See* Pl. Ex. 15, p. 4.

Although not a perfect analogy, consider the modern-day automobile industry. There is fierce competition in the car market between the traditional internal combustion engine cars and electric cars. Their features and components are distinctly and profoundly different, but the automotive manufacturers are competing for the same consumer dollar.

In addition to those seismic differences, the marketing of cars and trucks is also experiencing a different form of competition for that consumer dollar. The existence of the traditional car dealership, licensed by the manufacturer but independently owned, now has to compete with electric car and truck manufacturers selling directly to the consumer instead of licensed dealers. It cannot be denied that the form of the sales efforts and the methods employed are changing, even as competition for the purchasing dollar remains the same.

Changes and improvements to products is a never-ending pursuit, but the desire for maintenance and increases in revenue are constant in commercial life. As can be seen from Plaintiff's Exhibit 2, the desire to obtain a new and desirable customer is not deterred by emphasis on methods employed.

Mr. Shin's position at Yelp is also substantially similar to his position at Groupon. Vivek Patel, Yelp's Chief Product Officer and Mr. Shin's direct supervisor, testified Mr. Shin's position involved cross-functionality and required collaboration

with the sales, finance, product, and engineering teams; Mr. Goodall testified the same about Mr. Shin's role at Groupon. Mr. Patel and Mr. Goodall also testified that Mr. Shin's roles required Mr. Shin to, for example, bring products to market, determine the efficacy of advertising initiatives, and expand audience reach.

Furthermore, Mr. Shin's Yelp job description described his position as "own[ing] the consumer experiences that connect consumers to enterprise brands as well as the business interfaces and measurement tools that brands leverage to purchase and learn the impact of their advertising spend." Pl. Ex. 9. Mr. Goodall testified this was also Mr. Shin's role at Groupon. The evidence thus establishes that Mr. Shin's positions are, at least for the most part, nearly identical.

Mr. Shin's testimony that he learned nothing of use while at Groupon is equally bereft of probative value. Common sense and the experiences of work life, particularly here, put the lie to the claim. The end game at Groupon was no different than that at Yelp. Mr. Shin was hired at Groupon to develop growth initiatives, i.e., to increase producers paid advertisers. He was viewed as a star hire by Mr. Goodall. Mr. Shin was put in charge of over thirty people who reported to him in a cross-functional operation. Included in the disciplines represented were operations, advertising, sales, merchandising, and other topical issues.

In leading the group, Mr. Shin performed well. He had to delve into a number of disciplines and functions. This exposure to the inner workings of Groupon was not open to most personnel and was not publicly available. At the Weekly Business

11

Reviews ("WBRs"), Mr. Shin was exposed to a trove of confidential data and trade secrets. Plaintiff's Exhibit 30 was composed of 181 slides, key business metrics of varying kinds.

All kinds of trade secret information was contained in the slides, including margins, road maps, and research. As Mr. Goodall testified, one cannot know all of the material exposed to, recognizing that it took thousands of hours to put together and build on. He conceded that some of the information gets stale but stated other matters remain stable. Of significance, Mr. Goodall testified that one learns what works and what doesn't; what you learn of importance stays with you intrinsically even though you may not remember specific numbers and would have to rely on slides for precision. *See PepsiCo*, 1996 WL 3965, at *19 ("it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well intentioned the effort may be to do so"). Indeed, courts have recognized that "once a person has knowledge of a competitors [*sic*] business information, when they are called upon to act on behalf of his own company, his ability to compartmentalize the knowledge of his competitor's [information] is 'nigh impossible.'" *Id.*

Thus, Mr. Shin's testimony that he learned nothing of value while at Groupon is unworthy of belief. Learning is an ongoing process. It is for certain we do not retain all we have learned, perhaps not even most things. But to urge the proposition that one uses nothing that was learned a few months or weeks earlier, particularly when the

evidence supports the conclusion that the functions performed for Yelp were similar to those rendered at Groupon, is simply not believable.

Furthermore, Mr. Shin's testimony is also directly refuted by an email he sent (while still working at Groupon) to Cole Sanders at Yelp, explicitly citing Groupon's proprietary "internal data" and Groupon's merchants' historic advertising trends. *See* Pl. Ex. 11 ("If I were to write justification, I would cite some internal research my team did on our merchant customers in a survey before launching Sponsored Listings that could be material to the conversation . . . .").

Mr. Shin also asks the Court to believe that his computer that belonged to Groupon was wiped clean because of the use of FedEx in its surrender to Groupon. The more compelling conclusion to be drawn is the inference that he wanted to conceal data and information he found useful to his new duties at Yelp.

At bottom, Groupon has shown that Mr. Shin left Groupon for a substantially similar position with a competitor, and the disclosure of the trade secrets Mr. Shin learned at Groupon is inevitable—indeed he has already shown a propensity to disclose such information. *See* Pl. Ex. 11. Therefore, the Court determines Groupon has shown a strong likelihood of success on the merits of its breach of contract and misappropriation of trade secrets claims.

## II.    Irreparable Harm and Inadequacy of Legal Remedy

Even with a showing of a strong likelihood of success on the merits of its case, Groupon must also demonstrate that irreparable harm is "likely" if the Court denies its

motion for preliminary injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Harm is irreparable if legal remedies are inadequate to cure it. *Foodcomm Int'l v. Berry*, 328 F.3d 300, 304 (7th Cir. 2003). Inadequate "does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Id.*

Disclosure of an employer's trade secret and confidential information can constitute irreparable harm. *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 715 (N.D. Ill. 2009). Such harm cannot generally be easily quantified; and therefore, if disclosure is likely, the employer lacks an adequate remedy at law. *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006). "Similarly, the loss of fair competition that results from the breach of a non-competition covenant may irreparably harm an employer." *Ram Prod. Co. v. Chauncey*, 967 F. Supp. 1071, 1086 (N.D. Ind. 1997) (citing *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361 (8th Cir. 1991)).

Groupon demonstrated Mr. Shin had access to its confidential and trade secret information, and disclosure of its confidential and/or trade secret information would put it at a serious competitive disadvantage. In the Court's view, it is not possible for Mr. Shin to do his job at Yelp without drawing on confidential knowledge he gained at Groupon. Additionally, as noted above, Mr. Shin himself demonstrated a willingness to disclose such knowledge. *See* Pl. Ex. 11. Without an injunction, Groupon stands to have the considerable time, expense, and resources it invested to grow its advertising

14

products undone. Monetary damages would be insufficient, as it would be almost impossible to calculate the extent of the harm.

### III. Balancing of Harms and Public Interest Considerations

At the next stage of its analysis, the Court weighs the harm of denying an injunction to Groupon against the harm to Mr. Shin of granting one. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 521 539 (7th Cir. 2021). This balancing test is done on a sliding scale: "If the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor." *Id*. (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). In balancing the harms, the Court also considers the public interest. *Id.*

Though a close call, the Court finds the balance of harms tips in favor of Groupon. On one hand, Groupon has a legitimate claim against the disclosure of trade secrets and confidential information. On the other hand, Mr. Shin has a legitimate right to pursue employment in his area of expertise and training. The Court is mindful a preliminary injunction will result in some hardship to Mr. Shin. Mr. Shin will be enjoined from working at his desired place of employment for a period of time and deprived of an opportunity for significant income. But, to his credit, Mr. Shin has demonstrated his actual and potential ability to two employers within the span of a few months. Upon learning of his intended departure, Groupon sweetened the pot of his remuneration and offered to increase his earnings if he would stay. Groupon also

offered Mr. Shin the option to stay employed with full pay and benefits while he searched for a non-competitive role. Mr. Shin declined.

As for his current employer, Yelp, its offer of employment came with an increase in both earnings and ownership opportunities as part of the inducement to leave. The ink was barely dry on Groupon's employment contract with Mr. Shin when he was targeted as a candidate worthy of solicitation for employment. So long as he honors his legal commitment to Groupon, we do not anticipate any difficulty on his part in getting employment.

With respect to public interest considerations, while the public has an interest in workplace mobility and free and fair competition, it has an equally compelling interest in upholding valid and reasonable contracts as well as honoring obligations for which individuals bargained for and derived significant benefits. The public interest also favors the protection of trade secret and confidential information gathered and developed by a company at significant expense. *La Calhene, Inc. v. Spolyar*, 938 F. Supp. 523, 531 (W.D. Wis. 1996).

The Court therefore concludes that any harm a preliminary injunction may cause to Mr. Shin is outweighed by the injury that a failure to impose the injunction may cause Groupon. The public will not be harmed by holding Mr. Shin to his word and the contractual obligations for which he bargained.

Based on all of the above considerations, the Court finds a preliminary injunction is warranted and thus grants Groupon's Motion.

16

### IV. Bond Requirement

Federal Rule of Civil Procedure 65(c) provides that "the court may issue a preliminary injunction . . . only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The appropriate amount of the bond is subject to the court's discretion." *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 910 (N.D. Ill. 2015). The Court finds a bond in the amount of $10,000 is appropriate.

### V. SCOPE OF THE INJUNCTION

Groupon's Motion for a Preliminary Injunction is granted on the following terms:

1. For a period of eighteen (18) months following the date of his termination from Groupon, Mr. Shin shall not work for Yelp in any capacity, directly or indirectly, as Mr. Shin will misappropriate and disclose and/or use Groupon's trade secrets to Yelp's benefit;

2. Mr. Shin must, at all times henceforth, maintain the confidentiality of all Proprietary Information, as defined in the CIPRA, and never disclose such Proprietary Information to Yelp and/or any of Yelp's employees, for any reason whatsoever; and

3. For a period of eighteen (18) months from the date of his termination from Groupon, Mr. Shin shall not, directly or indirectly, induce or attempt to

induce any merchant, customer, supplier, licensee, or business relation of Groupon to cease doing business with Groupon, or in any way interfere with the relationship between Groupon and any merchant, customer, supplier, licensee, or business relation of Groupon.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court denies Groupon's Motion to Strike [39] and grants Groupon's Motion for Preliminary Injunction [34, 35] in accordance with the terms set forth above.  Status hearing is set for 1/27/2022 at 11:00 a.m.   It is so ordered.

Dated: January 6, 2022

Charles P. Kocoras
United States District Judge